## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISON

| | | |
|---|---|---|
| JENNILYN SALINAS, MAURICE LYNNETTE, LINDSEY NGUYEN, DEANNA LORRAINE, J. CANN, "P.P.", "D.D.," "T.M.," "S.M.," AND "M.L." FOR THEMSELVES AND AS PUTATIVE CLASS REPRESENTATIVES, | § § § § § § § § | |
| Plaintiffs. | § | |
| v. | § § | CIVIL ACTION NO. 6:21-CV-162 |
| NANCY PELOSI, MITCH McCONNELL, CHUCK SCHUMER, MARK ZUCKERBERG, JOSEPH BIDEN, KAMALA HARRIS, BRAD RAFFENSPERGER, ALL MEMBERS OF THE 117TH U.S. CONGRESS, ALL 50 STATE GOVERNORS AND SECRETARIES OF STATE,[1] JACK DORSEY, MIKE PODHORZER, PETE SESSIONS, DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, DEMOCRATIC SENATE CAMPAIGN COMMITTEE, REPUBLICAN NATIONAL COMMITTEE, et al. | § § § § § § § § § § § § § § § § § | |
| Defendants. | § | JURY TRIAL REQUESTED |

### PLAINTIFFS' SECOND AMENDED[2] CLASS ACTION[3] COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF

---

[1] Members of Congress and the state government officials are named and served individually.

[2] Plaintiffs Original Complaint was never served but only the First Amended Complaint. Therefore, Plaintiffs file this Second Amended Complaint Class Action Complaint and Application for Injunctive Relief (hereinafter, the "Complaint") as a matter of course pursuant to Fed. R. Civ. P. 15(b) within 21 days after service of a motion under Rule 12.

[3] A motion for class certification is forthcoming following service of process on Defendants.

COME NOW, Jennilyn Salinas,[4] Maurice Lynnette, Lindsey Nguyen, Deanna Lorraine, J. Cann, "P.P.," "D.D.," "T.M.," "S.M.," and "M.L." (collectively, "Plaintiffs"), by and through their attorney, Paul M. Davis, for themselves and seeking certification as representatives of a class of parties who were similarly injured and are still being injured by the ongoing pattern of racketeering and conspiracy to deprive of civil rights described herein, respectfully represent the following to this Honorable Court:

## I.
## PARTIES

### A. Plaintiffs

1.    Jennilyn Salinas[5] is a resident of the state of Texas.

2.    Maurice Lynnette is a resident of the state of Florida.

3.    Lindsey Nguyen is a resident of the state of Washington.

4.    Deanna Lorraine is a resident of the state of Texas.

5.    J. Cann is a resident of the state of Texas.

6.    "P.P." is an individual who resides in the state of New York.  P.P. files under initials due to a reasonable concern for personal safety and property and that of family in retaliation for filing this lawsuit.

---

[4] Former Plaintiff Jeremy Bravo has decided he no longer wishes to pursue his claims in this lawsuit. Jennilyn Salinas replaces Jeremy Bravo as the first named Plaintiff and Plaintiffs request that the clerk re-titled this action in the Court's electronic docket as *Salinas v. Pelosi* and that Jeremy Bravo be removed from being a party to this case in the electronic docket.

[5] Plaintiffs request that Jennilyn Salinas replace Jeremy Bravo as the first named Plaintiff in this case and that Jeremy Bravo be removed from the docket.

7.    "D.D." is an individual who resides in the state of Texas.  D.D. files under initials due to a reasonable concern for personal safety and property and that of family in retaliation for filing this lawsuit.

8.    "T.M." is an individual who resides in the state of Texas.  T.M. files under initials due to a reasonable concern for personal safety and property and that of family in retaliation for filing this lawsuit.

9.    "S.M." is an individual who resides in the state of Texas.  S.M. files under initials due to a reasonable concern for personal safety and property and that of family in retaliation for filing this lawsuit.

10.    "M.L." is an individual who resides in the state of Texas.  M.L. files under initials due to a reasonable concern for personal safety and property and that of family in retaliation for filing this lawsuit.

**B. Defendants**

11.    Defendant, Nancy Pelosi is a resident of the state of California who is being sued in her individual capacity and who is the Speaker of the US House of Representatives who has been served with process at 1236 Longworth H.O.B. Washington, DC 20515.

12.    Defendant, Mitch McConnell is a resident of the state of Kentucky who is being sued in his individual capacity and who is a US Senator who has been served with process at 317 Russell Senate Office Building Washington D.C.

13.     Defendant, Chuck Schumer, is a resident of the state of New York who is being sued in his individual capacity and who is a US Senator who has been served with process at 322 Hart Senate Office Building Washington, D.C. 20510.

14.     Defendant, Mark Zuckerberg is a resident of the state of California and who is being sued in his individual capacity for his intentional torts performed in his individual capacity and in directing Chan Zuckerberg Initiative located at 314 Lytton Ave Palo Alto, Ca. 94301 and Facebook, located at 1 Hacker Way, Menlo Park, CA 94025, where he has been served with process.

15.     Defendant, Joseph Biden is being sued in his individual capacity and is a resident of the state of Delaware and has been served with process at 1600 Pennsylvania Avenue, Washington, DC 20500.

16.     Defendant, Kamala Harris is being sued in her individual capacity and is a resident of the state of California and has been with process at 3450 Massachusetts Ave. NW #1, Washington, DC 20392.

17.     Defendant, Brad Raffensperger, is a resident of the state of Georgia who is being sued in his individual capacity.  Mr. Raffensperger is Georgia Secretary of State and has been served with process at 214 State Capitol Atlanta, Georgia 30334.

18.     Defendant Pete Sessions is a resident of the state of Texas and is being sued in his individual capacity.  Mr. Sessions has been served with process at his Washington, D.C. office at 2204 Rayburn House Office Building, Washington, DC 20515.

19.     Defendant Mike Podhorzer is a resident of the District of Columbia who may be served with process at 733 15th Street NW, #1014, Washington, DC 20005 or wherever he may be found.

20.     Defendant Jack Dorsey is a resident of the state of California being sued in his individual capacity for intentional torts formed in his individual capacity and made in directing Twitter.  Mr. Dorsey is the CEO of Twitter and has been served with process at Twitter's corporate offices at 1355 Market St., Suite 900, San Francisco, CA 94103.

21.     Plaintiffs name, individually, as Defendants in their individual capacities all current members of the 117th Congress of the United States (the "Congressional Defendants"), including, as listed on **Exhibit 2**, all members of both the U.S. House of Representatives and the U.S. Senate who are individuals residing in the respective states they purport to represent and have been served with process or service has been attempted at their respective Washington D.C. at the address indicated on **Exhibit 2**.

22.     Plaintiffs additionally names as Defendants, individually and in their personal capacities all the state Governors and Secretaries of State listed on **Exhibit 2** attached hereto (the "State Defendants" or the "Functionary Defendants" or "state level defendants").  These individuals reside in the respective state listed above their names and have been served with process or service has been attempted at the addresses provide in **Exhibit 2**.

23. Defendant Democratic Congressional Campaign Committee is a District of Colombia corporation that may be served with process through their registered agent, CT Corporation System, 1999 Bryan St., Ste. 900 Dallas, TX 75201-3136.

24. Defendant Democratic Senatorial Campaign Committee is a District of Colombia corporation that may be served with process through their registered agent, CT Corporation System, 1999 Bryan St., Ste. 900 Dallas, TX 75201-3136.

25. Defendant Republican National Committee is an unincorporated political association that may be served with process at their offices located at 310 First St., S.E., Washington, D.C. 20003.

26. Defendant Democrat National Service Corp. dba Democratic National Committee is a District of Columbia Corporation that may be served with process at 430 South Capital St. SE, Washington, D.C. 20003 or wherever it may be found.

27. Defendant Facebook, Inc. is a corporation that may be served with process at 1 Hacker Way, Menlo Park, CA 94025 or wherever it may be found.

28. Defendant Twitter, Inc is a corporation that may be served with process at 1355 Market St., Suite 900, San Francisco, CA 94103 or wherever it may be found.

29. Defendant Shereen Ahmad is a resident of the state of Texas who may be served with process at 3339 Pine Needle Dr., Round Rock, TX 78681 or wherever she may be found.

30. Defendant Ruth Regerro Hughs is a Texas resident who may be served with process at 1700 Apricot Glen Dr., Austin, TX or wherever she may be found. Ruth Hughs recently resigned as Texas Secretary of State but is referenced herein in

any allegation mentioning the "Secretaries of State" or otherwise referring to "state level defendants" or "Functionary Defendants."

31.     Defendant Sapphire Strategies is a corporation that may be served with process at 614 S. Street Northwest, Washington, DC 20001 or wherever it may be found.

32.     Defendant Julia Ager is an individual who, upon information and belief is a resident of the District of Columbia and may be served with process at 614 S. Street Northwest, Washington, DC 20001 or wherever she may be found.

33.     Defendant Amber McReynolds is a resident of the state of Colorado who may be served with process at 140 S. Marion Pkwy, Denver, CO 80209 or wherever she may be found.

34.     Defendant National Vote at Home Institute is a corporation that may be served with process by its registered agent at 316 Mountain Ave. SW, Roanoke, VA 24016 or at PO Box 65752, Washington, DC 20035 or wherever it may be found.

35.     Defendant Center for Tech and Civic Life is a corporation that may be served with process at 233 N. Michigan Ave., Ste 1800, Chicago, IL 60601-5802.

36.     Defendant Robert Francis "Beto" O'Rourke is a Texas resident who may be served with process at 110 Los Angeles Dr., El Paso, Texas.

## II.
## JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.  Furthermore, where, as here, deprivations of constitutional rights are

alleged, including a conspiracy to deprive or failure to prevent or render aid regarding such deprivations, 28 U.S.C. § 1343 confers original subject matter jurisdiction on the federal district courts. The Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

38.     The Court has personal jurisdiction over all Defendants named herein pursuant to 18 U.S.C. § 1965, which provides for nationwide service of process, because one or more Defendants reside in the district and in the State of Texas and all Defendants have participated in the conduct of an enterprise through a pattern of racketeering activity and have minimum contacts with the United States. In a RICO case brought pursuant to § 1965, once personal jurisdiction is established against one defendant in the forum state, the relevant due process inquiry is whether the defendants have sufficient minimum contacts with the United States where the ends of justice require it. *Ima Jean Robinson Springs v. Sec. Fin. Corp. of Tex.*, SA-11-CA-797-OG, 2011 WL 13324311, at *14–15 (W.D. Tex. Nov. 21, 2011) (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994)).

39.     Venue is proper in this district because one or more of the Defendants resides in this district and the district has a substantial connection to the claim, since one or more of the Plaintiffs also reside in this district.

40.     All conditions precedent to this action have occurred.

## III.
## STATEMENT OF FACTS

### INTRODUCTION:

**This, the People's Lawsuit seeks to end the era of rule by wealthy elites and their corrupt two-party political cabal and to restore the form of representative government guaranteed by the U.S. Constitution.**

41.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein in this statement of facts.

42.    This lawsuit is unlike any other in history because it is the first time that a group of ordinary Americans has sued to win back their right to a constitutional republican form of government from the two racketeer-influenced and corrupt organizations known as the Democrat Party and the Republican Party.  Plaintiffs sue to reestablish the nation that was originally envisioned and framed by their forefathers, the revolutionaries who laid down their lives and everything they held dear to establish the first nation in world history that was a government of the people, by the people, and for the people, founded on the idea that all men are created equal.

43.    This lawsuit is about how both federal and state public officials acted together as Democrats and Republicans in a pattern of criminal racketeering and as part of a "well-funded cabal"[6] in conspiracy with various private persons, including persons in the news media, social media, and technology industry, high net worth individuals, and others, for the purpose of enriching themselves and monopolizing power over government in a scheme to willfully deprive the American People of their "most precious" and fundamental right: the right to the "Republican Form of Government" guaranteed by Article IV, Section 4 (the "Guarantee Clause") of the

---

[6] Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME (Feb. 4, 2021), p. 6, attached hereto at **Exhibit 1** and *available at* https://time.com/5936036/secret-2020-election-campaign.

Constitution of the United States and other fundamental civil rights including equal protection under the law and freedom of speech.

## A. The Supreme Court explains the guarantee to the people of "Republican Form of Government" in the Constitution.

44.    In an 1891 opinion affirming this most honorable and storied Western District of Texas, the Supreme Court concluded: "By the constitution, a republican form of government is guarantied[7] to every state in the Union, and ***the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration***, and pass their own laws in virtue of the legislative power reposed in representative bodies, ***whose legitimate acts may be said to be those of the people themselves***; but while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, ***as against the sudden impulses of mere majorities***."  *Duncan v. McCall*, 139 U.S. 449, 461 (1891) (emphasis added).

45.    It is truly ironic that the *Duncan* case originated in the Western District of Texas.   The Supreme Court's most robust explanation, in *Duncan*, of the Constitution's  Guarantee Clause, which reads, "The United States shall guarantee to every State in this Union a Republican Form of Government,"[8] captures the very essence of Plaintiffs' action before this Court.  At its core, Plaintiffs' cause of action is very simple: the acts of Defendants described herein have both the result *and* the aim

---

[7] An alternate, more archaic spelling of the word.
[8] U.S. CONST. art. IV, § 4.

of depriving Plaintiffs of their most fundamental right, the right to a republican form of government, which is government "deriving their just powers from the consent of the governed,"[9] a government "of the people, by the people, and for the people."[10] Plaintiffs' come before this Court because, as demonstrated herein, Defendants have stripped them of this most sacred of human rights and other fundamental rights.

46.     Considering that one of the most renown opinions to come out of the Western District of Texas was a minority voting rights case striking down the Texas poll tax, it is almost as if the Western District of Texas were destined to enter the relief requested in this lawsuit.  In *United States v. Texas*, the Court opined, "the right to vote"  is "our most precious right . . . the essence of a democratic society." *United States v. State of Tex.*, 252 F. Supp. 234, 250–51 (W.D. Tex.), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966).  By this complaint, Plaintiffs request that the Court preserve our "Republican Form of Government" and the "democratic society" on which it stands.

**B. "Sudden impulses of mere majorities."**

47.     The terms "democracy" and republic," are often used interchangeably. In fact, they are not interchangeable.  Black's Law Dictionary gives the following definition for *republic*:

> A system of government in which the people hold sovereign power and elect representatives who exercise that power.  • It contrasts on the one hand with a pure democracy, in which the people or community as an organized whole wield the sovereign power of government, and on the other with the rule of one person (such as

---

[9] The Declaration of Independence para. 2 (U.S. 1776).
[10] Abraham Lincoln, The Gettysburg Address para. 3 (Nov. 19, 1863).

a king or dictator) or of an elite group (such as an oligarchy, aristocracy, or junta).

REPUBLIC, Black's Law Dictionary (11th ed. 2019). The "pure democracy," described in this definition, inevitably results in the tyranny of "mere majorities" described by the Supreme Court in *Duncan*. *See* 139 U.S. at 461 ("limited by written constitutions . . . as against the sudden impulses of mere majorities"). Under a "democracy," even a razor thin 51% ideological majority can quickly descend into oppressive government persecution of the 49% minority. As we have seen throughout history, it is human nature to control and subjugate the "minority." This is why the framers of the Constitution created a "republic" with checks and balances to avoid a situation in which a mere 51% majority runs roughshod over the rights of the minority based on their "sudden impulses."

