# EXHIBIT B

# THE CHAIRMAN'S REPORT OF THE ELECTION LAW STUDY SUBCOMMITTEE OF THE STANDING SENATE JUDICIARY COMMITTEE

**SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING**

Honorable William T. Ligon, Chairman
Senator, District 3

Honorable John Kennedy
Senator, District 18

Honorable Bill Heath
Senator, District 31

Honorable Blake Tillery
Senator, District 19

Honorable Michael Rhett
Senator, District 33

Honorable Elena Parent
Senator, District 42

I. INTRODUCTION

II. EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV. FINDINGS

V. RECOMMENDATIONS

1

## I.     INTRODUCTION

The charge assigned to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee was to examine the recent election cycle, the recount process, the audit process, the current investigations taking place, the litigation that is moving forward, as well as address issues relating to the upcoming runoffs. In the matter of the law itself, we were to also consider Georgia's election laws as they have impacted and are impacting the current election cycle. This Report may be further amended prior to the 2021 Georgia Legislative Session.

This Subcommittee met once at the Georgia State Capitol on Thursday, December 3, 2020. The hearing was open to the public, and there was an open invitation for citizens to speak before the committee. Subcommittee members also expressed stories they had heard from their constituents. Other committee meetings have also been hearing testimony which should be considered to present an even broader understanding. At this time, the additional committees which have met and received testimony are the Senate Governmental Affairs Committee and the House Governmental Oversight Committee. Many who could not testify due to lack of time have recorded their own testimonies online and shared their written speeches with this committee; the Subcommittee received many affidavits under oath.

<u>This Report by the Subcommittee Chair has not been formally approved by the Subcommittee or the standing Judiciary Committee.  It is submitted for informational purposes to be a part of the record at the request of the Judiciary Chair.  It is a summary of testimony given in person and by affidavit.  For more information, please refer to the video record of the hearing and the affidavits submitted.</u>

## II.    EXECUTIVE SUMMARY

The November 3, 2020 General Election (the "Election") was chaotic and any reported results must be viewed as untrustworthy.  The Subcommittee took evidence from witnesses and received affidavits sworn under oath.  The Subcommittee heard evidence that proper protocols were not used to ensure chain of custody of the ballots throughout the Election, after the opening of ballots prior to the Election, and during the recounts. The Subcommittee heard testimony that it was possible or even likely that large numbers of fraudulent ballots were introduced into the pool of ballots that were counted as voted; there is no way of tracing the ballots after they have been separated from the point of origin. The Subcommittee heard testimony of pristine ballots whose origin looked suspicious or which could not be verified and the inability of poll workers to distinguish between test ballots and absentee ballots. Signatures were not consistently verified according to law in the absentee balloting process.

Poll watchers on Election Night testified that they had noted that ballots were not secured, that seals and security tags were not used, and the chain of custody was often lax or non-existent. During the recount process, the monitors observed similar patterns of unsecured ballots that had broken seals and open cases of ballots laying around for hours or overnight in unsecured

locations. There was a lack of enforcement of the law, sloppy handling of the ballots by those counting, deliberate covering-up of voting numbers by workers, lack of following the process during the recount, unsafe handling of military ballots, and insecure data such as on laptops and flash drives. According to submitted testimony, there were also many equipment failures when ballots would not go through the machines and other times when ballots were counted more than once.

A great deal of testimony supported evidence of a coordinated effort to prevent a transparent process of observing the counting of ballots during the absentee ballot opening period and on Election Night. Witnesses testified to hostility to Republican poll workers during the recount – directional signage was unavailable, doors were locked, and Republican poll watchers were sent home early or given menial assignments.

Monitors throughout the state were often kept at an unreasonably long distance – some social distancing was understandable, but monitors were blocked from having the visual ability to see what was written on the ballots or to have any meaningful way to check the counting or to double-check that what was counted was actually assigned to the right candidate. They also could not observe what was entered into the ARLO system, nor could they be told the count that was being entered into ARLO. Instead, they were told that those numbers would be totaled and come back from the Secretary of State's Office. They were also told not to take pictures, film, or have other means of acquiring proof of the process that they were experiencing based on a rule from the State Elections Board.  That rule contravenes the spirit and purpose of the election law.