48.    Democrats currently hold a literal 51% majority[11] in the House of Representatives, a "50 plus one"[12] advantage in the Senate, and, having "won" a presidential Electoral College vote in which the "popular vote," as officially reported, came to 51.3% for Joe Biden,[13] hold the Executive Branch with razor-thin popular support. Despite appearing to take both Congress and the Presidency with a mere 51% "majority," the Democrats have already enacted dramatic and sweeping policy changes through "Executive Orders"[14] and stand ready to pass essentially *permanent*

---

[11] 222 out of 435 total seats is exactly 51%.
[12] With Kamala Harris, as "President of the Senate," acting as the tie-breaking vote.
[13] *2020 National Popular Vote Tracker*, THE COOK POLITICAL REPORT, *available at* https://cookpolitical.com/2020-national-popular-vote-tracker.
[14] *See* Temporary Restraining Order (Doc. 10-1 "Alternate Proposed TRO"), pp. 4–5.

changes to the laws of the United States through legislation, [15] which they may even force through via the "nuclear options" of eliminating Senate "guardrails" such as the "filibuster" and the "Byrd Rule."[16]

49. Certainly, such a situation is itself cause for alarm as it gives the distinct appearance that our Nation has reached the exact situation warned of in *Duncan* where a "mere majority" is poised to cram down their "sudden impulses" on the 49% "minority." However, as described below the current situation is actually infinitely worse than it appears.

## C. Molly Ball of TIME lays out how Defendants conspired to deprive Plaintiffs of their right to a "Republican Form of Government."

50. A conspiracy to deprive Americans of the republican form of government, a form of government that has existed (albeit to an ever-diminishing extent) since the Constitution of the United States went into effect in March of 1789, would obviously need to be well-funded, with many moving parts and actors in powerful places, and would need to be *secret*, since an overwhelming majority of Americans, presumably, still strongly believe in government "of the people, by the people, and for the people." Describing such a conspiracy to the Court is a monumentally difficult task in a time where any attempt to contravene the prevailing narrative in popular news media and on social media is immediately dismissed as a

---

[15] *See* Memorandum to Support Entry of Alternative Temporary Restraining Order (Doc. 10), ¶¶ 3–9 and footnotes.

[16] *See* Dave Hoppe, *Democrats Flirt with Destroying Another Senate Guardrail*, NATIONAL REVIEW (Feb. 15, 2021) *available at* https://www.msn.com/en-us/news/politics/democrats-flirt-with-destroying-another-senate-guardrail/ar-BB1dH5T7 (The "Byrd Rule," similar to the filibuster, "limits the ability of the majority to stuff extraneous legislative goodies into budget-related proposals and pass them with a simple-majority vote under that process.").

"conspiracy theory" and its progenitors labeled as "crackpots," which is, indeed, part of the strategy to "control the flow of information."

51.     Fortunately, in what is nothing short of a godsend to Plaintiffs, Molly Ball of TIME and other TIME reporters credited in Secret History,[17] did much of Plaintiffs' work for them in documenting Defendants' conspiracy.  In an article dated February 4, 2021, Ms. Ball conveniently, and in detailed fashion, laid out *The Secret History of the Shadow Campaign That Saved the 2020 Election* (the "Secret History").  *See* **Exhibit 1**.  In her Secret History, Ball describes the "conspiracy to save the 2020 election" as something its participants *want told*:

> That's why the participants want the secret history of the 2020 election told, even though it sounds like a paranoid fever dream— *a well-funded **cabal** of powerful people*, ranging across industries and ideologies, working together behind the scenes to influence perceptions, *change rules and laws*, steer media coverage and *control the flow of information*.  They were not rigging the election; they were fortifying it. And they believe the public needs to understand the system's fragility in order to ensure that democracy in America endures.

*Id.*, p. 6 (emphasis added).  Of course, Ball inserts the last sentence as a thinly-veiled attempt to whitewash Defendants' conspiracy as an effort "to ensure that democracy in America endures."   However, the goal of the "conspiracy," as described in the article's opening paragraphs, was "Trump's ouster."   *Id.* at p. 1.  To the Defendant conpsirators, democracy was "broken" only because it had resulted in the election of an outsider to their political cabal who wanted to "drain the swamp" and return power to the American people.  Thus, they had to remove the "orange man at all costs" and

---

[17] Secret History, p. 26 ("With reporting by Leslie Dickstein, Mariah Espada, and Simmone Shah")

anyone who stood with him because he threatened their monopoly on government and their access to the unending of wealth afforded by their political corruption.

**D. Secret History reveals how the 2020 Federal Election had little to do with the "will of the people."**

52.     This Lawsuit is about remedying Plaintiffs' constitutional rights to "choose their own officers for governmental administration"[18]—to elect their representatives to government.  Secret History gives a *shocking* detailed account about how the 2020 Federal Election had almost nothing to do with the "will of the people."[19]  Instead, it had everything to do with a political power play by a "well-funded cabal of powerful people" (the "Cabal").[20]

53.     The most nauseating aspect of Secret History is that Ms. Ball is actually bragging about the efforts of these shadowy members of the Cabal, acting behind the scenes to manipulate the election outcome, as *heroic*.  Ball, an obvious sycophant, if not an outright member, of the Cabal, casts the Cabal, which she further described as an "informal alliance between left-wing activists and business titans,"[21] as the protagonists of TIME's epic poem because, of course, they opposed the evil villain, Donald Trump.

54.     What is conspicuously missing from her account, however, is any apparent concern for the actual will of American voters.  Ball gives lip service to it, of course.  It would defeat the purpose of the Cabal to fully give away their con of the

---

[18] *Duncan*, 139 U.S. at 461.
[19] Secret History at p. 26.
[20] The term Cabal is intended at all times to be used to include Defendants named herein as well, all of whom were participants in the conspiracy described in Secret History.
[21] Secret History, p. 2.

American People.  But the Cabal's disdain for the will of American voters is belied throughout the article.  The "concern for democracy" is actually expressed as grave concern that voters would, in fact, do the *unthinkable* and cast a vote for Donald J. Trump.

### E. Secret History reveals, ironically, the "concern for democracy" was, in fact, a concern regarding for whom Americans would vote.

55.    Mike Podhorzer, whom Ball describes as "The Architect," allegedly orchestrated the entire conspiracy out of a concern that support for Donald Trump had cut into the Democrat's traditional grip on the voting bloc of "blue collar white voters" who comprise much of the membership in the well-known Democrat stronghold, the AFL-CIO labor union.  *Id.* at p. 7.  So, "[h]e began circulating weekly number-crunching memos to a small circle of allies and hosting strategy sessions in D.C."  According to Ball, everything apparently grew from there.  In other words, ***the entire original purpose*** of the Cabal was to make sure that traditional Democrat voters did not defect from the ranks to vote for the populist[22] candidate, Donald Trump.

56.    Secret History is written in language to give the appearance that the Cabal acted out of some grave concern for "democracy," when in fact it reveals the exact opposite.  The Cabal carried out their conspiracy out of fear that *people would actually vote for Donald Trump*.  This much is abundantly clear in several additional statements made throughout Secret History.   On page 15, Ball reports that

---

[22] *See, e.g.*, Noah Bierman, *Even if Trump loses, Trumpism may outlast him*, THE LOS ANGELES TIMES (Oct. 23, 2020) *available at https://www.latimes.com/politics/story/2020-10-23/even-if-trump-loses-trumpism-may-outlast-him*

Podhorzer, in organizing the Cabal, "was warning everyone he knew that polls were underestimating Trump's support."  On page 19, it describes the Democrat "despair" on election night that "Trump was running ahead of pre-election polling, winning Florida, Ohio, and Texas easily and keeping Michigan, Wisconsin and Pennsylvania too close to call."  However, Podhorzer, "was unperturbed" because the "surge" in Trump's support was exactly what he had planned for.  *Id.* at p. 19.  Apparently, the Cabal had already made sure the *fix was in* to thwart the will of anyone who voted in a way that "business titans" (specifically including those in the "U.S. Chamber of Commerce"), the "AFL-CIO," "left-wing activists," their allies in the news media, social media, and technology industries, and federal, state, and local level officials (all included in Secret History as members of the "Cabal") did not like.

### F. Similar tactics used to sink Bernie Sanders, the Democrat populist candidate.

57.     What is incredibly ironic, is that while TIME describes the Cabal as composed overwhelmingly of left-wing progressives, supporters of populist Democrat candidate, Bernie Sanders, may note similarities between Ball's description of the "shadow campaign" against Trump to the demise of the Sanders campaign.  Sanders held frontrunner status in the 2020 Democrat presidential primary until the eve of "Super Tuesday."  As The Guardian reports: "Sanders' ascent set off *panic* among [Democrat] party officials and leaders.  Swing-district Democrats warned Sanders would hurt their chances of re-election, while *members[23] of the Democrat National*

---

[23] According the corporate documents and by-laws, only leaders of this partisan entreprise can be "members of the Democrat National Committee."

*Committee plotted to stop him* if he arrived at the convention shy of the delegates need to win the nomination outright.[24]   According to The New York Times, "Interviews with dozens of Democratic Party officials, including 93 superdelegates, found overwhelming opposition to *handing* Mr. Sanders the nomination if he fell short of a majority of delegates."[25]   Party leaders were "willing to risk intraparty damage to stop his nomination at the national convention in July if they get the chance."[26]   In other words, just as in regard to Trump, the political establishment would do whatever it had to in order the thwart the will of the people in electing an establishment outsider.

58.     There is no question Sanders was the anti-establishment populist candidate from the left.  If his frontrunner status had continued, it would have set up a worst-nightmare scenario for the political establishment and "corporate elite" where, for the first time in modern American history, if ever, the presidential election would be a choice between TWO anti-establishment populist candidates.  Jennifer Epps-Addison, the president of the Center for Popular Democracy, which endorsed Sanders, stated: "We're taking on not only the corporate elite of this party but the billionaire class, the pharmaceutical industry, the prison industrial complex, Wall Street, the insurance companies."[27]

---

[24] Lauren Gambino, *How Bernie Sanders went from frontrunner to the last-chance saloon*, THE GUARDIAN (Mar. 15, 2020) *available at* https://www.theguardian.com/us-news/2020/mar/15/bernie-sanders-vermont-senator-socialist-democratic-party.
[25] Lisa Lerer and Reid J. Epstein, *Democratic Leaders Willing to Risk Party Damage to Stop Bernie Sanders*, The New York Times (Mar. 2, 2020) *available at* https://www.nytimes.com/2020/02/27/us/politics/democratic-superdelegates.html.
[26] *Id.*
[27] *Id.*

59.    The Washington Post, self-proclaimed sentinels against the death of "Democracy"[28] "in Darkness," described "striking" similarities between Trump supporters and Bernie supporters in an article entitled, *Trump and Sanders lead competing populist movements, reshaping American politics*: "Each is powered by a disdain for elites they perceive as having flourished while other Americans suffered, a rejection of the establishment and the figures who have controlled it, and a contempt for the institutions that over the decades have blunted, as they see it, the success of efforts like theirs."  Even a broken clock is right twice per day, and The Washington Post hit the nail on the head with this statement.

60.    It is this class of "populists" for which Plaintiffs now sue, those who are treated like cattle by this elite establishment.  The corrupt "two-party" political monopoly forces Americans to choose between the "lesser of two evils" candidates for President anointed by the "two-party" monopolistic Cabal every four years.  President Trump and Senator Sanders were anti-establishment candidates who won the hearts of common, everyday Americans, who then saw their chosen candidates destroyed by the Cabal.

61.    The Trump camp differs from the Bernie camp only in the *means* of resolving the same problem and the best man for the job.  There should be no disagreement between the two camps that Defendants *are* the problem and have caused severe injuries to the constitutional rights of Plaintiffs.  It is time for the

---

[28] Strangely, none of these publications ever seem to reference a "republic" as defined further above. It is always "democracy," which would seem to drive the very narrative that the tyranny of a 51% majority is exactly what the Constitution prescribes, when it clearly is not. Plaintiffs contend this is yet another willful tactic of Defendants.

corrupt two-party system to end and for the People to rule themselves once again, as intended by the founding fathers.

### G. "Securing the Vote."

62. To carry out their conspiracy to deprive Plaintiffs of their constitutional rights, Defendants altered the rules and procedures of the 2020 Federal Elections in all 50 states, and including Guam, Puerto Rico, and the District of Columbia (collectively, with the 50 States, the "Voting Districts") in a manner that severely and pervasively violated the election integrity safeguards enacted by Congress in the Help America Vote Act of 2002, as amended, 52 U.S.C. §§ 20901–21145 ("HAVA") and Section 301–302 of the Civil Rights Act of 1960, 52 U.S.C. §§ 20701–02 (the "1960 CRA") (collectively, HAVA and the 1960 CRA, the "Election Integrity Safeguards").

63. Secret History discusses this conspiracy to violate these Election Integrity Safeguards, starting on page 10 under the subheading "Securing the Vote." One particularly disturbing, yet telling paragraph in the article comes earlier where, after Ball discusses Podhorzer's attempts to expand his Cabal by finding "liberals who saw Trump as a dangerous dictator," she credits Podhorzer with concluding: "America's decentralized election system couldn't be rigged in one fell swoop. That presented an opportunity to shore it up." The attempt to "shore it up," however, was actually the scheme to violate the Election Integrity Safeguards described in greater detail below, primarily through the expansion of mail-in or absentee voting (collectively, "Mail-In Voting"). Secret History, pp. 10–12.

64.     Of course, the Cabal, composed in large part, of the Defendant Governors and Secretaries of State at the state level in this lawsuit, needed funding to violate the Election Integrity Safeguards, $400 million of which, they received from Congress in the CARES Act, $425 million of which they received in HAVA grants from Congress, and $350 million of which they received from Defendant Mark Zuckerberg's Chan Zuckerberg Initiative. *Id.* at p. 10.   Amber McReynolds's "National Vote at Home Institute, then provided the state and local level officials, including the Defendants who are secretaries of state, all the "technical advice" they needed to apply the funds, which was, in fact, advice on how to conduct the federal elections in violation of HAVA and the 1960 CRA. *Id.* at 10–11.  The Cabal enabled state and local officials to "bolster" mail-in voting in "37 states and D.C." *Id.* at 11. Despite lawsuits "brought by the Trump campaign to sow doubt about mail voting," the Cabal was able to achieve an incredible feat: "In the end, nearly half the electorate cast ballots by mail in 2020, practically a revolution of how people vote.  About a quarter voted early in person.  Only a quarter of voters cast their ballots the traditional way: in person on Election Day." *Id.* at 12.

What is fascinating about the intense focus on Mail-In Voting by the Cabal/Defendants, composed of a "constellation of operatives across the left", a "progressive movement" that also contained many "bipartisan" actors from the Republican side,[29] is that, prior to 2020, Mail-In Voting had been almost universally condemned in America as an inherently unsecure method of voting. *See, e.g.,* Liptak,

---

[29] *Id.* at 4, 7.

*Error and Fraud at Issue as Absentee Voting Rises*, NEW YORK TIMES (Oct. 6, 2012) ("[A]bsentee voting replaces the oversight that exists at polling places with something akin to an honor system."); *Marks v Stinson*, CIV. A. 93-6157, 1994 WL 146113, at *1 (E.D. Pa. Apr. 26, 1994) (finding supposedly prevailing candidate "conducted an illegal absentee ballot conspiracy and that the [election officials] covertly facilitated the scheme").