The Secretary of State's Office was unresponsive to its hotline. It has been unresponsive to many who wonder if their vote ever really counted. The office has turned a blind eye to fraud to the point that it ought to be considered gross negligence.

The Subcommittee did not have time to investigate the numerous publicly reported issues with the Dominion voting machines. The Subcommittee takes notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. Testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process.  The Subcommittee learned that the history and control of the company that owns the Dominion voting system is unclear and provides serious implications of foreign interference in the U.S. election.

## III.  ORAL TESTIMONY

**Violation of Ballot/Computer Security Procedures During Early Voting and on Election Day**

- Bridget Thorne, who has nine years' experience as a poll worker/precinct manager in Fulton County, worked for five and a half days during early voting as a technician in the temporary warehouse in the Georgia World Congress Center. Because of positive COVID tests among Fulton County elections employees, Dominion Software was selected to run the warehouse. Thorne was disturbed at the lack of ballot security. Test ballots were printed on the same type of paper (official Rolland Voting paper) as real ballots, but test ballots were not routinely marked as such or destroyed. Thorne testified she saw a stack of these ballots almost eight inches tall.

    On October 30, when early voting finished at State Farm Arena in Fulton County (the "State Farm Arena"), Thorne observed 40-50 scanners being brought into the arena and tens of thousands of ballots being scanned in by random people pulling ballots from random places – no formal procedure, no oaths, no chain of custody. When Thorne objected to this haphazard process, a Dominion employee replied, "It's fine, we have been doing this all week." When Thorne left that night, she observed unsecured suitcases of ballots next to the scanners.

    Upon arriving at the State Farm Arena the following morning, Thorne saw that suitcases of ballots had been piled in a corner and sealed. But there was no restricted access, so anyone could have removed one or more suitcases. In addition, anyone could have opened them and resealed them" because "seals were easily accessible." During the day, employees brought Thorne other ballots that were found in the warehouse, asking if they were real or test. She had no way of knowing.

    The following night, when Thorne was again working at the warehouse, she observed a Dominion employee and an Election Group Consultant printing "test ballots" but doing so incorrectly. She realized then that "<u>anyone </u>in the warehouse had access to printing real ballots."

    Before Election Day, Thorne attempted to report her concerns about these insecure ballot operations to the Secretary of State (SOS) office and to the State Board of Elections; she received no response.

    Since giving her testimony to the Senate Subcommittee, Bridget Thorne has been fired by a consultant working for Fulton County.

**Recount: Counting Votes Without Monitoring, or Without Meaningful Monitoring**

- Election Day – Video from State Farm Arena in Fulton County showed a Fulton County Election worker approaching the media and poll monitors. After a brief exchange, the media and monitors packed up and left. This coincided with media reports that everyone was told to leave State Farm Arena around 10 p.m. on Election Night; workers testified they were told that tabulation was stopping for the night and would resume the next morning. Instead, video from State Farm Arena revealed that about six workers stayed behind. What happened next revealed a coordinated effort by election workers to deliberately conceal their continued counting of ballots out of public view, in direct violation of the law. This incident was premeditated. Those workers pulled out four concealed cases of ballots from under a table and continued counting for another two hours. During those two hours there were multiple machines running, each of which could process up to 3000 ballots per hour.  A "representative" of The Secretary of State's office claimed that it had a representative present during that period, and the media reported that statement widely; it was not true.  The representative admitted he was not present during that time period and is not evident on the video.

- David Cross, though unable to speak at the hearing due to time constraints, submitted written testimony with graphs, one of which appears to enhance the significance of what took place with the change in vote totals just after the late-night activities took place at State Farm Arena. Due to its significance to the State Farm Arena video seen by the committee, his graph is included with this Report. It shows that 136,155 votes suddenly appeared in Biden's vote column at 1:59 a.m., November 4, 2020.