65.    In fact, former President Jimmy Carter and former Secretary of State, Jim Baker, released a bi-partisan report in 2005 entitled "Building Confidence in U.S. Elections," which made the following conclusions:

> Fraud occurs in several ways. Absentee ballots remain the largest source of potential voter fraud. A notorious recent case of absentee ballot fraud was Miami's mayoral election of 1998, and in that case, the judge declared the election fraudulent and called for a new election. Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted. Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail. States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots. States also should make sure that absentee ballots received by election officials before Election Day are kept secure until they are opened and counted.

REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, BUILDING CONFIDENCE IN U.S. ELECTIONS (2005), p. 46 (the "Carter-Baker Report"). Not surprisingly, but eerily in keeping with the apparent vast reach of the Cabal to "control the flow of information,"[30] the Carter-Baker Report has mysteriously disappeared from the

---

[30] *Id.* at p. 29.

website of American University's Center for Democracy and Election Management, which facilitated the Commission and was the internet home of the Report until recently.  This is evident by several internet searches for the document, leading to the link that is now defunct.[31]  For the utterly disingenuous Cabal, it seems that *actual* measures to enhance election integrity are part of the "disinformation" to be "controlled."  Notably, even The New York Times reported on the inherent insecurity risks of Mail-In Voting in 2012, and over 60% of European countries and many other developed countries around the world ban the practice, except for citizens living overseas.[32]  As detailed further below, Congress held hearings regarding the SAFE Act in which compelling evidence of the risks inherent in Mail-In Voting was presented.

## H. Defendants' Pattern of Racketeering.

### i.  Structure and Purpose of the Enterprises

66.    Defendant Democrat National Committee ("Enterprise A" or "DNC") is an enterprise as defined in 18 USC 1961(4) and ostensibly exists to promote, raise funds, and assist in the election of "progressive" persons for state and federal public office.

67.    Defendant Republican National Committee ("Enterprise B" or "RNC") is an association in fact enterprise as defined in 18 U.S.C. § 1961(4) and ostensibly

---

[31] Plaintiffs have, nonetheless, obtained a copy of the Report available for viewing.

[32] Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, THE NEW YORK TIMES, (Oct. 6, 2012), *available at* https://www.nytimes.com; Paul Bedard, *Developed countries 'ban' mail-in voting, US would be 'laughing stock':Report*, WASHINGTON EXAMINER (Aug. 5, 2020) *available at https://www.washingtonexaminer.com.*

exists to promote, raise funds, and assist in the election of "conservative" persons for state and federal public office.

68.     From 2014 through 2019 senior leaders of enterprise A and Enterprise B met in a series of meetings with the specific intent to form a third enterprise and series of schemes designed to commit acts of racketeering and fraud in the 2020 federal election and thereafter.

69.     This third enterprise shall be referred to herein as the "MDPE" enterprise and is an association-in-fact enterprise separate and unique from Enterprises A and B as it operates covertly, without direct interaction, identification or disclosure to the public.

70.     Defendants Blunt (Mo), Roberts (Ks), McConnell (Ky), Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), Alexander (Tn), Defendants Klouchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill), Feinstein (Ca), Pelosi (Ca) and Zuckerberg act as and shall be referred to hereinafter as "senior leaders" directing the MDPE racketeering engaged association-in-fact enterprise and the term "senior leaders" shall refer to these Defendants throughout and are also senior leaders of Enterprise A and Enterprise B depending on whether they represents themselves as "Democrats" or "Republicans" respectively.

71.     The MDPE enterprise does not overtly or truthfully raise monies through fundraising activities but functionally by acts of fraud "shaves" monies from

Enterprises A and B through collusive acts of fraud conducted by MDPE-engaged Defendants.

72.     The MDPE enterprise conducts operations other than predicate acts of racketeering focused on legitimate promotion of ideologies tied to the Enterprise Defendant's desire to install a socialist form of government.  This portion of the enterprise conducts legitimate mail and wire communications operations using print, video and audio media directly stating the "need" for more "compassionate" and "social justice" acts of government.  These statements ask persons receiving said communications to donate monies to fund and enable this agenda.  These actions of the MDPE enterprise are distinctly different from other operations as they do not promote a fraudulent scheme, use a fraudulent statement and are never tied to publication to the fraud schemes publication.On or about January 7th, 2016 senior leaders of Enterprise A and Enterprise B jointly agreed to engage in an association-in-fact enterprise MDPE with the intent to execute the conspirators many fraud and racketeering schemes under the ruse of "politics as usual" conduct.

73.     The common agreement and defined goal of senior leader defendants culminated into the "purpose" of Enterprise MDPE to 'get rid of the orange man (candidate and then president Donald J. Trump) at all cost" in order to accomplish the term goals of the conspirators.

74.     The senior leader Defendants' joint agreement was for the association-in-fact enterprise MDPE to operate a conspiracy to engage in acts of racketeering to accomplish the conspiracies term goals, which are as follows:

a. To establish and maintain a complete monopolistic control over all aspects of the United States federal government. And;

b. To obtain and maintain absolute control over all aspects of the "unlimited checkbook" (the US economy, the ability to tax American Citizens and to print unlimited amounts of currency) in order to expand the defendant's wealth, power and use monies illegally for bribes and coercive purposes. And;

c. To prohibit, delay, deny and refute the discovery of the Defendants' association-in-fact enterprise, it's frauds and to prohibit any investigation of the Defendants' unlawful conduct associated with the execution of the pattern of criminal racketeering acts and illegal schemes described herein.

75. The MDPE enterprise conspiracy operates in a manner:

a. To prohibit the rise of any threat to their monopolistic hold over all aspects of American society by jointly agreeing to:

i. Spend monies obtained by fraud, as part of the scheme, to irrationally increase the costs of campaigning for any federal office.

ii. Prohibit any person not associated with the association in fact enterprise scheme from mounting a viable challenge for any federal office.

      iii.   Bribe, extort and coerce 'state – level' persons, including but not limited to all Governors and Secretaries of State named herein as Defendants in their individual capacities, with political ambitions to "play-ball" under the threat of loss of support, defamation of character, and other threats to persons and members of family and in exchange for financial support in campaign for reelection or election to higher public office.

      iv.   Directly engage in the formation of organizations which prohibit any other person not associated with the defendant's conspiracy from engaging in a face-to-face equal debate with other 'offerings' presented to the American people in the election process. (example "the counsel on presidential debates")

b.  To prohibit any opposing view or ability to influence a lawful challenge or change to the defendant's national monopoly over all aspects of state and federal governmental offices.

c.  By acts of extortion/coercion to directly prohibit any member of law enforcement either from the state or federal level from investigating a third party compliant, or criminal complaint brought forth to law enforcement against any action of the association in fact enterprise. Methods of extortion/coercion include:

i.   Threat of loss of budget made to supervisors and directors of law enforcement agencies. [33]

ii.  Threat of loss of employment to members of law enforcement that take actions to open an investigation.[34]

iii. Threat of personal bodily injury to members of law enforcement that take any action to independently gather evidence.[35]

iv.  Acts of blackmail against witnesses and members of law enforcement who possess information regarding crimes committed by members of the conspiracy engaged in racketeering acts and other crimes on behalf of the association in fact enterprise.[36]

76.   The senior leaders of the association in fact enterprise MDPE agreed to engage in acts of fraud, extortion, defamation of character, coercion and other acts of criminal conduct in order to assure the success of the term goals of the conspirators.

---

[33] For specific example, in 2017 Defendant Pelosi directly stated to then AG Jeff Sessions, the "congress would not allow an investigation / fishing expedition" relating to Wayne County Michigan voting issues as alleged further below in this Complaint. Other MDPE-engaged Defendants within the House/Senate budget committees then brought forth statements regarding the need for Congressional oversight of Department of Justice budgets and use of funds used for "frivolous" election concerns while the nation was engaged in a war, "acts of gun violence were rampant on the streets of America" and "Racism" was on the rise in the United States.

[34] Whistleblower reports obtained through the public media and issued into the press in 2018 shows laws enforcement officials were threated and many resigned due to interference by "government officials" tied to the Wayne County, MI issues identified further below in this Complaint.

[35] In regard to the foregoing footnote, the same reports indicated the methods of conduct included physical threats to law enforcement after they resigned from government positions and attempted to conduct investigations in their private capacities into the Wayne County, MI issues identified below in this Complaint.

[36] Retired law enforcement officers conducting private investigations stated that their witnesses had been blackmailed to prohibit the discolosure of information and evidence for parties involved in the Wayne County election fraud with ties "high-ranking" federal government and/or political party officials.

77.    The senior leaders of the association in fact enterprise MDPE agreed jointly to utilize persons associated with or employed by Enterprise A and Enterprise B to conduct aspects of the conspiracy in order to create a "façade of legitimacy " as a "normal function of politics" in the operation of the MDPE enterprise's purpose and goals.

78.    The senior leaders of the association in fact enterprise MDPE jointly agreed should any member of the conspiracy be exposed in the conduct of the conspiracy or it's many complicated schemes that all members of the conspiracy would agree such conduct was to be considered "the normal function of government" when in fact such acts were and are "unlawful " as defined in state and federal law.

79.    The senior leaders of the conspiracy jointly agreed to engage in conduct that was inherently unlawful in nature, violated state and federal laws and planned to do so in a manner in which the courts would likely define such acts to be a "political thicket" as the courts had routinely refused to undertake cases in the past.  By such conduct the Defendants would be assured to successful meet all of their goals and objectives by effectively manipulating the operating systems of government, despite the inherent violations of law.

## ii. Predicate Acts of Racketeering

80.    In 2002 President Bush signed in to law the Help America Vote Act offering federal monies to assist in Federal elections pertaining to conduct of all federal ballots, with stated terms and processes pertaining to:

a.   registration of voters,

    b.   handing of ballots and registrations,

    c.   requirements to obtain Identification with registration of voters

    d.   requirement to obtain information pertaining to first time voting in a federal election.

    e.   Records retention

    f.   Verification of machine accuracy

    g.   And setting standards for machine accuracy and auditing standards

81.    In 1964 President Johnson signed into law the Civil Rights Act of 1964 which prohibited ballot box stuffing and mandated the retention of records and papers for 22 months pertaining to federal ballots, for all federal offices.

82.    From 2002 through 2020 and ongoing all fifty states have received monies from the federal government from the "Help America Vote Act" as stated by the Congressional Budget Office and affirmed by each state's secretary of state's publications for acceptance of federal monies.

83.    On June 16th, 2015 Donald J. Trump announces his candidacy for President as a Republican.

84.    Enterprise B is unable to reject Mr. Trump's candidacy and the senior leaders of the association-in-fact enterprise begin a direct campaign to discredit Mr. Trump as "unelectable".

85.    Senior leaders direct Enterprise A to engage in a fraudulent and nefarious effort to assure Mr. Trump would not obtain the office of President by assuring a "popular vote" count victory for conspiracy member Hillary Clinton.

86.     From June 2015 through November 2016 Enterprise A engaged in broad acts of ballot box stuffing nationwide with a focus on Pennsylvania.

87.     From 2015 through late 2016 Conspiracy operative Micheal "Ozzie" Myers engaged in acts of conspiracy and bribery on behalf of the association in fact enterprise bribing Domenick J. Demuro, election judge for the 39th Ward, 36th Division.

88.     Mr. Myers bribed Mr. Demuro to add votes for persons in primary and federal elections to assure a mathematical outcome desired by the Association in fact enterprise.  Mr. Myers was Charged under federal indictment on July 23rd, 2020.

89.     During the 2016 election, the conspiracy also funded "ballot box stuffing" initiatives in Michigan, Ohio, New Jersey, Florida, California, Texas, and Arizona. These initial methods included fraudulent unofficial ballots, registering non-residents, illegal immigrants, felons, dead persons, and then accepted ballots from such unlawfully registered persons as expert witnesses testified to Congress in the SAFE Act hearings of 2019.

90.     On December 13th 2016 Wayne County Michigan Clerk Cathy Garrett issued a report stating "optical scanner at 248 of the city's 662 precincts, or 37%, tabulated more ballots than the number of voters tallied by workers in the poll books". Records show conspiracy candidate Clinton "won 10,704 more votes than Mr. Trump".

91.     Conspirators acting to prohibit the exposure of the association-in-fact enterprise's ballot box stuffing scheme to prohibit Donald J. Trump from obtaining the office of the President of the United States acted at the state level and barred a

recount of Wayne County Michigan Ballots misquoting a Michigan State law that allegedly prohibited the recount for "unbalanced precincts or ones with broken seals". This conduct was unlawful as the state was barred from such conduct under criteria set forth in the Help America Vote Act.

92.    Senior leader Defendants in 2016 engaged in acts of extortion and coercion by directing agents of the MDPE enterprise to threaten senior and junior members of the Department of Justice with termination, loss of benefits, criminal prosecution on false allegations, and other career-ending measures in the nature of the "you'll never work in this town again" threat to prohibit these members of law enforcement from conducting an investigation of the clearly apparent Wayne County Michigan ballot-box stuffing scheme despite requirement by law set forth in the Civil Rights Act of 1960 and 1964 which require federal investigation by the Attorney General into such matters.

93.    These senior leaders also engaged in acts of bribery to various members of the Department of Justice by offering promotion and other career incentives, including lucrative private sector employment positions in exchange for their agreements to "look the other way" and not conduct an investigation as required by federal law pursuant to the Civil Rights Acts of 1960 and 1964.

94.    Evidence shows the conspiracy's conduct of ballot box stuffing and other "elections crimes" to be rampant in the 2016 federal election including evidence showing persons being bussed in across state lines to illegally vote in the states of

Nevada, New Hampshire, Massachusetts, Pennsylvania and New York, all under the director of senior leaders to MDPE enterprise operatives down the chain of command.

95.     In early 2017 President Trump sent a directive to FCC Chair Ajit Pai requiring the agency to "protect first amendment speech" and directed the agency to review "Fairness Doctrine type" criteria applied to social media companies.

96.     Defendants Zuckerberg and Dorsey deemed Mr. Trump's "Fairness Doctrine" and Free speech protection initiatives to be a threat to their companies' profits and their own personal wealth generators.

97.     In response to Mr. Trump's FCC directive senior leader Defendants engaged in the pattern of racketeering began scouring the employee and volunteer base of Enterprises A and B seeking direct contacts with Defendant Zuckerberg and Dorsey.  Agents with contact history were found to be employed by Defendants DSCC and DCCC.

98.     On or about June 18th, 2017 Defendants Zuckerberg and Dorsey were contacted by agents working for Defendant DCCC under the auspices of "Fundraising" in order to set personal meetings to discuss "the Trump issue".

99.     Agents working for Defendants DSCC and DCCC presented a plan to agents of Defendant Zuckerberg and Dorsey in which Defendants Dorsey and Zuckerberg would engage in suppression of First Amendment-protected speech of persons objecting to any narrative presented by Defendants DSCC and DCCC to the companies owned or managed by Defendants Zuckerberg and Dorsey.

100.    Defendants DCCC and DSCC employees agreed to pay companies owned by Defendant's Zuckerberg and Dorsey higher than normal advertising fees in exchange for preferred treatment by the companies.

101.    On 05/14/2019 Defendant Lofgren introduced The Securing Federal Elections Act or "Safe Act" on the floor of the 116th Congress.  The Association fact enterprise Conspiracy's intent of the act's introduction was to obtain information from experts and witnesses on how to conduct a fraudulent ballot process.