- Scott Hall of Fulton County is an experienced poll watcher who testified that there was a secured "lunch area" but when he bought lunch for workers, they were not permitted to use that area.  There were no cameras in that area, yet tables were set up for counting, and poll watchers were excluded.  He has photographs of the area.  He also testified that there were stacks and stacks of unsecured blank ballots ("checks," as he called them) that were in the open.

- Mr. Hall noted a limitation of one monitor per 10 recounting tables as being an inadequate ratio to be truly effective.  He was constantly engaged in the recount, even being called to go to the World Congress Center at ridiculous hours, such as 10 p.m., for more counting.  He was adamant that something was seriously wrong with how Fulton County was handling the ballots.

- Mark Amick reported that in DeKalb County, only one monitor was allowed per 10 tables of 16 recounters.  He testified that monitors were kept six feet away and could not see the totals entered on the computer screens.

5

- At State Farm Arena at the end of the recount day on November 14, Susan Voyles of Sandy Springs observed pallets of ballots remaining to be counted beginning the following day. When she arrived the next morning, November 15, those pallets were gone.

- On November 15, Voyles and her partner with whom she had traveled to State Farm Arena (also identified as a Republican), were given only 60 ballots to review, even though other tables had thousands. Voyles and her partner, as well as other Republican monitors, were told at 10 a.m. there was nothing else for them to do, so they should leave. Since giving her testimony to the Senate Subcommittee, Susan Voyles has been fired by a consultant working for Fulton County.

- Tony Burrison of Savannah and a military veteran served as one of very few recount observers during the recount in Chatham County. He described the process as "disgusting" – stacks of ballots were being counted with no oversight or accountability. Based on what he observed, he believed there is a major problem with voting integrity due to tampering with the vote.

- Nancy Kain of DeKalb reported that she was kept too far from the counting to verify any votes.

- Hal Soucie of Smyrna, a poll watcher at State Farm Arena, testified that he was told that he was not supposed to be close enough to see batch numbers.

**No Chain of Custody**

- Annette Davis Jackson, a Gwinnett monitor, saw broken locks on the bins containing paper backup ballots.

- Scott Hall of Fulton County was told to leave the World Congress Center after he tried to document and photograph nine unsecured bags of ballots. He testified he "cried" over the incidents he saw.

- Dana Smith, a Republican poll watcher in Hart County, testified that she observed the paper backup ballots being placed in unlocked canvas bags for transport to the county office of the Elections Supervisor. The precinct manager finally (at Smith's insistence) obtained locks before transporting the bags in her car, but she refused to complete chain-of-custody forms. Smith also testified that there was open access to the special paper used to print the paper backup ballots.

- Hal Soucie observed the recount process in two counties, Cobb and Fulton. At State Farm Arena in Fulton County, he reported "suitcases" full of ballots "all over the place," with no chain-of-custody procedures, no time and no date information. He observed people taking ballots out of the cases, counting, and putting them right back into the cases. No one checked him in as a credentialed observer, and one man handed him a stack of ballots without knowing who he was or where the ballots came from.

**Suspicious "Pristine" Absentee Ballots**

- At the State Farm Arena recount on November 14, Susan Voyles – who has 20 years' experience managing election precincts in Fulton County – reviewed a stack of 110 absentee ballots [ballots are normally placed in stacks of 100] and noticed they were "pristine." They had not been folded, and they did not appear worn as though voters and election workers had handled them. Each ballot was "bubbled in" with exactly the same marking, which showed a small crescent of white in the bubble. It appeared as though one ballot had been marked and then reproduced over 100 times. In addition, one of these ballots bore the distinctive ink markings of having been pulled from a printer too soon. Almost all of these ballots were votes for Vice President Biden; only two were for President Trump. In her 20 years of election experience, Voyles had never seen any ballots like these. As noted above, Ms. Voyles has been fired from her position as a poll manager with Fulton County, presumably for her honest testimony.

- Hal Soucie, who was also at the State Farm Arena, verified that he saw the pristine ballots mentioned by Ms. Voyles.