102.    Defendants Raskin, Davis, Butterfield, Fudge, Aguilar, Van Drew, Kildee, McBath, Blunt-Rochester, Lawson and Cooper all "co-sponsored" the Safe Act and began to accept information directly from witnesses and experts as to the "vulnerability" of election outcomes to acts of mail in ballot fraud, electronic machine irregularities and how such conduct could be used to alter the outcome of all federal ballots.

103.    Experts testified before the House to multiple committees in which the senior leader Defendants were in attendance including:

   a.  The committee for House Administration (ending on 06/26/2019)

   b.  Committee on Science, Space, and Technology (ending on 06/26/2019)

104.    Experts testified to the following:

   a.  Mail in ballots were easily manipulated and directed how ballots could be and were manipulated;

   b.  The Help America Vote act requires states to ask verification of voting questions which the state's refuse to ask in violation of law;

c. The Help America Vote Act requires the collection of identification which the states failed to collect in both registration and first time use of mail in ballots;

d. The Election Assistance Commission's ("EAC") directives were in fact directly opposite of requirements of federal law;

e. Each of the fifty states had for more than 15 years accepted federal grants and were subject to these laws despite refusals to comply;

f. To various machine irregularities and failures of the 50 states to comply with audit procedures, machine testing protocols and the refusal to comply with federal records retention laws including those set forth in the 1964 civil rights acts;

g. As well as outlined HOW NOT TO CONDUCT THE 2020 FEDERAL BALLOT, advising not to allow mail-in ballots, advising a total hand count and requiring strict third-party monitoring of all acts in all precincts in all counties.

105.     Prior to presentation of the Safe Act to Congress on or about March 12th 2019, several Safe Act expert witnesses mailed reports, letters, and documents to their own state representatives who were members of the 116th Congress stating the collective expert witness concerns and the necessity each representative's engagement in congressional/federal action.  The experts stipulated such engagement was to assure the requirements to assure "the states" correction of known failures and to properly administer a federal ballot/election process in each state in

compliance with federal law due to each state's more than a decade acceptance of federal funds.

106.    On 06/27/2019 Defendants in the House of Representative passed the Safe Act to give the appear that election integrity is a priority when, in reality senior leader Pelosi and other leaders of the Democrats in the House knew that the MDPE senior leaders in the Senate would kill the Safe Act bill.  Their purpose was to obtain expert testimony on vulnerabilities in election integrity so that these senior leaders could then use the information and pass it on to their various operatives in each state to make sure these vulnerabilities were embedded and exploited in each state's federal elections. As described below, the senior leaders of the MDPE enterprise used bribery and extortion to coerce the state Governors and Secretaries of State, named herein as Defendants, to implement the vulnerabilities discovered through the Safe Act expert testimony into their respective state's election procedures.

107.    On 06/28/2019 Senate records indicate the Safe Act was read into the record twice and then referred to the Senate Committee of Rules and Administration.

108.    On or about 06/27/2019 Defendants Blunt (Mo), Roberts (Ks), McConnell (Ky) Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), and Alexander (Tn) acting as conspirators from Enterprise B, accessed information only available to Members of the Senate Committee of Rules and Administration, and accepted all evidence sent forth to the Senate by the Safe Act witnesses pertaining to past election frauds and necessity for compliance with federal law to ensure a "secure" 2020 federal election.

109.    On or about 06/27/2019 Defendants Klobuchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill), and Feinstein (Ca) acting as conspirators from Enterprise A, accessed information only available to Members of the Senate Committee of Rules and Administration, and accepted all evidence sent forth to the Senate by the Safe Act Witnesses pertaining to past election frauds and necessity force compliance with federal law to ensure a "secure" 2020 federal election.

110.    Senior leaders of the MDPE enterprise decided to "kill" the Safe Act in order to suppress the known lack of integrity and vulnerabilities in the process and administration of Federal Elections.

111.    The Safe Act as presented to Defendants Blunt (Mo), Roberts (Ks), McConnell (Ky), Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), Alexander (Tn), Defendants Klouchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill), and Feinstein (Ca) contained a "paper ballot requirement" (Sec. 102(a)(2)(i)) that required "the preservation as official record" an individual voter verified paper ballot for use of any recount or audit with respect to any election for Federal office in which the voting system is used." (Sec. 102(a)(2)(ii)) this requirement more clearly defined "what" item would be audited in a Federal Election and set forth a criterion for "voter verified" ballot.

112.    On or about February 2nd 2020, senior leader of the MDPE enterprise Defendant McConnell abused his powers of office prohibiting the implementation of

election security procedures mandated in the SAFE Act, as advocated by experts, by prohibiting the Act to be considered or processed for a vote.

113.    On or about February 5th 2020, senior leaders of the MDPE enterprise decided to utilize the Covid 19 virus as a reason to modify election processes to those recommended to be banned or corrected by Safe Act experts.

114.    Senior leaders of the MDPE enterprise knew mail-in ballots were highly predisposed to fraudulent submission.

115.    Senior leaders of the MDPE enterprise had direct and specific knowledge each state failed to properly conduct the necessary processes to assure a proper mail in registration or ballot process as required in the Help America Vote Act of 2002.

116.    Senior leaders of the MDPE enterprise had direct and specific knowledge ALL states had accepted federal monies and were required to comply with all of the processes and application of standards criteria outlined in the Help America Vote Act of 2002 and knew NONE of the states were in compliance or had the ability to comply in the 2020 Federal Election for all offices.

117.    Senior leaders of the Conspiracy then began to personally, individually and through their offices present a false narrative that "COVID-19" presented a "unprecedented need" to make changes to the 2020 Federal Elections and that mail-in voting would be safe and secure when they in fact knew differently.  This fraud scheme designed to defraud the American public by engaging in record level ballot

box stuffing and fund raising methods through false statements is known as the "unprecedented" scheme.

118.    On or about February 7th 2020 Defendants Biden and Harris began to make public statements on wires, on TV, and through the mails, many of which were sent to, or heard by Texas residents in support and execution of the "unprecedented" event scheme to present the COVID-19 false narrative to the American people, including Texans.

119.    In Early 2018 Employees of DSCC and DCCC acting under the direction of senior conspiracy leaders formed a new company named Sapphire Strategies to act as a conduit for fraudulent narratives, content and statements made across stateliness in order to engage in wire and mail fraud conduct.

120.    Sapphire Strategies was founded by Julia Ager who acted as Chief Digital Officer for Defendant DCCC.  Ms. Ager acting for Defendant DCCC claims to have raised over $110 Million and is the self-appointed architect of Enterprise A's 2018 mid-term election win.

121.    Shereen Ahmad, a Texas native and Texas resident, acted as Defendant DCCC's Committee's Senior Digital Strategist.  Ms. Ahmad acted jointly with the MDPE enterprise to expand fraudulent narratives and talking points delivered in social media with the goal to engage in wire fraud and other criminal schemes.  Ms. Ahmad's conduct began on or about October 2017 and continued until March 18 2021. Ms. Ahmad acted not only as a conspirator but as a senior strategist and primary facilitator of all false narrative used by the MDPE Enterprise nationally

122.   On or about March 15th 2018, Ms Ahmad accepted employment with Sapphire Strategies acting for Defendant DCCC claiming to reach "American voters an unprecedented 800 million times" in the execution of fraudulent statements placed into the mail and wires with the intent to fraudulently induce persons, including Texans, to donate money to both Enterprise A and Enterprise B, which money was transferred to the MDPE Enterprise.

123.   After the testimony of Safe Act experts, Defendants Pelosi, Schumer, and other senior leaders of the MDPE enterprise on the US Senate Rules and Admissions committee delivered the information obtained from the expert testimony to Ms. Ahmad using agents of the DSCC.  On or about December 1, 2019, Ms. Ahmad began crafting a series of false statements and narratives to be utilized by all MDPE participants and in all acts of the MDPE enterprise's fraudulent fund raising campaigns.

124.   Ms. Ahmad based this series of fraudulent statements upon the false "Russian collusion" narrative, which Ms. Ahmad and the senior leaders of the MDPE enterprise knew to be false.  These fraudulent statements were then later released to other MDPE participant Defendants as listed in **Exhibit 3**[37] who then expanded the messages into the public spectrum with the intent to defraud Plaintiffs and other

---

[37] **Exhibit 3** is a chart that sets forth all of the specific predicate acts of each Defendant with regard to promoting the Russia Collusion Narrative and/or the COVID-19 Narrative for the purpose of soliciting campaign donations or otherwise promoting each narrative as a participant in the MDPE enterprise.  The labels for the Columns indicate which specific part of the Fraudulent Narrative was promoted by each Defendant by reference to the allegations in paragraphs 124 a - d and 125 a – b as indicated by an "x."  **Exhibit 3** also indicates the approximate time frame the statements were made and locations.  Plaintiffs incorporates the chart in **Exhibit 3** as factual allegations as though fully set forth herein.

40

Americans for money donations.    These fraudulent statements, which shall be referred to as the "Russia Collusion Narrative" were as follows:

     a.  *"The Russian Government got Trump Elected."*  This statement is boldly fraudulent in tone, context and content, when in fact the Russian government took no official part in the 2016 United States Election and there was no tangible or credible evidence to support such a salacious statement.

     b.  *"Agents working for the Russian Government got Trump Elected."*  This statement is boldly fraudulent as no evidence has ever been submitted nor an investigation concluded which found any "agent" acting under the employment or direction of the Russian Government who took any act to substantially change the 2016 federal election to the benefit of Mr. Trump.

     c.  *"Trump colluded with Russia in order to get elected."*  This statement is boldly fraudulent in fact, substance and is devoid of method in which "Russia" could in fact deliver an election win for Mr. Trump.  Factually, there has never been any evidence presented nor a viable investigation that concluded Mr. Trump had ANY contact with the Russian Government, or an agent of the Russian Government seeking election assistance, or seeking a nefarious partner to engage in election rigging.

     d.  *"Trump sold US Secrets to Russia in order to get elected."*  This statement is so obviously fraudulent in context of the 2016 election the statement is laughable.  In 2016, at the time of the release of these fraudulent statements, Mr. Trump was an average US citizen who lacked any access to secret material.  Further, there has been no credible evidence

from any viable source that produced any document of an offer of secrets or a counter offer by any Russian Agent or Government official offering "the US presidency" as compensation for US State Secrets.

125.    Ms. Ahmad, as senior strategist, acted jointly with other MDPE participant Defendants on or about February 1st 2020 began to craft a series of fraudulent statements based upon a purposefully fraudulent "COVID 19 unprecedented event" narrative.   These fraudulent statements were then later released to other MDPE Defendants as listed in **Exhibit 3** who then expanded the messages into the public spectrum with the intent to defraud Plaintiffs and other Americans for money.    These fraudulent statements, which shall be referred to hereinafter as the "COVID-19 Narrative" (and collectively with the Russia Collusion Narrative shall be referred to as the "Fraudulent Narratives") were as follows:

a.    *"COVID-19" represented an "unprecedented event".*  This statement is directly false.  Factually, per capita, the 1918-1919 Spanish flu epidemic was more virulent in nature, causing more deaths after contraction of the illness and was much more aggressive in its infection. Clearly, a national epidemic was previously known and in that previous epidemic agent (Spanish flu) in fact killed more persons than COVID-19 did at the time of the release of the narrative.  Factually, COVID-19 was only unprecedented in the mind of the MDPE Defendants who sought a reason to engage in criminal conduct and not unprecedented in any other measure of the word.

b.    *"COVID-19" represented an "unprecedented event that required modification of election laws".*   This statement is objectively,

contextually and legally false in content and is devoid of historical fact and purposefully fraudulent, as it is obtuse.  Factually, the Spanish Flu epidemic of 2018-2019:

    i.   Infected more than 500 million people worldwide (From World Health Organization and Library of Congress)  within the first year of its introduction.  By comparison, COVID-19 has infected less than 174 million people (from World Health Organization) in the almost 2 years since its introduction.   COVID-19 was not unprecedented as a contagion, or in the rate of deaths/injuries caused therefore any statement alleging the event to be "unexampled" is fraudulent.

    ii.   Was first found in the United States in 2018 during an election year and spread rapidly and in duration included the 1920 presidential election. Neither the 1918 or 1920s US Government undertook any conduct or saw any rational reason to implement new election protocols.  COVID-19 was not unprecedented as a "unexampled" event previously unknown in election cycles. Any statement otherwise is fraudulent.

    iii.   The 1918 Government directed persons to wear masks, and closed schools, theaters and businesses but did NOT change election laws under executive fiat or legislative process. COVID-19 was not unprecedented as a "unexampled" event previously unknown necessitating changes to election laws. Any statement otherwise is fraudulent.

iv.  Historically speaking COVID-19 was not unprecedented as a event or methods previously used during the time of such an event, or in the rate of deaths / injuries caused therefore any statement alleging the event to be "unexampled" is fraudulent.

v.  Clearly COVID-19 under all aforementioned measures was not "unexampled" nor the method of lawfully conducting an election during a historic health emergency "unknown" by the law, or the government itself.   Clearly any narrative or statement misleading persons / plaintiffs otherwise is inherently fraudulent as well as contextually false.

126.  During the 2020 Federal Election cycle, Defendant Pelosi paid Sapphire Strategies a total of $5,255,470 for "branding and message delivery services" for dissemination of the Fraudulent Narratives, which she and the other senior leaders and other Defendants knew to be absolutely false.

127.  Through Sapphire Strategies Defendant Pelosi released the Fraudulent Narratives into social media outlets Facebook and Twitter, which the senior leaders and other Defendants knew to be absolutely false.

128.  Defendant Schumer coerced DSCC employee Devan Barber through the offer of third party employment and promotion to DSCC chief of staff position for his compliance with the scheme to provide DNC funding to Sapphire Strategies for execution of the fund raising schemes using the Fraudulent Narratives.  Defendant Schumer previously presented Employee Scott Fairchild, an employee of DSCC a

similar coercive offering to which Mr. Fairchild declined, but later conspired in narratives crafted by MDPE operatives.

129.   Defendant Pelosi through the use of false information and contrived threat designed to publicly humiliate and end the career of Persico extorted Sean Persico in order to obtain his assistance to influence DCCC employee Jackie Fort-McKay[38] and obtain her compliance to participate in MDPE enterprises money-laundering schemes, as described below.

130.   Fort-McKay's compliance was required in order to for the MDPE Defendants to obtain indirect control of DCCC financial resources required to divert fraudulently obtained monies to MDPE engaged defendants and enterprises.  Fort-McKay was responsible for managing the regulation of incoming monies from 'lawful' and 'unlawful' DCCC operations. Monies 'laundered' through the DCCC's financial relationships then went directly to MDPE engaged Defendants as payments for services rendered and to companies such as Sapphire Strategies for services rendered to the MDPE racketeering engaged enterprise.[39]

131.   MDPE-engaged Defendants who were Democrat candidates in the 2020 federal election, in accordance with senior leader Defendants Pelosi, Schiff, and Schumer's directives, paid Sapphire Solutions more than 18 Million Dollars for

---

[38] Persico coerced Fort-McKay into compliance by offering an overly-generous retirement package including employment with a private enterprise.

[39] By way of example, Kamala Harris's infamous "campaign trip" to Houston, Texas was a DNC and DCCC co-sponsored event. In said event, Ms. Harris directly stated the MDPE enterprise's COVID-19 Narrative and Russia Collusion Narrative.  Monies raised from these Fraudulent Narratives were collected by the DCCC and other associated PACs.  These monies were then diverted to MDPE-engaged Defendants and enterprises such as Sapphire Strategies, as described in greater detail further below in this Complaint.