- During the recount, Scott Hall of Fulton County saw large quantities of ballots at the World Congress Center that appeared to have been machine-produced. He stated that he saw this "over and over." The Subcommittee received evidence that other poll workers throughout the State reported similar instances of "pristine" ballots with no explicable origin.

**Duplication of Ballots Without Oversight**

- Nancy Kain, a naturalized citizen in DeKalb County, volunteered as a poll watcher for Advance Voting at lower Roswell Road, served as a poll monitor during processing of absentee ballots and as a poll watcher on Election Day. At 10 a.m. on November 5, at the State Farm Arena, she was not asked for credentials and noticed that many people did not even have credentials. She observed a young man with paper ballots putting in selections on a ballot on a voting machine and wondered why it was not going through the scanner. The supervisor explained that the military ballots are transcribed in proper format and ballots come in that they were trying to salvage because of damage, thus they were just transferring them to a new ballot, and that was the process. Yet, no one was there to verify what the young man was doing. He was the brother of the

supervisor. Technically, he was voting for someone else on a voting machine. She took video and photographs and recorded her conversation with the supervisor.

- Mark Amick observed the processing of Provisional, Military and UOCAVA ballots in Fulton County on November 6 from early morning until 10:15 p.m. The only "oversight" provided was from a Secretary of State (SOS) employee who was not seen in the area before mid-morning, and who spent much of day not observing the duplication and tabulation process but rather sitting in the back of the room and leaving the room while on his phone. The first time Amick saw the SOS employee on the counting/sorting floor was 5:53 p.m. By 6:02 p.m. he had returned to his chair at the back of the room, and he did not go back onto the counting/sorting floor by the time Amick left at 10:15 p.m.

**Denial of Entry to Election Day Poll Watchers and During Recount**

- Mark Amick, a credentialed Statewide Poll Watcher in Milton (Fulton County), was denied entry into the Birmingham Falls Elementary School precinct despite his statewide credentials. The Subcommittee has also received evidence from monitors that some of them were denied entrance during the recount.

**Hostility**

- Hale Soucie of Symrna testified that Cobb County was using an electronic counting machine on the first day to count ballots, which was not the approved way to do the recount. The next day, it was the hand count process. He stated that on his second day he immediately observed that the first auditor made three mistakes in two minutes calling three ballots marked for Trump as Biden votes, but the second auditor caught those mistakes. He noticed another table that was not even doing a double-check at all. When he sought to observe, he was met with great hostility and vulgar name calling directed at him. The Subcommittee received other evidence of hostility against the monitors.

**Wildly Disparate Vote Totals from the Recount**

- While observing the recount at the DeKalb County Board of Elections on November 15, Mark Amick saw that a box of ballots was recorded as 10,707 votes for Biden and 13 votes for President Trump. He flagged this obvious disparity to the election workers, who discussed among themselves how it came to be. Two election officials with whom he engaged about this issue became agitated with Amick for his continued monitoring of the situation. They finally agreed to recount the box, resulting in a revised total of 1,081 votes for Vice President Biden and 13 for President Trump – still statistically disparate, but 9,626 votes less so. Amick was not certain if the corrected count was actually entered into the final recount totals.

- At State Farm Arena during the recount, Susan Voyles also noted a stack of absentee ballots with only two votes for President Trump.

- Hal Soucie of Smyrna, while monitoring in State Farm Arena, noticed stacks of ballots quite high, such as eight inches high for Biden, yet not a single Trump vote. He stated that he works with data and marketing, and anytime figures start reaching the 90th percentile, that type of consumer data is suspect, and when it gets to 100 percent that is passing the level of improbable to impossible.

**Ballots Counted from Ineligible Voters**

- Mark Davis analyzed data from U.S. Postal Service change-of-address (COA) forms and compared it to voters who voted in their former precincts. For example, he discovered that 14,980 out-of-state movers still voted in the Georgia General Election. Another 40,279 moved across county lines more than 30 days prior to the election, yet still voted in their former county precincts, a violation of Georgia law. He also noted that about 1,000 voters had voted twice in the Primary, inferring that the same pattern could have existed in the General Election.