"branding and strategic messaging services" to disseminate the Fraudulent Narratives.  These monies were provided to them via the DCCC/DSCC money laundering scheme was part of the verbal contract obligation between senior leaders, MDPE-engaged parties.

132.   Defendants DSCC and DCCC utilized the Fraudulent Narratives to raise money by 'branded' messages into social media, the mail, the wires, and on television through companies such as Sapphire Solutions across state lines in acts of wire and mail fraud with the proceeds of the fraud schemes being funneled into Political Action Committees (PACs), such as Julian for the Future and Pac to the Future.

133.   From 03-18-2019 to 11-18-2019 Julian for the Future paid Sapphire Strategies 2,766,565 in 33 payments for "services rendered" in connection to the Russia Collusion Narrative.  These monies were collected from events sponsored by DCCC and DSCC at which the Fraudulent Narratives were utilized to collect donations.

134.   On or about February 10th 2020 senior leader Defendants acting as part of the MDPE enterprise and it's connected conspiracies directed Defendants DSCC, DCCC, RNC, and other named defendants to engage in the "unprecedented" fraud scheme using the COVID-19 Narrative as engineered by Defendant Ahmad as an excuse to "make changes" to established election law and to avoid, negate, or obscure existing federal voting integrity and procedure laws.

135.    From 08-22-2019 to 12-04-2020 PAC for the Future paid Sapphire Strategies $4,008,351 for "message development and strategic services" tied to state-by-state directives to field operatives of the MDPE enterprise to spread the COVID-19 Narrative, and other statements engineered by Defendant Ahmad designed to cause fear, confusion and falsely promote the need for "alternative voting methods," when in fact, none were needed.   Ahmad was paid by monies obtained through communication of the Fraudulent Narratives through the wires, social media, the mail, and television.

136.    From 10-19-2020 to 11-06-2020 the Democratic Party of Wisconsin paid Sapphire Solutions six payments totaling $1,880,470 for "message development and strategic services" tied directly to use of the COVID-19 Narrative designed to cause fear and confusion as well as falsely promote the need for "alternative voting methods."

137.    Senior leaders, including Pelosi, acting through the DCCC in April of 2020 directed Sima Ladejevardian, a Democratic party candidate for Texas US congress district TX-02 to engage Sapphire Solutions and to engage in the above-described false narratives put forth by the DCCC and DSCC in mail and wire releases spreading the Fraudulent Narratives with the intent to defraud Texas voters of monies given in donation.

138.    From 05-15-2020 to 11-05-2020 Sima Ladejevardian paid Sapphire Strategies ten payments totaling $104,200 for "message development and strategic services" tied directly to use of the Fraudulent Narratives engineered by Defendant

Ahmad and designed to cause fear and confusion as well as falsely promote the need for "alternative voting methods."

139.    Agent of the Conspiracy Robert "Beto" O'Rourke actively promoted the Fraudulent Narratives and messages in Texas in several speaking events through the state of Texas as organized, financed and supported by Defendant DNC from December 12th 2019 through November 3rd of 2020.

140.    On December 17th 2019 Agent of the Conspiracy O'Rourke falsely stated then president Trump conspired with Russia to get elected in 2016 when no evidence showed such interaction and Safe Act experts had supported in Evidence a conspiracy to engage in election fraud by Enterprise A in Texas, Georgia, Wisconsin, Michigan, New York and Florida.

141.    On January 3rd 2020, Safe Act Expert witness R.B. directly emailed O'Rourke evidence provided to the Defendants previously in order to inform Mr. O'Rourke of his false statement made on December 17th 2019.

142.    Despite being noticed on January 3rd 2020, Agent for the Conspiracy O'Rourke acting under the direction and employment of Defendant DNC continued to propagate the Russia Collusion Narrative and other 'Trump related" fraudulent statements with said conduct continuing until after Nov. 3rd 2020.

143.    Mr. O'Rourke accepted Fraudulent Narratives talking points delivered by mail and wires across state lines at the direction of senior leaders, acting directly and through Defendants DSCC and DCCC which Mr. O'Rourke and the other Defendants knew to be fraudulent, as well as directly unsupported by fact with the

intention to defraud Texas citizens to induce them for monies in the form of campaign contributions.

144.   From November 2019 through November 3rd 2020, and thereafter, Defendant DNC directly and through agents, as well as PACs, engaged in wide ranging fraudulent fund raising activities in the state of Texas based upon the Fraudulent Narratives with the intent to defraud Texas citizens in order to unlawfully obtain monies used to perpetrate and expand the Russia Collusion. Narrative and COVID-19 Narrative.

145.   From November 2019 through November 3rd 2020, Democrat senatorial candidate MJ Hegar traveled across state lines into Texas along with employees of the DCCC, the DSCC, and the DNC to spread the messages of the Fraudulent Narratives through social media, over the wires, through the mail, and on television to raise money from donors to support the MDPE enterprise's racketeering pattern.

146.   Senior leaders of the MDPE enterprise directed employees of Defendant DNC to pay for the publication of the False Narratives and other fraudulent talking points over the wires on social media, through the mail, and on television in the state of Texas.  The Fraudulent Narratives were distributed by DNC subsidiary operation "Democratic Party of Texas" to agents of the MDPE enterprise engaged directly by knowledge and freewill or by threats of career ending extortion (removal of funding support; support of the party; "you'll never work in this town again") and acts of coercive promises of advancement, more funding availability and promises of private sector employment should the person fail to achieve a election victory.  All candidates

of Enterprise B were to spread the fraudulent statements of Defendant DNC in order to illegally obtain monies and promote the "unprecedented" voting fraud scheme.

147.    Senior Defendants Pelosi, Schumer, and Schiff directed Defendant DNC to use fraudulently obtained monies collected at DNC events using the fraudulent Covid-19 Narrative and Russia Collusion Narrative to send monies to the the Democratic Party of Texas ("DPT").    Then, operatives engaged in the MDPE conspiracy such as MJ Hegar, acting under the direct supervision of Defendants Pelosi and Schumer extorted and/or otherwise coerced leaders of DPT into distributing preprinted false narratives using DPT logos and letter head to Texas residents and MDPE-engaged Defendants in the state of Texas in order to perpetrate the MDPE fraud schemes in Texas. Operatives such as MJ Hager threatened leaders with the loss of monies, funds, and loss of "party" support in future operations should they fail to comply with the directives of the senior leader Defendants.

148.    Senior leaders of the MDPE directed employees of Defendant DNC and Defendant RNC jointly and collusively to spread the Fraudulent Narratives and other fraudulent statements nationwide through the wires, on social media, in the mail, and on television through commercials and talking points for the media and other fraudulent statements in order to unlawfully obtain monies during the 2020 federal election cycle from donors, including Plaintiffs.

149.    Senior leaders of the MDPE directed employees of Defendant DNC and Defendant RNC's in fraudulent fund-raising scheme using the talking points of the "unprecedented" voting fraud scheme focused to increase the costs of media coverage,

printing costs, and other associated costs necessary to present a rational opposing argument to the false narratives and fraudulent statements made by the Conspirators.

150.    Defendants Zuckerberg and Dorsey enacted new policies and procedures at companies under their control, including Facebook and Twitter to brand any opposing view to the Fraudulent Narratives and other frauds of the senior leaders and participants of the MDPE enterprise as "false", "untrue" and "conspiracy theory."

151.    Defendant Zuckerberg and Dorsey unilaterally violated and effectively revoked protected First Amendment speech by any person that expressed an opposing view to those of Defendants Zuckerberg and Dorsey or those set forth by the senior leaders and participants in the MDPE enterprise's conspiracy in which Defendants Zuckerberg and Dorsey had joined and agreed to support for financial gain.

152.    All Defendants who held office in the 116th Congress from any state had specific knowledge of the requirements of Federal law for compliance with the Help America Vote act and did NOTHING to advise their local state officials, or make any public statements declaring the "states" waived their rights to modify local election procedures due to the acceptance of conditional federal monies tied to the Help America Vote Act of 2002.

153.    Senior leader Defendants Pelosi (Ca), Blunt (Mo), Roberts (Ks), McConnell (Ky), Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), Alexander (Tn), Defendants Klouchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill),

and Feinstein (Ca), as well as Defendants Biden and Harris had specific knowledge presented to them by expert witnesses as follows:

    a.   HAVA required states to use funds from HAVA to comply with all aspects of Title III of the act.

    b.   HAVA required the use of funds to be consistent with other laws including the retention of all records and papers pursuant to the Civil Rights Acts of 1960 and 1964.

    c.   HAVA required the collection of all passwords and items necessary to comply with laboratory accreditation as required in Section III of the Act.

    d.   HAVA required the states who seek grants to modify state law to comply with the Act prior to issuance of funds.

    e.   HAVA required each state in a uniform and nondiscriminatory manner, notify each voter:

        i.   If a voter has not previously voted by mail in a jurisdiction (that specific state) must present a form of identification when voting in person. And;

        ii.   If a voter is voting by mail, when submitting the ballot, must submit with the ballot a copy of a valid form of identification.

    f.   HAVA required of each state to produce a paper record with a audit capacity requisite of "ALL RECORDS and PAPERS" as required in the

Civil Rights act and NONE of the states complied with this requirement.

g.  HAVA required a single voter registry that none of the states linked to other states to prohibit ballot box stuffing by illegal voters "crossing state lines."

h.  HAVA required verification of voter registration in person or mail and none of the states met the registration requirements for mail-in voting or registration.

i.  HAVA required the states to "ASK" a voter at registration if they had voted in a federal election before and all of the state's forms and methods failed to meet this requirement.

j.  HAVA required the collection and retention of identification records with ballots for first time voters in person and by mail and none of the state's record collection or retention processes / policies complied with this mandate.

k.  The EAC's own form provided to each state, as well as, 'get out the vote" initiatives funded by the conspirators' enterprises or associates failed to meet HAVA requirements.

l.  HAVA required minimum requirements under section 304 and all modifications of local rules made by state level defendants acting in support of the "unprecedented" fraud scheme complied with these standards.

    m. HAVA required the Attorney General to bring legal action in all appropriate jurisdictions to enforce sections 301, 302, and 303 of the Act.

154. As the chief election officials of their respective states the Secretaries of State named as Defendants herein are responsible for conducting their state's elections according to the foregoing provisions of HAVA but, at the direction of the participants and senior leaders in the MDPE enterprise named herein and in exchange for benefits in support for future campaigns for public office and/or in the face of threats to expose damaging information about them publicly, did intentionally cause their respective state's election procedures to fail to conform to HAVA by entering into contracts or otherwise implementing procedures in violation of one or more of the foregoing provisions.

155. As the chief executives of their respective states, the Governors named as Defendants herein are responsible for ensuring their state's elections are conducted according to the foregoing provisions of HAVA but, at the direction of the participants and senior leaders in the MDPE enterprise named herein and in exchange for benefits in support for future campaigns for public office and/or in the face of threats to expose damaging information about them publicly, did intentionally cause their respective state's election procedures to fail to conform to HAVA by violating one or more of the foregoing provisions through executive orders or by agreeing to "look the other way."

156.   Senior leader Defendants Pelosi (Ca), Blunt (Mo), Roberts (Ks), McConnell (Ky), Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), Alexander (Tn), Defendants Klouchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill), and Feinstein (Ca) knew of federal civil rights laws that require "all papers and records" retention for audit but knowingly proceeded to falsely state the conduct of audits and elections were matters of "state government" and not that of the federal government.

157.   All Defendants further engaged in the pattern of racketeering by universally falsely labeling any allegations of election fraud to be a "Trump supporter fantasy" and "baseless conspiracy theory" when in fact the entire process as to all federal ballots was unlawful and inherently unsecure and susceptible to ballot-box stuffing scheme.

158.   Senior leader Defendants Pelosi (Ca), Blunt (Mo), Roberts (Ks), McConnell (Ky), Hyde-Smith (Ms), Fischer (Ne), Wicker (Ms), Capito (WV), Cruz (Tx), Shelby (Ala), Alexander (Tn), Defendants Klouchar (Mn), Schumer (NY), Udall (NM), Cortez-Masto (Nv), King (Me), Wicker (Ms), Leahy (Ma), Warner (Va), Durbin (Ill), and Feinstein (Ca), made sure the Department of Justice lacked the necessary financial resources to conduct a national investigation for failures of the states to comply with the Help America Vote Act by failing to provide necessary funding to offset the Defendants provided to the state level defendants which engaged in the "unprecedented" election fraud scheme.

159.    All of the state-level defendants named herein who held the positions of Governor and Secretary of State acting as chief election officials purposefully, as part of the MDPE enterprise, caused their individual states to enter into contracts with voting equipment manufacturers or vendors with the specific knowledge the equipment manufacturer or vendor would not provide all of the required passwords and other administrative keys required to obtain "all records and papers" as required in the Civil Rights Act of 1960 and 1964.

160.    All state-level defendants, including all Secretaries of State named herein, acting in participation in the MDPE enterprise, caused their respective individual states to violate records accumulation, retention, and auditing standards as stipulated in the Help America Vote Act of 2002 by failing to implement sufficient records retention standards/policies required to comply with the Act, and meet "all records and papers" retention standards as stipulated in the Civil Rights Act of 1960 and 1964.

161.    All of the state level Defendants including all Governors and Secretaries of State/chief election officials named herein participated in the MDPE enterprise by using fraudulent statements based around the "State Election Law Narrative."  The "State Election Law Narrative" is the false narrative that states have the absolute authority to regulate their own elections in any manner a state pleases to do.  The state Governors and Secretaries of state made false statements of this nature through the wires, on social media, in the mail, and through media talking points on television.

162.   The state Governors and Secretaries of State knew that their respective state was required to comply with HAVA by the receipt of grant money and with the records retention requirements of the federal Election Integrity Safegaurds pursuant to Article I, section 4 of the Constitution but falsely represented that the procedures they implemented were lawful and within their authority.  They all made these statements in exchange for bribes at the direction of the senior leaders of the MDPE enterprise which bribes were promises of future campaign support for reelection or higher office or lucrative private sector jobs and/or in the face of extortion by threats to expose publicly damaging information, whether the information was true or false.

163.   All of the state level Defendants who are Governors or Secretaries of State participated the MDPE pattern of racketeering by making false, fraudulent and misleading statements centered around the State Election Law Narrative while having specific knowledge their individual state knowingly accepted HAVA grant money which required compliance with HAVA.

164.   All of the state level Defendants who held elected positions of Governor, while acting in participation in the MDPE pattern of racketeering issued unlawful "state election law" modifications through executive orders or otherwise that resulted in unlawful changes to federal election processes and criteria within with the specific knowledge the individual state accepted HAVA grant money which required compliance with HAVA in their state's administration of the federal elections.

165.   In the spring of 2019, concerned citizens seeking to protect their civil rights brought forth evidence and information to the MDPE Defendants regarding

issues with election integrity and cybersecurity as well as enforcement requirements in the HAVA.[40]

166.    On July 17th 2019, the 116th House of Representatives forwarded to the Senate a "tax bill" that had no election protections or any component to protect the civil rights of American Citizens. Functionary defendants acting at the state level including the Governors and Secretaries of State as identified in **Exhibit 3** requested federal funds to implement the MDPE's ballot box stuffing scheme under the auspices of the fraudulent COVID-19 Narrative, engineered by Defendant Ahmad and directly funded using monies obtained by fraud by the MDPE racketeering enterprises fraud and money laundering operations. The resultant bill would be known as the "CARES Act."