**Constitutional Violations of Duly Passed Law**

- Dr. John C. Eastman, former Professor of Law and former Dean of the Chapman University Fowler School of Law and current Fellow at the Claremont Institute, testified regarding the plenary authority of the legislative body of the States to set the "Times, Places and Manner" of elections involving Federal officials, including with respect to the selection of Electors for the Electoral College in the presidential election, citing Article I, Section 4 and Article II, Section 1 of the U.S. Constitution. He noted that when States have vested that authority in the people of their States that they are bound to follow the people's choice in a free and fair election, but where fraud and failure to follow the law as passed by the legislative body is evident, that authority can be withdrawn. The legislature then can exercise its plenary authority to choose the electors in a presidential contest. He referenced both *Bush v. Gore* and *McPherson v. Blacker* as authoritative.

  Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law.  He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

    Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

- Phil Waldron, a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

    Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote. That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour. His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

- Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process. "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

**Outside Influence Over Governmental Election Functions**

- Scott Walter from the Capitol Research Group testified about Mark Zuckerberg's Center for Technology and Civic Life (CTCL), a progressive advocacy group that seeks to influence elections via voter "education" and get-out-the-vote efforts. In the 2020 election, CTCL made grants to individual counties, in Georgia and elsewhere, ostensibly to help run safe elections during COVID. But county boards could use the money for whatever they wanted, and the bulk of the grants (95% of total funding) went to counties that voted for Clinton in 2016 and for Biden in 2020. In fact, nine of the 10 Georgia counties that experienced the largest shifts toward Democrats in 2020 received CTCL grants -- $4.38-$10.47 spent per each man, woman, and child in those counties. Georgia should not allow "privatized" elections via the organization that the Washington Post has called the "Democratic Party's Hogwarts for digital wizardry."

**Voters Unable to Verify Votes Counted**

- Grace Lennon, a student at Georgia Tech, hoped to early vote on October 23. When she arrived, she was told that she had been sent an absentee ballot. She never received an absentee ballot. She had to sign an affidavit saying that she had not requested nor had she received an absentee ballot. She was then given a voter card to vote on the machine. However, the next day, she learned that someone had voted absentee in her name on October 7th. She was not able to verify that her vote actually counted for the one she chose to select in the election or whether the absentee ballot counted instead. Senator Greg Dolezal confirmed that most all the Senators had heard many similar stories.

## V.    FINDINGS

1- The November 3, 2020 election was chaotic and the results cannot be trusted.
2- The Secretary of State and the State Elections Board failed to enforce the law as written in the Georgia Code, and furthermore, created policies that contravened State law. As Senator Matt Brass concluded at the December 3 hearing, "We have heard evidence that State law was not followed, time after time after time."
3- The Secretary of State failed to have a transparent process for the verification of signatures for absentee ballots, for the counting of votes during the subsequent recount and audit, and for providing the type of guidance and enforcement necessary to ensure that monitors and other observers had meaningful access to the process.
4- The Secretary of State instituted an unconstitutional gag order so that monitors were told not to use photography or video recording devices during the recount.
5- Election officials at all levels failed to secure test ballots and actual ballots. Many reports indicate that proper procedures were not followed, and there was systematic failure to maintain appropriate records of the chain of custody for these ballots, both prior to and after voting and throughout the recount.
6- The Secretary of State and Election Supervisors failed to stop hostile behavior of workers toward citizen volunteer monitors during the recount process.
7- The events at the State Farm Arena are particularly disturbing because they demonstrated intent on the part of election workers to exclude the public from viewing the counting of ballots, an intentional disregard for the law. The number of votes that could have been counted in that length of time was sufficient to change the results of the presidential election and the senatorial contests. Furthermore, there appears to be coordinated illegal activities by election workers themselves who purposely placed fraudulent ballots into the final election totals.
8- Grants from private sources provided financial incentives to county officials and exerted influence over the election process.
9- The oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified.