167.    The Governors and Secretaries of State used the CARES Act monies to implement knowingly unsecure changes to the mail-in ballot processs in violation of the HAVA provisions described herein, including widespread use of unattended ballot boxes from which the MDPE-participating Defendants planned to execute the largest ballot box stuffing scheme in US History.  The Governors and Secretaries of State named herein as Defendant collectively sought $1.4 Billion in federal monies for this purpose.

168.    In response to the request from the Governors and Secretaries of State for $1.4 billion, the Congressional Defendants, acting willfully at the behest of the MDPE senior leaders, issued  $400 million dollars in federal monies through the

---

[40] Referencing the SAFE ACT and congressional record and other supporting documentation attached to the SAFE ACT.

CARES Act, with knowledge the monies would be used to illegally deprive the American people of their constitutional rights.

169.   In early 2020 using the State Election Law Narrative presented by the state Governors and Secretaries of State, private enterprises and organizations, including Defendant Center for Tech and Civic Life ("CTCL"), funded by Defendant Zuckerberg's Zuckerberg Chan Initiative sent their employees and agents to testify to Congress once again restating the MDPE's fraudulent Covid-19 Narrative seeking additional federal monies totaling $1.4 billion taxpayer dollars in order to execute the MDPE's nationwide ballot box stuffing schemes.

170.   In mid 2020, the Zuckerberg Chan Initiative, a foundation headed by Defendant Mark Zuckerberg, who had knowledge of the conspiring Defendants' fraudulent scheme,  chose to become a willful participant in the conspiracy by causing Zuckerberg Chan Initiative to contribute $350 million to the State Defendants and other officials at the state level for the purpose of depriving the American people of their civil rights through severe and pervasive violation of HAVA and the 1960 CRA.

171.   Zuckerberg Chan Initiative engaged the CTCL to facilitate the distribution of the $350 million from Defendant Zuckerberg.  The CTCL gave "COVID-19 response" grants of varying amounts to 2,500 in 49 states.  In exchange for the money, local election officials, operating under the direction and authority of their respective state's Secretary of State and Governor, agreed to conduct their elections according to conditions set by the CTCL, which included mail-in voting ballot and registration forms and instructions that violated HAVA.

172.    Evidence provided by Plaintiffs, obtained from public sources, including media and official records show all Functionary Defendants[41] at the state level implemented the MDPE enterprise's national ballot box stuffing scheme in accordance with the MDPE enterprises' fraudulent Covid-19 Narrative.   Records show ALL states used federal monies obtained using the fraudulent Covid-19 Narrative while some states also utilized monies obtained from the Zuckerberg Chan Initiative to fully execute the ballot box stuffing scheme.

173.    Senior level MDPE defendants and Beneficiary Defendants[42] within the 116th Congress allocated $400 million federal taxpayer dollars via the CARES Act using the fraudulent Covid-19 Narrative, with the express knowledge said monies were to be used to execute a national ballot-box stuffing scheme that would fail to comply with HAVA and the retention requirements of the 1960 CRA and 1964 Civil Rights Act.   Senior leader Defendants specifically knew and endorsed unlawful conduct of the Functionary Defendants at the state level who acting on behalf of the MDPE conspiracy would use federal monies to engage in acts to unlawfully change state election rules, procedures, and policies in ways that violated HAVA and violated the records retention requirements of the 1960 CRA.

**A. Violations of the 1960 Civil Rights Act.**

174.    As further described in **Exhibit 4**,[43] All 53 Voting Districts destroyed "paper" and "records" that is required to be retained as various papers came into

---

[41] As identified  and defined in **Exhibit 3**.

[42] As identified and defined in **Exhibit 3.**

[43] Exhibit 4 contains a chart of all the specific categories of violations of the 52 U.S.C. § 20701 and the records retention provisions of HAVA in each of the 50 states. The categories are listed as "FT1 –

possession of election officials, pursuant to the 1960 CRA.  The items destroyed were security envelopes which contained, marked on the face of the envelope a security barcode unique to each ballot inside.  Defendants issued unlawful procedures, policies and special waivers, which denied Plaintiffs of their constitutional rights intended to be protected through an available audit of the papers and records relating to the 2020 Federal Election.

175.   In addition to the foregoing violations of the 1960 CRA, postage marks are required to be retained as a record to match the security bar code on the envelope to the address of the ballot to ensure a proper audit trail.

176.   Functionary Defendants[44] and others acting under color of state law and as part of their conspiracy with the other Defendants, caused the execution and application of these unlawful policies and procedures that violated the 1960 CRA and therefore, violated the integrity of the election process by eliminating the ability to conduct any meaningful audit of the 2020 Federal Election papers, records, and other original materials, all of which are necessary for such an audit.

177.   In so defeating the ability for an audit of these original materials, as prescribed by the 1960 CRA, these acts had the effect of depriving Plaintiffs of their right to a republican form of government and their equal protection rights related to suffrage.

---

FT-8." If a state's election procedures violated a category, this is indicated by an "x."  This chart is followed by another chart that contains summaries of various records retention violations by each state. That chart is follow by the expert testimony of Dennis Nathan Cain who testifies to the violations of 52 U.S.C. § 20701 set forth in the charts. The allegations contained in **Exhibit 3** are hereby incorporated as factual allegations as though fully set forth in the Complaint.

[44] Again, the Governors and Secretaries of State identified and defined in Exhibit 3.

178.    In all 53 Voting Districts, the Functionary Defendants and local officials responsible for retaining original papers, records, and materials received and in their possession related to the 2020 Federal Election, implemented records retention policies in clear violation of section 301 of the 1960 CRA, as set forth in **Exhibit 4** and by thereby acted under color of state and local law in a manner that willfully deprived Plaintiffs of their right to a republican form of government and their equal protection rights related to suffrage.

179.    For all reasons listed above and yet to be stated, Plaintiffs allege the result and purpose of the Functionary Defendants' willful participation in the conspiracy and pattern of racketeering, acting under color of state law and in egregious violation of constitutionally protected substantive due process and equal protection rights under the Fourteenth Amendment related to suffrage, was to deprive the people of the United States of the republican form of government guaranteed in the Constitution, Plaintiffs being among those people.

## B. First Amendment Allegations

180.    "In November 2019, Mark Zuckerberg invited nine civil rights leaders to dinner at his home," where they discussed and conspired about how to control the "flow of information" on social media to fit their purpose of the "ouster of [President] Trump" from office.  In conspiracy with other social media CEOs, including Jack Dorsey, and various persons in the news media, this "Cabal" of news media, social media, and technology "titans of business" conspired to "control the flow of information" by suppressing the political views of Plaintiffs and, in particular their

support of particular candidates for Congress and for President Donald J. Trump. *See* Secret History (in particular, section under subheading "The Disinformation Defense").

181.   The overt acts in furtherance of this conspiracy were to censor the free speech of Plaintiffs by placing various "warnings" about "false" content in their posts, which Defendants had subjectively determined to be "disinformation" based on their invidious discriminatory animus against Plaintiffs for their political views and support of particular candidates.

182.   Other overt acts taken or caused by Defendant Zuckerberg and his co-conspirator Defendant Jack Dorsey and their respective social media platforms, Facebook and Twitter, and other various social media platforms, included (1) "shadow banning" Plaintiffs' posts, (2) placing Plaintiffs' posts in an "echo chamber," where the reach of their posts was limited as compared to other Americans on social media, who shared the political views of the Defendants, (3) suspending Plaintiffs' accounts, and (4) involuntarily deleting Plaintiffs accounts altogether.

183.   Whereas social media has quite literally become the modern-day "public square" where public debate and protected speech that underlies the very purpose of the First Amendment takes place.  No other suppression of Plaintiffs' right to free speech could be more severe than depriving them of the right to free speech on social media.  By comparison, there is simply nowhere else for persons to go in this day and age to voice their opinions on matters of political importance where their voices will

be heard.  As such, Defendants inflicted the harshest form of deprivation of Plaintiffs' First Amendment rights causing severe damages and mental anguish.

184.   In addition, Defendant Zuckerberg participated in the same concert of action with the Cabal and the MDPE conspiracy and pattern of racketeering to cast Plaintiffs who exercised their First Amendment rights to peaceably protest at the U.S. Capitol on January 6, 2020 (the "Protest").  The method of this part of the conspiracy was to focus the attention of the media coverage and media posts on various bad actors who committed acts of violence at the Protest and attribute these bad acts to Plaintiffs who were merely peacefully exercising their protected First Amendment rights.

185.   It was a classic "guilt by association" scheme designed to paint the Plaintiffs in a false light and stir public outrage against them for the purpose of interfering with their right of free speech and freedom to peaceably assemble.

## C. Specific Failures to Comply with HAVA

186.   HAVA is a statutory scheme enacted by the 107th Congress to "right those wrongs" of the 2002 Bush v. Gore and Congressional election debacle where "four to six million" Americans "never had their votes counted" due to "faulty machinery," "wrongful and illegal purges from voter lists," and "poorly designed ballots."  148 Cong. Rec. S10412-02 (Oct. 15, 2002) (statement of Sen. Dodd regarding final Senate conference report).

187.   In his speech before Congress regarding the final Senate conference report, Senator Dodd specifically praised Defendants Mitch McConnell and Chuck

Schumer, for their "tremendous work" on HAVA, and went on to say HAVA was the "first civil rights legislation of the 21st century."  *Id.*

188.   In doing so, Sen. Dodd acknowledged both the purpose of HAVA to protect our "most fundamental right as American citizens: the right to vote" in the United States, which he described as a "beacon light of self-government."  *Id.*  Sen. Dodd's comments also specifically shows the intent of Defendants Schumer and McConnell to deprive Americans of this "most fundamental right" including the right to "self-government" in their willful participation in the conspiracy to violate Plaintiffs' constitutional rights.

189.   Moreover, Sen. Dodd explained yet another reason why all the Congressional Defendants are liable for their willful participation in the conspiracy when he acknowledged that, with regard to election procedures, "each Member who serves here [in Congress] is an expert because they would not have arrived here had they not been elected."  *Id.*  In other words, the Congressional Defendants knew full well what they were doing and cannot now feign ignorance of the Election Integrity Safeguards, particularly not Defendants McConnell and Schumer with regard to HAVA.

190.   The current members of the 117th Congress who stood election in 2020 all took their oaths of office after willfully participating as candidates in an election they knew to be in violation of HAVA and the 1960 CRA and willfully benefitted from the fraudulently appropriated federal and private money contributed by Congress and Zuckerberg that Functionary Defendants used to violate HAVA and the 1960

CRA. Those Defendants who were members of the 116th Congress participated in approving federal funds to be distributed to the Functionary Defendants for use in violating HAVA and the 1960 CRA.

191. Defendant Joseph Biden was among the members of the U.S. Senate who voted in favor of HAVA and had knowledge of its purpose, provisions, and requirements. Yet, he took the oath of office for President of the United States on January 20, 2021 after willfully participating as a candidate in an election he knew to have been conducted in violation of HAVA and the 1960 CRA.

192. Defendant Kamala Harris was a Senator in the 116th Congress who voted for the CARES Act and approved federal funding which was used, with her knowledge, to violate HAVA and the 1960 CRA. Yet, she took the oath of office for Vice President of the United States on January 20, 2021 after willfully participating as a candidate in an election she knew to have been conducted in violation of HAVA and the 1960 CRA.

193. HAVA set forth specific "minimum requirements" with which the Defendants, as members of state or federal government, or governmental employees, or elected officials acting under color of law, failed to comply in the conduct of the 2020 Federal Election.

194. The minimum requirements in HAVA stipulated specific duties regarding "mail in ballots," "registration of voters by mail," and highly detailed voter identification processes, and other requirements with which Defendants, as members

of state or federal government, or governmental employees, or elected officials acting under color of law failed to comply.

195.    All Defendants who are members of state or federal government, or are governmental employees, or elected officials acted willfully alongside one another and/or in concert under color of law to unlawfully use federal monies granted pursuant to HAVA to change state voting procedures in a manner which failed to meet lawful requirements defined as "minimum requirements" in HAVA and instead used federal monies for the purpose of causing all 53 federal Voting Districts to fail to comply with federal election law, including HAVA and the 1960 CRA.

196.    All Defendants acting in participation with the MDPE enterprise whether as members of state or federal government, or governmental employees, or elected officials acting willfully alongside one another and/or in concert under color of law, engaged in acts of selective enforcement to fraudulently certify federal elections as valid, when in fact they were unlawful and failed to meet criteria set forth in federal law and state law.

197.    All Functionary Defendants acting in participation with the MDPE enterprise acted willfully alongside the federal officials and private individuals named as Defendants herein and in concert under color of law with specific knowledge of administrative requirements due to HAVA, and willfully failed to implement these requirements.  All MDPE-participating Defendants and all Functionary Defendants had specific knowledge of the conditions for compliance with HAVA for which the federal monies would be issued.

198.    The foregoing actions of Defendants engaged in the MDPE enterprise, willfully participating in joint activity in the conspiracy and pattern of racketeering described herein, resulted in the failure of every election conducted in the 53 Voting District to comply with the Election Integrity Safeguards.

199.    Since January 3, 2021, NONE of the named Defendants have brought forth any information, presented a demand for investigation, or acting in an official capacity to instigate an investigation or caused the Department of Justice to review all of the state's failures to utilize federal monies in the state's failure to comply with Federal law.

200.    The participants in the MDPE enterprise in the position of state governors had specific knowledge that the placement of unmonitored and unsupervised ballot drop boxes prohibited each state from complying with the question criteria set forth in HAVA requiring the state to affirm a first-time mail-in voter had identification records with the ballot thereby effectively denying each American who voted in that manner of their right to vote and their right for that ballot to be counted in violation of their equal protection rights regarding the right to vote.

201.    On January 6, 2021, Defendant Mike Pence, knowingly violated his oath to uphold the Constitution and laws of the United State by certifying the 2020 Presidential election results acting as part of the conspiracy to "get rid of the orange man at all costs." Defendant Pence cast a vote to pass HAVA in 2002 and had specific knowledge of each state's 18-year history of receiving federal grants under HAVA. It

is not plausible Mr. Pence lacked the knowledge or capacity to understand his action

to certify the election result violated federal law.

## IV.
## CAUSES OF ACTION

**A. COUNT ONE – Conspiracy and conduct to deprive of constitutional rights related to suffrage and the right to a republican form of government under 42 U.S.C. § 1983.**

202.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

203.    Defendants, which include the federal officials, state officials, and[45] private persons named herein, acted under color of state law—the various states' elections, laws, regulations, procedures, and administration thereof—related to the 2020 Federal Election, as willful participants in a conspiracy consisting of joint activity with state and local officials, including the state Governors and Secretaries of State named herein, and acted with each state and voting district, to deprive Plaintiffs of their various rights, privileges, and/or immunities secured by the Constitution of the United States.

204.    These various Constitutional rights include, (1) all substantive due process rights related to suffrage and casting a vote in a federal election, (2) all equal protection rights related to the right of suffrage being debased or dilution of the

---

[45] The terms "and" and the term "or" are intended throughout this Complaint to be construed in their broadest use possible as "and/or" or similar, except where such interpretation would not make logical or grammatical sense or such interpretation would operate to prevent Plaintiffs from stating a claim upon which relief could be granted.

weight of Plaintiffs' votes, and (3) deprivation of Plaintiffs' rights to the republican form of government guaranteed by Article IV, section 4 of the Constitution.

205.   At all relevant times, Plaintiffs were acting as private citizens related to their rights of suffrage and rights to a republican form of government.