## VI. RECOMMENDATIONS

### A. Absentee Ballots

In addition to following the law as already written by the legislature, such as not opening absentee ballots until Election Day, additional steps should be taken to ensure that only legal absentee votes are counted.

At a minimum, these recommendations include requiring photo identification, following signature match procedures faithfully, allowing absentee ballots to be used only upon demonstration of need, mailing absentee ballots out only upon the request of the registered voter, and although already illegal, expressly prohibiting drop boxes.

### B. Secure Chain of Custody and Additional Security Measures

Procedures should be established to ensure proper chain of custody for all ballots, whether they are test ballots, new unused ballots, spoiled ballots, cast BMD-generated ballots, absentee ballots, and even the specialty paper that is used to print the ballots.

Penalties should be clearly known and enforced for any violations.

There should be complete security when workers go on the job, with sign-in of their names and a time stamp, when they go in and when they go out.

Cameras should also be on-site to monitor the process at all times, as well as all the entrances to the buildings where ballots and the ballot paper are stored.

### C. Meaningful Access for Poll Watchers and Monitors

Citizens who are seeking to ensure the integrity of the vote need to be able to truly see the process. They should be able to ensure that people are reading their ballots before they are cast. They should be able to inspect the signature match process when ballots are opened. They should be able to write down seal information so they can ensure proper custody is in place. They should be close enough to see the names on the ballots during any recounts, the counts written on recount report sheets, the counts going into the ARLO system, the counts written on ballot containers, the process of the seals being broken as the ballots are entering the process, and so forth.

> More poll watchers and monitors should be allowed to participate since the ratio needs to be improved. Objections by monitors should be addressed immediately on-site to ensure access and transparency.
>
> Hostile actions by election workers toward volunteers should be immediately addressed and should be cause for dismissal.

### D. No Unconstitutional Gag Orders

> There is no reason to ban cameras when tabulation is taking place or when recounts and audits are taking place.
>
> Furthermore, there is no reason to ban cameras at the polling booth as long as voters have privacy while voting.
>
> The State Board of Elections should not ban cameras and recording equipment. They must fulfill their duty to ensure a transparent election process. Furthermore, citizens have a right to share those photos, recordings, and thoughts about what they observe.

### E. Unqualified Voters Should Be Purged from the System

> No underage voters should be in the system to allow their votes. No felons should be in the system to allow their votes.
>
> Other categories of voters, such as the deceased and those who have moved out of state, should also be examined as to their continued presence on the voter rolls.

### F. Violations of State Election Laws Must Be Prosecuted

> The Georgia Bureau of Investigation ("GBI") and the Attorney General should aggressively investigate and prosecute those who violate election laws, including those conspiring to place fraudulent ballots into the system and the 1,000 persons identified by the Secretary of State who voted twice in the 2020 primaries. If prosecutions do not happen, violations will recur.
>
> The GBI should establish an independent office for the investigation of all claims of voter fraud. That office should report regularly to the Judiciary Committee and, except in the case of investigations involving the Secretary of State or its personnel, the office of the Secretary of State.
>
> The GBI should investigate the cases where many affidavits already exist regarding election fraud in the 2020 General Election.

G.  **Forensic Audits of Ballots and Machines**

The Legislature must determine if ballot marking devices (BMDs) have been manipulated to provide a fraudulent result and without regard to whether the forensic audits can actually identify the manipulation of votes and the authenticity of the ballots that are in the ballot boxes, either generated by the BMDs or those that are absentee ballots.

Independent third-party auditors should review the fiducials on all ballots types (absentee, military, machine generated), audit the absentee ballot results from the last election, confirm the number of external envelopes in each county, and the number of ballots for each county.

Such audits should help ensure that phantom ballots and other fraudulent ballots are not counted in election results, and that legal votes are the only votes counted.

H.  **For Rectifying the 2020 General Election Results**

The Legislature should carefully consider its obligations under the U.S. Constitution.  If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race.  Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

Respectfully submitted this the 17th day of December 2020.

_____
Honorable William T. Ligon, Chairman
Senator, District 3