206.   Defendants' conspiracy and conduct against Plaintiffs would deter a person of ordinary firmness from continuing to engage in these protected constitutional rights.

207.   Plaintiffs' protected constitutional rights were a substantial and motivating factor for Defendants' conspiracy and conduct to deprive them of these rights.

208.   Defendants' decision to violate Plaintiffs' clearly established constitutional rights was not objectively reasonable in light of the circumstances.

209.   Defendants' conspiracy described herein caused severe damages to Plaintiffs in depriving them of their Constitutional rights and subjecting them to suffer the dominion and control of an illegitimate Congress, President, and Vice President, which enacted Executive Orders, policies, and/or legislation in violation of Plaintiffs' rights to a government whose legitimate acts must be by consent of the governed, a republican form of government.

210.   Defendants' conspiracy and conduct described herein caused Plaintiffs to suffer other severe damages, including mental anguish and emotional suffering.

**B. COUNT TWO – Conspiracy and conduct to deprive of First Amendment rights and retaliate for the free exercise thereof under 42 U.S.C. § 1983.**

211.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

212.   Defendants acts described herein, including but not limited to, interfering with and/or retaliating against Plaintiffs for the free exercise of their First Amendment rights to free speech by "controlling the flow of information" related to Plaintiffs' rights to speak about suspected fraud in the 2020 Federal Election and/or to voice support for a particular political candidate and/or to express a political view on social media; rights to petition the government for redress of grievances by the relief sought herein and through verbal acts in protest of the illegitimate Congress counting the Electoral College votes on January 6, 2021 whether at the Capitol in person or on social media, and their rights to peaceably assemble in protest.

213.   Defendants conspiracy and conduct in violation of Plaintiffs' First Amendment rights also specifically includes the acts of Roger Sollenberger in concert with his various colleagues at Salon.com, including but not limited to Justin Pelofsky, in retaliation against Plaintiffs for exercising their rights to petition the government for redress of their grievances in this Lawsuit.  Such conspiracy and conduct included spreading objectively and patently false statements publicly about the Lawsuit and conducting an intimidation campaign against Plaintiffs' counsel in this matter for attempting to enforce Plaintiffs' constitutional rights before this Court.

214.   At all relevant times, Plaintiffs were acting as private citizens related to matters of public concern.

215.   Defendants' acts against Plaintiffs would deter a person of ordinary firmness from continuing to engage in their protected First Amendment rights.

216.   Plaintiffs' protected First Amendment rights were a substantial and motivating factor for Defendants' conduct to deprive them of their rights.

217.   Defendants' decision to violate Plaintiffs' clearly established constitutional rights was not objectively reasonable in light of the circumstances.

218.   Defendants' conspiracy and conduct described herein caused Plaintiffs to suffer severe damages, including mental anguish and emotional suffering.

## C. COUNT THREE Conspiracy to interfere with constitutional rights under 42 U.S.C. § 1985.

219.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

220.   By the conduct described in the foregoing paragraphs, Defendants conspired together, whether directly or indirectly, for the purpose of depriving Plaintiffs of their constitutional rights related to their substantive due process rights to suffrage and related equal protection rights, their rights to a republican form of government, and their various rights under the First Amendment.

221.   Defendants' conspiracy was also for the purpose of depriving Plaintiffs of their rights to give "support or advocacy in a legal manner toward or in favor of the election of one or more lawfully qualified persons a an elector for President or Vice President, or as a Member of Congress of the United States." § 1985(3).

222.   Defendants' conspiracy was also for the purpose of retaliating against Plaintiffs from exercising all of the above constitutional rights.

223. Defendants' conspiracy was motivated by class-based invidious discriminatory animus.  The "central theme" of § 1985 was to provide an oppressed class with "equal access to political power."  *United Broth. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983).  At that time, the specific oppressed class was African Americans.  Here, the oppressed class is Americans who are not members of the "Political Class."  Through their actions described in this Complaint, the Defendants have establish their own elite and unassailable caste, the Political Class that no common American can break into without the approval of the members of the caste.

224. Through their actions described herein, the Defendants have consolidated and are continuing to consolidate absolute power over the American people were are not members of their caste.  They despise and oppress non-members of their elite Political Class comprised of both politicians and their wealthy co-conspirators as described herein.  The goal is to grow ever wealthier by oppressing and exploiting common, everyday Americans who are not members of the Political Class.

225. They despise anyone who espouses conservative views and who values individual rights against government and they persecute anyone who expresses such a view.  In this manner, their conspiracy to deprive Plaintiffs of constitutional rights is motivated by a class-based, invidious discriminatory animus.  It is based on Plaintiffs' political views, personal beliefs about equality and individual rights, which

include religious beliefs as Christian or other faiths, and the fact that Plaintiffs are not members of the Political Class.

226.    Defendants' conspiracy included illegal actions that were the product of the discriminatory animus.

227.    Defendants' conspiracy and conduct described herein caused Plaintiffs to suffer severe damages, including mental anguish and emotional suffering.

**D. COUNT FOUR – Action for neglect to prevent under 42 U.S.C. § 1986.**

228.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

229.    Defendants had knowledge of the conspiracy and conduct to be done, as set forth above, had the power to prevent or aid in preventing the commission of the same, and neglected or refused so to do, resulting in the deprivation of Plaintiffs' various constitutional rights set forth herein.

230.    Plaintiffs suffered severe damages by Defendants' failure to prevent or aid in preventing the deprivation of their constitutional rights, including[46] mental anguish and emotional suffering.

**E. COUNT FIVE – *Bivens* claim for conspiracy and/or conduct to deprive of constitutional rights related to suffrage and the right to a republican form of government against federal officials only.**

231.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

---

[46] The term "including" shall always be read in this Complaint to mean "Including but not limited to" unless such meaning does not make logical or grammatical sense in context or would result in a failure to state a claim upon which relief could be granted.

232.   Defendants, which include the federal officials and private persons named herein, acted under color of state law—the various states' elections, laws, regulations, procedures, and administration thereof—related to the 2020 Federal Election, as willful participants in a conspiracy consisting of joint activity with state and local officials, including the state Governors and Secretaries of State named herein, and acted with each state and voting district, to deprive Plaintiffs of their various rights, privileges, and/or immunities secured by the Constitution of the United States.

233.   These various Constitutional rights include, (1) all substantive due process rights related to suffrage and casting a vote in a federal election, (2) all equal protection rights related to the right of suffrage being debased or dilution of the weight of Plaintiffs' votes, and (3) deprivation of Plaintiffs' rights to the republican form of government guaranteed by Article IV, section 4 of the Constitution.

234.   At all relevant times, Plaintiffs were acting as private citizens related to their rights of suffrage and rights to a republican form of government.

235.   Defendants' conspiracy and conduct against Plaintiffs would deter a person of ordinary firmness from continuing to engage in these protected constitutional rights.

236.   Plaintiffs' protected constitutional rights were a substantial and motivating factor for Defendants' conspiracy and conduct to deprive them of their rights.

237.    Defendants' decision to violate Plaintiffs' clearly established constitutional rights was not objectively reasonable in light of the circumstances.

238.    Defendants' conspiracy and conduct violated Plaintiffs' clearly established constitutional rights according to the standards set forth in relevant case law relating to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)

239.    Defendants' conspiracy and conduct described herein caused severe damages to Plaintiffs by depriving them of their Constitutional rights and subjecting them to suffer the dominion and control of an illegitimate Congress, President, and Vice President, which enacted Executive Orders, policies, and/or legislation in violation of Plaintiffs' rights to a government whose legitimate acts must be by consent of the governed, a republican form of government.

240.    Defendants' conspiracy and conduct described herein caused Plaintiffs to suffer severe damages, including mental anguish and emotional suffering.

**F. COUNT SIX – *Bivens* claim for conspiracy and/or conduct to deprive of First Amendment rights against federal officials only.**

241.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as though fully set forth herein.

242.    This cause of action is only against all Defendants who are officials of the federal government.

243.    Defendants acts described herein, including but not limited to, interfering with and/or retaliating against Plaintiffs for the free exercise of their First Amendment rights to free speech by "controlling the flow of information" related to

Plaintiffs' rights to speak about suspected fraud in the 2020 Federal Election and/or to voice support for a particular political candidate and/or to express a political view on social media; rights to petition the government for redress of grievances by the relief sought herein and through verbal acts in protest of the illegitimate Congress counting the Electoral College votes on January 6, 2021, whether at the Capitol in person or on social media, and their rights to peaceably assemble in protest.

244.   At all relevant times, Plaintiffs were acting as private citizens related to matters of public concern.

245.   Defendants acts against Plaintiffs would deter a person of ordinary firmness from continuing to engage in their protected First Amendment rights.

246.   Plaintiffs' protected First Amendment rights were a substantial and motivating factor for Defendants' conduct to deprive them of their rights.

247.   Defendants' decision to violate Plaintiffs' clearly established constitutional rights was not objectively reasonable in light of the circumstances.

248.   Defendants' conspiracy and conduct violated Plaintiffs' clearly established constitutional rights according to the standards set forth in relevant case law relating to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)

249.   Defendants' conspiracy and conduct described herein caused Plaintiffs to suffer severe damages, including mental anguish and emotional suffering.

**G. COUNT SEVEN – RICO 18 U.S.C. § 1962(c) against all Defendants.**

250.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

251.    The Count is against all Defendants.

252.    The MDPE enterprise is an enterprise engaged in and whose activities affect interstate commerce in the solicitation and intake of donations from various persons across all states.

253.    All Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and depriving them of their constitutional rights.

254.    Pursuant to and in furtherance of their fraudulent scheme, the Democrat Defendants committed multiple related predicate acts of racketeering which includes the following as set forth in the Statement of Facts and exhibits thereto:

**i.    18 U.S.C. § 1512 Tampering with a witness, victim, or an informant.**

255.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

256.    Whoever corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in any official proceeding, or attempts to do, or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, commits a violation of 18 U.S.C. § 1512(c).

257.   Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from (1) attending or testifying in an official proceeding or (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense, commits a violation of § 1512(d).

258.   As set forth in the statement of facts Defendants used moneys obtained by wire and mail fraud to bribe public officials into destroying, mutilating, or concealing election papers and records for the purpose of obstructing official audits of federal ballots constitutes, which constitute violations of § 1512(c).

259.   As set forth in the statement of facts, the senior leaders of the MDPE enterprise directed employees and agents of the enterprise to coerce the state Governors and Secretaries of State named as Defendants herein to alter their respective state's election procedures through executive orders, execution of contracts, and implementation of altered procedures that violated the records retention provisions of HAVA and the records retention provisions of the 1960 CRA. The specific violations by each state are set forth in **Exhibit 4**.

260.   As specifically described in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders offered benefits to the Governors and Secretaries of State in the form of financial support for their campaigns for reelection or for higher office or lucrative private sector jobs or a prestigious position in federal government or other benefits in exchange for their agreements to facilitate the violations of HAVA and the 1960 CRA.

261.   As specifically described in the statement of facts, the participants in MDPE enterprise, acting under the direction of the senior leaders offered benefits to law enforcement officials and employees of the Department of Justice in the form of prestigious promotions, lucrative private sector jobs, or prestigious position in federal government and financial benefits in exchange for their agreements not to investigate the violations of HAVA and the 1960 CRA.

262.   As specifically described in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders threatened to publicly expose false and/or damaging information about the Governors and Secretaries of State if they refused to facilitate the violations of HAVA and the 1960 CRA.

263.   As specifically described in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders threatened to publicly expose false and/or damaging information law about law enforcement officers and employees of the Department of Justice and/or physically threatened them if they attempted to investigate the violations of HAVA and the 1960 CRA that occurred in elections starting at least in 2016.

264.   The purpose of the foregoing actions was to destroy or conceal records relating to the federal elections to prevent such records from being used in any official audit of the federal elections and/or to prevent the investigation of violations of federal election law.

ii.   **18 U.S.C. § 1343 Fraud by wire, radio, or television**

265.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

266.    As set forth in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders communicated the Fraudulent Narratives, which they knew to be false, over the wires, through social media and on television for the purpose of obtaining donations from persons, including the Plaintiffs, across the United States, including in Texas.

### iii.    18 U.S.C. § 1341 Frauds and swindles

267.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

268.    As set forth in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders communicated the Fraudulent Narratives, which they knew to be false, through the mail to potential donors for the purpose of obtaining donations from persons, including Plaintiffs, across the United States, including in Texas.

### iv.    18 U.S.C. § 666 Bribery concerning programs receiving federal funds

269.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

270.    Each of the 50 states received federal HAVA grant money in excess of $10,000 to be used for the purposes of facilitating federal elections that comply with HAVA.

271.   Each of the Governors and Secretaries of State named as Defendants facilitated and directed use of the HAVA grant money in a manner that violated HAVA.

272.   The Governors and Secretaries of state did this at the direction of the senior leaders of the MDPE enterprise and/or their agents in exchange for financial support for their campaigns for reelection or to higher office or lucrative private sector jobs or a prestigious position in federal government or other benefits.

273.   The value of the benefits each Governor and Secretary of State received in exchange for their agreement was in excess of $5,000.

274.   The purpose of these acts of bribery was to enable ballot box stuffing schemes to control the outcome of the 2020 federal elections and future elections.

**v.   18 U.S.C. § 201 Bribery of Federal Officials**

275.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

276.   As set forth in the statement of facts, the senior leaders of the MDPE enterprise and agents acting under their direction committed multiple acts of bribery when they offered to Congressional Defendants the value of funding and support for their campaigns to public office, prestigious appointments to various committees, better offices, and other benefits for the quid pro quo of such officials' agreements to (1) vote for appropriation of  federal funds through the CARES Act to state and local officials for the purpose of funding the administration of federal elections in violation of the papers and records retention requirements of the 1960 CRA and the procedures

of HAVA, (2) adopt the Russia Collusion Narrative and/or the COVID-19 Narrative in their talking points to the media or on the campaign trail to solicit donations to their campaigns, and (3) to vote to certify the Electoral College votes on January 6, 2021 without objection.

277.   Defendant Pence also received benefits from the senior leaders of the MDPE enterprise in the form of promised support both financial and public endorsement for a campaign to become the 2024 Republican nominee for President of the United States in exchange for his agreement to certify the Electoral Colleges votes on January 6, 2021.

### vi.   Common Law Bribery

278.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

279.   Bribery is generally defined at common law and as reflected in the penal codes of most states as a corrupt benefit given or received to influence official action.[47]

280.   As set forth in the statement of facts, the senior leaders of the MDPE enterprise directed employees and agents of the enterprise to coerce the state Governors and Secretaries of State named as Defendants herein to alter their respective state's election procedures through executive orders, execution of contracts, and implementation of altered procedures that violated the records retention provisions of HAVA and the records retention provisions of the 1960 CRA.

---

[47] James Lindgren, *The Theory, History, and Practice of the Bribery-Extortion Distinction*, 141 U. Pa. L. Rev. 1695, 1696 (1992–1993).

281.   As specifically described in the statement of facts, the participants in MDPE enterprise, acting under the direction of the senior leaders offered benefits to law enforcement officials and employees of the Department of Justice in the form of prestigious promotions, lucrative private sector jobs, or prestigious position in federal government and financial benefits in exchange for their agreements not to investigate the violations of HAVA and the 1960 CRA.

282.   As set forth in the statement of facts, the senior leaders of the MDPE enterprise and agents acting under their direction committed multiple acts of bribery when they offered to Beneficiary Defendants[48]/Congressional Defendants the value of funding and support for their campaigns to public office, prestigious appointments to various committees, better offices, and other benefits for the quid pro quo of such officials' agreements to (1) vote for appropriation of federal funds through the CARES Act to state and local officials for the purpose of funding the administration of federal elections in violation of the papers and records retention requirements of the 1960 CRA and the procedures of HAVA, (2) adopt the Russia Collusion Narrative and/or the COVID-19 Narrative in their talking points to the media or on the campaign trail to solicit donations to their campaigns, and (3) to vote to certify the Electoral College votes on January 6, 2021 without objection.

283.   Defendant Pence also received benefits from the senior leaders of the MDPE enterprise in the form of promised support both financial and public endorsement for a campaign to become the 2024 Republican nominee for President of

---

[48] As defined in Exhibit 3.

the United States in exchange for his agreement to certify the Electoral Colleges votes on January 6, 2021.

### vii.   Common Law Extortion

284.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

285.   As specifically described in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders threatened to publicly expose false and/or damaging information about the Governors and Secretaries of State if they refused to facilitate the violations of HAVA and the 1960 CRA.

286.   As specifically described in the statement of facts, the participants in the MDPE enterprise, acting under the direction of the senior leaders threatened to publicly expose false and/or damaging information law about law enforcement officers and employees of the Department of Justice and/or physically threatened them if they attempted to investigate the violations of HAVA and the 1960 CRA that occurred in elections starting at least in 2016.

### viii.   18 U.S.C. § 1952 Interstate and foreign travel or transportation in aid of racketeering enterprises.

287.   Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

288.   As set forth in the statement of facts and herein, the senior leaders of the MDPE enterprise and employees and agents the MDPE enterprise travelled across state lines to (1) promote the Fraudulent Narratives to facilitate money

transactions through soliciting donations over the wires, through social media, through the mail, and on television; (2) using monies obtained through wire and mail fraud in excess of $10,000, bribe the Governors and Secretaries of State into causing their respective state elections to violate HAVA and the 1960 Act; (3) extort the Governors and Secretaries of State into causing their respective state elections to violate HAVA and the 1960 Act; (4) bribe and extort law enforcement into not investigating allegations of violations of federal election law; and (5) bribe and extort candidates for federal office into promoting the Fraudulent Narratives at their campaign events to solicit donations.

### ix.    18 U.S.C. § 1956 Money Laundering

289.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

290.    Defendant Pelosi through the use of false information and contrived threats designed to publicly humiliate and end the career of Persico extorted Sean Persico in order to obtain his assistance to influence DCCC employee Jackie Fort-McKay and obtain her compliance to participate in MDPE enterprises money-laundering schemes, as described below.

291.    Fort-McKay's compliance was required in order to for the MDPE-engaged Defendants to obtain indirect control of DCCC financial resources required to divert fraudulently obtained monies to MDPE-engaged defendants and enterprises.  Fort-McKay was responsible for managing the regulation of incoming monies from 'lawful" and 'unlawful" DCCC operations.  Monies 'laundered" through

the DCCC's financial relationships then went directly to MDPE-engaged Defendants as payments for services rendered and to companies such as Sapphire strategies for services rendered to the MDPE racketeering engaged enterprise.

292.    These actions were taken with the knowledge that the monies were obtained through wire and mail fraud and with the intent to conceal or disguise the nature, source, or control of the proceeds of the mail and wire fraud scheme.

    **x.    Pattern of Racketeering Activity**

293.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

294.    The foregoing acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

295.    The pattern of racketeering activity has been ongoing since at least 2016 and will continue through future election cycles and represents a clear and present danger to the public good and well-being.

296.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c), that is ongoing and will continue in future elections cycles.

    **xi.    Plaintiffs have been injured by the Democrat Defendants' Racketeering.**

297.    Plaintiffs hereby incorporate all allegations in the foregoing paragraphs as thought fully set forth herein.

298.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that (1) Plaintiffs have been defrauded into making multiple campaign donations because of the Fraudulent Narratives unlawfully promoted by Defendants participating or directing MDPE enterprise, (2) businesses owned and operated by several Plaintiffs have been harmed as a result of the COVID-19 Narrative through downturn in revenues and increases in costs from the extended lockdowns promoted by the Defendants to facilitate the violations of HAVA and the 1960 CRA in the 2020 federal elections.

## V.
## APPLICATION FOR INJUNCTIVE RELIEF, INCLUDING A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

299.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

**A. Requesting the Court merely do its duty to enforce the Constitution should not be controversial, especially when compared to the immediate and irreparable harm that will be suffered by Plaintiffs.**

300.    Plaintiffs' plea before this Honorable Court is to now join with them, in this current constitutional crisis of an unlawfully elected Congress and President, when all other safeguards set forth in the Constitution of the United States for checks and balances on unlimited, tyrannical government power have been breached, to muster merely a fraction of the courage displayed by the founding fathers of our Republic, who so willingly and boldly sacrificed their blood, their tears, their fortunes,

whether meager or vast, and even their very lives, to win their freedom from a tyrannical monarchy across the ocean.

301. Plaintiffs would point out that granting the injunctive relief requested herein is actually very reasonable and should not be controversial.  At a time when at least 60% of Americans are sick and tired of the corrupt two-party system because the "parties do such a poor job representing the American people,"[49] the Court would not actually be "going against the grain," but would merely be officially recognizing what most Americans already know to be true: the two-party system is corrupt and is not working for the American people.  In 2020, its corrupt nature actually resulted in the deprivation of the Plaintiffs' constitutional rights described herein.

302. Where our founding fathers laid down their lives for the freedom to have a representative, republican form of government, by comparison, it does not seem like much to ask of the Court to merely enforce these rights that were earned by the shedding of blood in a brutal war with the British and later enshrined in the document we know to be the Constitution of the United States.

## B. Plaintiffs are entitled to injunctive relief against Defendants on the following grounds:

303. **Plaintiffs will certainly suffer immediate and irreparable harm** if the Court does not immediately enter the injunctive relief requested herein.[50]   If

---

[49] Jeffrey M. Jones, *Support for Third U.S. Political Party at High Point*, Gallup (February 15, 2020); Gabrielle Schulte, *Poll: 60 percent of voters say a viable third party is need to have an effective political system*, The Hill (Sept. 18, 2020).
[50] Fed. R. Civ. P. 65(b)(1); *Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 564 F. Supp. 2d 63, 66–68 (D. Me. 2008); *Nw. Airlines, Inc. v. Bauer*, 467 F. Supp. 2d 957, 963–64 (D.N.D. 2006); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

the Defendants, and the illegitimate Congress and President their actions installed, are able to continue govern the Republic, it will cease to be a republic.  It may become a true RINO "*republic* in name only" in the sense that the "People's Republic of China" contains the word "Republic," although it is common public knowledge that the China does not in any way belong to its people.

304.   It belongs to a tyrannical, authoritarian, communist police state that engages in atrocities against humanity, including the active persecution of proponents of free speech, democracy, persons of faith, and anyone else who poses a view that does not demonstrate absolute and unquestioning loyalty to the state and whatever ideologies it chooses to cram down the throats of its citizens.  The risk of the United State government descending into such an oppressive police state is tangible and imminent if the government ceases to be accountable to the People, as occurred in the illegal 2020 Federal Election.

305.   Indeed, the FBI has already targeted, intimidated, and even arrested many American citizens who were peacefully exercising their First Amendment right to protest violations of election integrity at the US Capitol and were not acting in any violent manner like certain others.  So, the persecution of political dissidents under the unconstitutional regime of Mr. Biden has already begun and will only get worse if the Court refuses to act.

306.   If the Court does not grant a restraining order against the illegitimate Congress and Executive Branch and order a new, lawful federal election, the economy of the United States will and become unstable and will cease to be a "safe haven" for

financial investors.  If investors come to view their investments in assets held in the United States as inherently unstable due to the Constitutional Crisis, it is clear that would have a devastating effect on the Plaintiffs' ability to plan for retirement by investing in 401(k)s, IRAs, or other such accounts.

307.   Indeed, confidence in the U.S. Dollar has likely never been lower and petroleum prices are beginning to sharply spike.  Not only does this result in the severe depletion of the savings of working-class Americans, but it exposes all Americans to acts of terrorism and the risk of losing loved-ones proudly serving in the military to death and injury in foreign military conflicts.

308.   As set forth in a report attached to a forthcoming motion for temporary restraining order, the price of oil directly affects the capabilities of the enemies of the United States to carry out terrorism and military campaigns in the middle east. President Trump's energy policy made the United States energy-independent.  The resulting fall in oil prices crippled the government of Russia, which, at the time President Trump took office, had a break even budget tied to oil being $100 per barrel. During President Trump's tenure, low oil prices defunded Russia's military such that they could not exert influence in the middle east, as they had for decades.

309.   The Court should note that President Trump was the first President to keep the United States from getting involved in a new military conflict in over 40 years, thus saving the lives of countless members of America's armed services.  ISIS, all but disappeared from existence during this same time.  This was not some sort of "magic wand" waved by President Trump, but rather the result of a sound energy

policy that had the effect of defunding America's adversaries abroad.  The historic peace deal between Israel and the UAE came after an unprecedented time of relative world peace.

310.   Now, the slew of executive orders from Mr. Biden, including policies such as ending the XL Pipeline, which not only put oilfield workers in the unemployment lines, but is clearly having an effect as oil prices continue to rise.  No doubt, Russia and ISIS are licking their chops.  If the Court fails to act to enforce the Constitution, it will only get worse.  An amnesty bill is now imminent which will all but erase our borders, and legislation and executive orders are already in the works to deprive Americans of their Second Amendment right to defend themselves as times get more desperate. ***How long until Americans can take no more and resort to unprecedented forms of self-help in the wake of our federal courts' abdication of their role to uphold the rule of law?***

311.   **Thus, there is no adequate remedy at law**[51] because it would be impossible to calculate an appropriate amount of monetary damages that would compensate Plaintiffs for such harm.  Indeed, no one could even guarantee that Defendants would have sufficient financial assets available for legal damages if the U.S. financial market experience prolonged instability or even total collapse, especially given that the U.S. Government is close to $30 trillion in debt.  It is also obvious that the risk of permanent deprivation of the right to vote in federal elections, which could be lost forever if the Defendants are not restrained from further action

---

[51] *Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1030–31 (N.D. Iowa 2010); *see Ruggieri v. M.I.W. Corp.*, 826 F. Supp. 2d 334, 336 (D. Mass. 2011).

and the Acts of Congress, taken after January 3, 2021 are not restrained from having legal effect.

312.    Congress has already acted to propose the "For the People Act," which guts HAVA and the 1960 CRA and provides for *nationwide mail-in voting*!  While the Courts are busy holding that state officials have such "sovereign" power over elections that they can change the rules in the middle of the game (as in many of the presidential election cases), Congress is busy making it so that the states will forever lose the power to protect their citizens' rights to free and fair elections by denying states the right to limit inherently unsecure mail-in voting in federal elections and other unsecure processes such as ballot-harvesting, internet voter registration, and same day voter registration.

313.    **There is a substantial likelihood that Plaintiffs will prevail on the merits of their claims.**[52]    Plaintiffs' probable right to relief is clearly demonstrated in the foregoing allegations.

314.    **The threatened harm to Plaintiffs outweighs the harm that the injunctive relief would inflict on Defendants**.[53]  It is self-evident that the loss of the right to government by consent of the governed is far worse than any harm Defendants may suffer if the Court grants the injunctive relief requested herein. Defendants will suffer no harm merely by temporarily losing their power to dramatically change the laws and policy of the United State.  Indeed, the only harm

---

[52] *Prudential Ins. Co.*, 728 F. Supp. 2d at 1029; *Fairchild Semiconductor Corp.*, 564 F. Supp. 2d at 66–67.
[53] *Prudential Ins. Co.*, 728 F. Supp. 2d at 1031–32; *Fairchild Semiconductor Corp.*, 564 F. Supp. 2d at 66; *see Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

that would be suffered by Defendants is harm to their pride that their illegitimate power will be temporarily limited until a jury of Americans can hear the evidence.

315.   **Issuance of the injunctive relief would not adversely affect the public interest and public policy.**[54]  It is self-evident that preventing the loss of the right to government by consent of the governed is in the public interest.

316.   **The Court should enter this injunctive relief, including a temporary restraining order with or without notice to Defendants**, because Plaintiffs will likely suffer further immediate and irreparable injury, loss, or damage if the order is not granted before Defendants can be heard.  Plaintiffs will file a motion requesting special appointment for service of process, however, the vast list of Defendants in disparate geographical locations makes service of process on all Defendants impracticable compared to the urgent need for immediate relief.

317.   Moreover, given that the allegations and evidence revealed in this Complaint could result in federal criminal prosecutions for various high crimes and misdemeanors, including but not limited to sedition, treason, racketeering, malfeasance by public officials, wire fraud, mail fraud, etc., there is a high risk that Defendants will destroy evidence prior to being given notice of injunctive relief once they are forced to take this lawsuit seriously.

318.   Plaintiffs will request issuance of summons and practicable methods of service for the Defendants.   However, service of each Defendant is likely not practicable prior to the time within which a Temporary Restraining Order should be

---

[54] *Prudential Ins. Co.*, 728 F. Supp. 2d at 1032; *Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F. Supp. 2d 796, 812 (N.D. Ohio 2008).

granted, which is immediately.  The federal officials named in and subject to the relief requested in this lawsuit continue to take sweeping action to drastically change the policies and laws of this country in violation of Plaintiffs' and the putative class members' constitutional rights.

319.   Accordingly Plaintiffs request a temporary restraining order consistent with the relief described herein[55] with notice or, alternatively, without notice to Defendants in a form of order to be attached to a separately filed motion for temporary restraining order.  After 14 to 28 days, Plaintiffs request entry of a preliminary injunction, upon a hearing thereof that should last until trial, at which time Plaintiffs request entry of a permanent injunction consistent with the relief requested herein.

## VI.
## ATTORNEYS' FEES & COSTS

320.   Plaintiff are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b) and hereby plead for the same.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, upon jury trial of this matter, plead for judgment against Defendants for the following:

    a.  Permanent injunctive relief in the form of a new federal election for Congress, President, and Vice President;

    b.  Permanent injunctive relief forever restraining Defendants from causing future violations of HAVA or the records retention provisions of the 1960 CRA in the manner alleged herein or in any other manner;

---

[55] Specific reference is made to in subsection "I,I" Conclusion to the Introduction

c.  Permanent injunctive relief forever restraining Defendants from violating Plaintiffs' constitutional rights as described herein,

d.  General Damages in an amount to be determined at the time of trial;

e.  Punitive Damages in an amount to be determined at the time of trial;

f.  Reasonable attorneys fees' and costs of suit;

g.  Prejudgment and postjudgment interest;

And all other general and special relief, whether at law or in equity as the Court may deem necessary or proper to which the Plaintiffs may be justly entitled.

Respectfully submitted to the Honorable Court this 10th day of June, 2021

/s/ *Paul M. Davis*
Paul M. Davis
Texas Bar Number 24078401
paul@fireduptxlawyer.com
PAUL M. DAVIS & ASSOCIATES, P.C.
3245 Main St., Suite 235, #377
Frisco, TX 75034
Phone: 469-850-2930

ATTORNEY FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that I have served the foregoing Second Amended Complaint on all counsel of record who have made appearances in this action to date via the court's ECF notification system on June 10, 2021.

/s/ *Paul M. Davis*
Paul M. Davis