## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISON

| | | |
|---|---|---|
| JENNILYN SALINAS, MAURICE LYNNETTE, LINDSEY NGUYEN, DEANNA LORRAINE, J. CANN, et al. | § § § § § | |
| Plaintiffs. | § § | |
| v. | § § | CIVIL ACTION NO. 6:21-CV-162 |
| NANCY PELOSI, MITCH McCONNELL, CHUCK SCHUMER, MARK ZUCKERBERG, et al. | § § § § | |
| Defendants. | § | JURY TRIAL REQUESTED |

### PLAINTIFFS' RESPONSE TO MOTION TO DISMISS OF DEFENDANTS OHIO GOVERNOR MIKE DEWINE AND OHIO SECRETARY OF STATE FRANK LAROSE

COME NOW, Jennilyn Salinas, Maurice Lynnette, Lindsey Nguyen, J. Cann "P.P.," "D.D.," "T.M.," "S.M.," and "M.L." (collectively, "Plaintiffs"), by and through their attorney, Paul M. Davis, to bring this Response to Motion to Dismiss of Defendants Ohio Governor Mike DeWine and Ohio Secretary of State Frank LaRose:

## I.
## INTRODUCTION

1.      Plaintiffs' Second Amended[1] Complaint (Doc. 145) (the "Complaint" or the "Second Amended Complaint") moots the issues raised by the Ohio Defendants in their Motion to Dismiss.  Nonetheless, if the Ohio Defendants raise similar argument

---

[1] The Second Amended Complaint was amended "as matter of course" because Plaintiffs never served their Original Complaint on any Defendants but only served the First Amended Complaint.  Therefore, Plaintiffs are amending their complaint by right pursuant to Fed. R. Civ. P. 15(a)(1)(B), once within 21 days after service of a motion under Rule 12.

in response to the Second Amended Complaint, their arguments fail for the reasons set forth below.

## II.
## ARGUMENT AND AUTHORITY

### A. Plaintiffs' RICO Claim in the Second Amended Complaint Moots the Ohio Defendants' Personal Jurisdiction Arguments

#### i. 18 U.S.C. § 1965 grants the Court personal jurisdiction over the Ohio Defendants because one or more Defendants who participating in the pattern of racketeering reside in this district.

2.      The Ohio Defendants' personal jurisdiction argument is moot because the Complaint sets forth how the Ohio Defendants have participated in the open-ended pattern of racketeering conducted through the MDPE[2] enterprise.  Section 1965 of RICO allows suit to be brought in a district in which a defendant, "resides, is found, has an agent, or transacts his affairs." *Ima Jean Robinson Springs v. Sec. Fin. Corp. of Tex.*, SA-11-CA-797-OG, 2011 WL 13324311, at *14–15 (W.D. Tex. Nov. 21, 2011) (citing 18 U.S.C. § 1965(a).  Defendants who are agents of the MDPE enterprise transact the enterprise's affairs in this district and also reside in this district. including but not limited to Defendants Shereen Ahmad, Beto O'Rourke, Sapphire Strategies and its employees, the DNC and its employees, the RNC and its employees, Governor Greg Abbott, former Secretary of State Ruth Hughes and the various members of Congress who represent congressional districts located in the Western District of Texas.

---

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Complaint.

3.      The Court has general personal jurisdiction over these Texas residents since they reside in Texas, in this district, and/or, in the case of corporate entities such as Sapphire, the DNC, and the RNC, have continuous and systematic transactions within Texas and this district under the direction of the senior leaders[3] of the MDPE conspiracy. "Once jurisdiction and venue are established against one defendant under § 1965(a), § 1965(b) permits nationwide service of process on all 'other parties' when the 'ends of justice require' it." *Ima Jean*, 2011 WL 13324311, at *14. "With respect to minimum contacts, the Fifth Circuit has held that "[w]hen a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Id.* (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994)).

4.      It cannot be questioned that the Ohio Defendants have sufficient minimum contacts with the United States. So now the question turns to what the Ohio Defendants did to participate in the MDPE enterprise's pattern of racketeering.

5.      As set forth in the Complaint, the goal of the senior leaders of the MDPE enterprise is to achieve a monopolistic hold over all aspects of government by (1) creating false narratives, including the Fraudulent Narratives and other fraudulent statements, (2) raising money from donations by promoting these false narratives over the wires, social media, on televisions and in the mails to solicit donations, (3)

---

[3] "senior leaders" are identified and defined in the Complaint at paragraph 70 and used throughout the Complaint to refer to the group that directs the operations of the MDPE enterprise.

using the fraudulently obtained donations to fund efforts to bribe and extort public officials, including the Ohio Defendants, into further promoting the false narratives and complying with the senior leaders' directives to change state voting laws and procedures in violation of the procedural safeguards of HAVA and the 1960 CRA's records retention provisions to preserve all papers and records for audit, and (4) with the safeguards of HAVA and the 1960 CRA out of the way, directing efforts to stuff the federal ballot boxes with fraudulent ballots to ensure that only candidates approved by the senior leaders will win elections.

6.      As described in the Complaint, the senior leaders and agents of the MDPE enterprise are only able to stuff the federal ballot boxes to ensure their candidates win with the cooperation of state Governors and Secretaries of State, including the Ohio Defendants.  So, the senior leaders either directly or through employees of Enterprise A (also referred to as the DNC) or Enterprise B (also referred to as the RNC) communicate to each Governor and Secretary of State that if they allow various violations of HAVA and the 1960 Act to occur in their state's elections, they will receive support, financial or otherwise, for their campaigns for reelection or election to higher office or another prestigious position in a government agency or lucrative private sector position.

7.      Here, the Defendants DeWine and LaRose both agreed to participate in the MDPE enterprise pattern of racketeering to implement and/or allow severe violations of HAVA and the 1960 CRA that rendered the federal elections in Ohio inherently unsecure and susceptible to ballot box stuffing schemes.  They authorized

execution of contracts with third party vendors and allowed procedures for administration of the Ohio federal elections in a manner that violated HAVA and the 1960 CRA. The specific violations authorized and/or allowed by Defendants DeWine and LaRose attached hereto as **Exhibit A**.

8.      Both Defendants DeWine and LaRose had knowledge that Ohio received federal HAVA grant money and CARES Act grant money under the condition that Ohio must comply with HAVA as to federal elections, including the records retention provisions that are similar to the 1960 CRA. Both Defendants DeWine and LaRose have knowledge that Ohio was required to follow HAVA and the 1960 CRA in congressional elections pursuant to Article I, section 4 of the U.S. Constitution. Yet, both Defendants DeWine and LaRose authorized and/or allowed the violations of these federal election laws to be violated in the 2020 Ohio federal elections set forth in **Exhibit A**.

9.      Defendants DeWine and LaRose accepted political benefits of great monetary value at the behest of the senior leaders of the MDPE pattern of racketeering in exchange for their agreements to participate in the MDPE pattern of racketeering to eliminate federal election integrity laws. They have given no indication they will take action to bring Ohio's election procedures into compliance with federal election law for future elections. So, they will likely continue to participate in the MDPE.

10.     Both HAVA and the 1960 CRA records retention provisions were enacted to protect the civil rights of American citizens against fraudulent ballots

being cast to dilute their vote and violate their right to equal protection under the Fourteenth Amendment.[4]  The right of the people to elect their own representatives to government is central to the right to a republican form of government guaranteed by the Constitution in Article IV, section 4. *See* Complaint, pp. 10–13 (and authorities cited).

11.     Thus, the Ohio Defendants' participation in the racketeering scheme and conspiracy of the MDPE enterprise to eliminate federal election integrity laws to stuff the federal ballot boxes is participation in a scheme to deprive the American people, including Plaintiffs, of their constitutional rights.  The MDPE enterprise pattern of racketeering would not be successful if not for the participation of all Defendants in the positions of Governor and Secretary of State, and Defendants DeWine and LaRose must be held accountable, along with the other Defendants or the racketeering scheme set forth in the Complaint will continue and worsen.

12.     Regarding due process in the exercise of personal jurisdiction, "it does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing in the United States."  *Id.* (citing *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 782 (N.D. Tex. 2008)).  The Ohio Defendants

---

[4] *See State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961) (purpose of requirement to preserve all "records and papers" for 22 months is to "secure a more effective protection of the right to vote"); *see also Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962) (purpose is to provide "an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles"); 148 Cong. Rec. S10412-02 (Oct. 15, 2002) (final Senate conference report explaining HAVA is being enacted to protect our "most fundamental right as American citizens: the right to vote").

reside in the United States, therefore due process concerns regarding personal jurisdiction are satisfied.

### ii. The ends of justice require the Court to exercise personal jurisdiction over the Ohio Defendants.

13.     The ends of justice require that the Court exercise personal jurisdiction over all Defendants.  Because RICO was intended as a means to eradicate organized crime, the purpose of § 1965(b) is to allow a plaintiff to bring all defendants before the Court in a single trial.  *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006)  *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 781–82 (N.D. Tex. 2008).  RICO was modeled on antitrust legislation which provides that the "Attorney General may lay the venue in any district where he may properly serve one or more of his defendants."  *Cory*, 486 F.3d at 1231.  RICO's purpose in eradicating organized crime would not be served where "some RICO violations would go unpunished whenever organized criminals operate within the same locale and cause harm in a distant state." *Id.*  "Insulating such a criminal enterprise from liability, when, for instance, the victim is unable to finance long-distance litigation, is not consistent with RICO's purpose. *Id.*, *accord Rolls-Royce*, 576 F. Supp. 2d at 781–82.

14.     Here, the U.S. Attorney General and the Ohio AG have abdicated their roles in protecting the public from the pattern of the racketeering perpetrated by the senior leaders, employees, and agents of the MDPE enterprise described in the Complaint. The Defendants' pattern of racketeering has resulted in a monopoly over the political industry to such an extent that the Defendants who direct the MDPE enterprise can now almost completely ignore the will of the people since they have

also eliminated legal safeguards against ballot-box stuffing schemes, including the audit trail to detect such schemes. Since Plaintiffs are now doing the job that the federal and state attorneys general have failed to do, the ends of justice demand that Plaintiffs be able to bring all Defendants into one forum to bring them to justice.

### iii.   The Court has pendent personal jurisdiction over Plaintiffs' remaining claims.

15.   Because the Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965 with regard to Plaintiffs' RICO claims, the Court has pendent personal jurisdiction over all Defendants as to Plaintiffs' remaining claims under the civil rights statutes. Pendent personal jurisdiction exists when a court possesses personal jurisdiction over defendants for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the remaining claims. *Rolls-Royce*, 576 F. Supp. 2d at 783 (citing *United States v. Botefuhr*, 309 F.3d 1263, 1272–73 (10th Cir. 2002).

16.   "In essence, once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all claims arise from the same facts as the claim over which it has proper personal jurisdiction." *Id.* The rationale for pendent personal jurisdiction is that a defendant who already is before the court to defend the claim over which the court has proper personal jurisdiction is unlikely to be severely inconvenienced by being forced to defend another "claim whose issues

are nearly identical or substantially overlap" the first claim. *Id.* "Notions of fairness to the defendant simply are not offended in this circumstance." *Id.* (citing 4A Wright & Miller, § 1069.7, at 228–29 (3d. ed. 2002).

17.  Here, the facts out of which Plaintiffs' RICO claims arise are nearly identical to or substantially overlap Plaintiffs' civil rights claims.  Both arise out of the Defendants' conspiracy to deprive Plaintiffs of their right to a republican form of government and equal protection under the law with regard to voting.  Defendants, by their acts of racketeering, established procedures for casting ballots in federal elections that were in gross violation of the papers and records retention requirements found in 52 U.S.C. § 20701 and HAVA in addition to the requirements of HAVA regarding identification requirements in the voter registration and mail-in voting processes.  The violation of Plaintiffs' First Amendment rights set forth in the Complaint were for the purpose of protecting Defendants' criminally fraudulent scheme from detection by suppressing information exposing Defendants' scheme.  Thus, the Court has pendent personal jurisdiction over Plaintiffs' claims under 42 U.S.C. §§ 1983, 1985, and 1986 against the Ohio Defendants.

## B. The case is not moot because the racketeering pattern and conspiracy is ongoing and will recur in future elections.

18.  First, the Second Amended Complaint adds injunctive relief to restrain the Defendants from violating federal election law in future elections, an issue that is clearly not moot.  In any case, it is ironic the Ohio Defendants accuse Plaintiffs of "[d]isenfranchising more than one hundred fifty million Americans" since that is exactly what they themselves have done by participating in the pattern of

racketeering and conspiracy alleged in the Complaint.  Defendants argue incorrectly that Plaintiffs' claims for injunctive relief regarding the 2020 federal elections are moot because "it is too late to reverse the results of the 2020 General Elections," and cited to authority stating a challenge to an election statute was moot where the election had already occurred and was unlikely to recur.  Motion, p. 5 (citing *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 587–89 (1972)).

19.     This is not the present situation before the Court.  Plaintiffs have attached evidence of numerous violations of papers and records retention requirements of federal election law.  The violations specific to Ohio and that occurred in all states are attached as **Exhibit A**.  These violations are so severe that it would be impossible to conduct an audit of the election with any certainty to guarantee the result reflects the will of the people.  If the accuracy of the 2020 federal elections cannot be guaranteed due to destruction of and failure to retain records for audit, then the Ohio Defendants cannot claim that the issue is moot because it is "too late."

20.     Ordering a new federal election where it can been proven that the election results cannot be trusted is not beyond the equity jurisdiction of the federal courts.  *See generally Donohue v. Bd. of Elections of State of N. Y.*, 435 F. Supp. 957, 967 (E.D.N.Y. 1976).  "Protecting the integrity of elections particularly Presidential contests is essential to a free and democratic society."  *Id.* "Indeed, entirely foreclosing injunctive relief in the federal courts would invite attempts to influence national elections by illegal means, particularly in those states where no statutory procedures are available for contesting general elections."  *Id.*

21.     Moreover, the violations caused by the Ohio Defendants are almost certain to recur because the violations are not one-off violations by rogue individuals. Rather, the violations at issue are written into the procedures Ohio used in its federal elections and will use again.  Where the very procedures used to conduct an election are in violation of federal civil rights legislation, Plaintiffs have no assurance of election integrity in the past or the future in national elections.

22.     Certainly, if this Court dismisses the case at bar due to mootness in the face of clear evidence that Ohio's election procedures were in blatant violation of federal civil rights law related to elections, the Court would be inviting future attempts to steal elections though "fraudulent registration or voting, ballot-stuffing or other illegal means."  *Id.*  As demonstrated in the attached evidence, the Ohio Defendants cannot be trusted to abide by and enforce federal election law and will likely continue to participate in the ongoing conspiracy and pattern of racketeering to deprive of civil rights.

23.     Let it never be said again that the federal courts do not have equity jurisdiction to order a new election if the evidence demonstrates a lack of election integrity to the extent that the people cannot trust the outcome.  In any case, the Ohio Defendants completely ignored the fact that Plaintiffs are seeking a jury trial for monetary damages against all Defendants who participated in the conspiracy and pattern of racketeering to deprive them of their constitutional rights.  Therefore, even if Plaintiffs are ultimately unable to meet their burden to demonstrated the necessity for new elections, they are still entitled to a jury trial on monetary damages for the

civil rights violations alleged in the Complaint and they are still entitled to future injunctive relief to prevent Defendants from continuing their pattern of racketeering and conspiracy to deprive of civil rights.

## C. Laches does not apply where the pattern of racketeering and conspiracy is ongoing and Plaintiffs had no notice of the conspiracy and pattern of racketeering until after the 2020 elections.

24.     Laches has three interrelated elements: (1) delay in asserting a right or claim, (2) the delay was inexcusable, and (3) undue prejudice resulted from the delay. *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 819 (W.D. Tex. 2017).  Here Plaintiffs did not inexcusably delay in asserting their rights because Plaintiffs had no reason to question the integrity of the elections until after the anomalies apparent in the November 3, 2020 election cycle were brought to light in publicly available information.  After observing anomalies through publicly-available information, Plaintiffs made inquiries into the causes of the anomalies and came into contact with various experts who have gathered and assembled the evidence attached to this Response.  Only then did Plaintiffs realize that their rights were being violated.  At that point, it took time to find an attorney to review the evidence and prepare a Complaint on such a complex matter.  In any case, as already stated, Plaintiffs seek injunctions against future violations of federal election integrity laws, which is certainly not barred by laches.

25.     The very idea that undue prejudice will result from Plaintiffs now bringing their claims after uncovering the conspiracy and pattern of racketeering set forth in the Complaint is outrageous.  Whereas the 2020 federal elections lacked

integrity to the extent that the results cannot be trusted or audited with certainty and the same pattern is likely to occur in the next election, there is severe ongoing harm to the public that Plaintiffs are now trying to prevent and remedy.  The Ohio Defendants willfully failed to protect the integrity of elections.  The Ohio AG's office should have taken action to prevent this but failed to do so.  They cannot now claim the defense of laches where it is not foreseeable that government officials would so completely fail in their duty to uphold the Constitution and laws of the United States.

### D. The Second Amended Complaint Moots the Eleventh Amendment Issue.

26.    Through poorly worded pleadings, Plaintiffs mistakenly gave the impression that they were suing the Ohio Defendants in their "official capacity," when they actually intended to sue them in their individual capacity.  This error has been corrected in the Second Amended Complaint, which moots the Eleventh Amendment issue raised by the Ohio Defendants.

27.    Under RICO, "public officials can be held individually liable for actions taken while holding public office and/or misuse of their public office." *LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 937–38 (N.D. Ill. 2008).  "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Supreme Court has held that state officials may be held liable in their personal capacity for actions taken in their official capacity that caused deprivation of federal rights "whether they act in accordance with their authority or misused it." *Id.* at 28.

28.    "[I]t has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Id.* at 30.  Now that Plaintiffs have amended the complaint to make clear it is a suit against the state officials in their individual capacities, the Eleventh Amendment issue raised by the Ohio Defendants is moot.

**E. Application of the Political Question Doctrine Does Not Apply**

29.    Ohio Defendants cite *Rucho* for the proposition that the Court must dismiss this case because "federal judges have no license to reallocate power between the two political parties." Motion, p. 10 (citing *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019)).  Plaintiffs, however, do not seek reallocation of power between political parties.  As described above, Plaintiffs seek a redress of grievances for violation of their constitutional rights to a republican form of government and equal protection under the law as representatives of a class of similarly injured parties. Injunctive relief to enforce civil rights statutes simply is not a political question. Neither is seeking relief to end an ongoing pattern of racketeering.

30.    Ironically, the Ohio Defendants cite *Baker v. Carr*, in which the Supreme Court specifically held that an action under the civil rights statutes by Tennessee voters alleging that a state statute effected an apportionment that deprived plaintiffs of equal protection presented a justiciable claim that was not a political question. *Baker v. Carr*, 369 U.S. 186, 209 (1962).  While the Supreme Court has held that suits based on the Guaranty Clause may fall within the political question doctrine, in *Baker*, the Court explained, "In determining whether a question

falls within (the political question) category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Id.* at 210

31.     Whereas this case rests upon an ongoing pattern of racketeering and conspiracy by members of Congress and state officials acting through private enterprises in concert with private individuals, it would be inappropriate to dismiss the case on grounds of the political question doctrine.  Here, where the politicians are the perpetrators of the pattern and conspiracy, it would lead to an absurd result for the Court to hold that the politicians must resolve the question themselves.  It would be akin to holding that criminals should have the sole authority to be their own judge, jury, and jailer.  Obviously, no criminal decides to throw himself in jail.  Neither will corrupt politicians police themselves.  Indeed, the Complaint describes how various Defendants bribed and extorted members of the Department of Justice to deter them from investigation violations of federal election law.  So, the responsibility falls to Plaintiffs and this Court.

32.     Moreover, where the civil rights statutes at issue provide for monetary and injunctive relief, there is satisfactory criteria for judicial determination here. Certainly, the federal courts must have authority to uphold the laws of the United States to protect the people of the United States, unless, of course, the Ohio AG wants to argue that the federal courts exist primarily to insulate the politicians from liability for violating the rights of the American people, including Plaintiffs.

## F. Article III Standing

33.     Plaintiffs have concrete injuries fairly traceable to the Ohio Defendants'

actions in furtherance of the racketeering scheme and conspiracy to deprive of civil

rights that can be redressed through monetary damages and injunctive relief.

Therefore, Plaintiffs have Article III standing.  *See, e.g.*, *DaimlerChrysler Corp. v.*

*Cuno, 547 U.S. 332, 332–33 (2006)* ("The requisite elements of standing are familiar:

'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly

unlawful conduct and likely to be redressed by the requested relief.'").

### i.  Plaintiffs have alleged injuries in fact that are not "generalized grievances about the conduct of government."

34.     Plaintiffs have alleged injuries in fact.  With regard to their RICO

claims, Plaintiffs asserted they have suffered harm to their business and/or property

by reason of Defendants' violations of 18 U.S.C. § 1962(c).  Defendants' pattern of

racketeering used the Fraudulent Narratives to obtain monies from Plaintiffs and to

destroy Plaintiffs' business through false narratives that led to extended economic

lockdowns that harmed Plaintiffs' small businesses.

35.     With regard to their § 1983 claims, Plaintiffs have asserted mental

anguish and suffering damages for deprivation of their various constitutional rights.

The Supreme Court has specifically held in the context of a § 1983 claim,

compensatory damages may include "impairment of reputation, personal

humiliation, and mental anguish and suffering."  *Memphis Cmty. Sch. Dist. v.*

*Stachura*, 477 U.S. 299, 307 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 254 (1978)

(mental and emotional distress constitute compensable injury in § 1983 cases).

36.     It should be obvious that these damages are not, as the Ohio Defendants contend, "the kind of undifferentiated, generalized grievance about the conduct of government." *Gill v. Whitford*, 138 S.Ct. 1916, 1931 (2018). The cases the Ohio Defendants cite are gerrymandering cases, which are inapposite for the context cited. In gerrymandering cases, the plaintiffs assert harm based on vote dilution by means of a lawful process of redistricting, which is a generalized grievance about the conduct of government.

37.     By contrast, Plaintiffs do not complain about the lawful conduct of government but about the conduct of Defendants' unlawful racketeering acts that harmed Plaintiffs' property and business and conspiracy to deprive of civil rights through violations of federal civil rights statutes enacted to protect Plaintiffs' voting rights. It is not government that Plaintiffs complain of but of the corrupt, illegal means by which Defendants impose near-absolute control over who is elected to public office. That is very different than a claim complaining of the "conduct of government" as in the cases cited by the Ohio Defendants.

38.     Moreover, the deprivations of constitutionally protected rights set forth in the Complaint have a unique effect on each individual depending on their personal values, motivations, goals, dreams, and political ideology. It is apparent that many left-leaning Americans are in favor of a more "collectivist" America with a more authoritarian form of government that exalts "equity" over equality of individual rights and personal responsibility through redistribution of wealth at the direction of the political class such as one would see in countries like Cuba or Venezuela.

Defendants' conspiracy to deprive of a republican form of government and equal protection in voting rights would not affect these Americans in the same way as it harms Plaintiffs because the outcome of the deprivation results in a more authoritarian form of government with leftist political values that is actually *desirable* to such Americans.  For Plaintiffs, however, the deprivations have a devastating emotional effect, as described in the Complaint and the Declarations attached to the Motion for Temporary Restraining Order (Doc. No. 5-7), which are incorporated herein by reference.

39.     Similarly, with regard to First Amendment rights, many left-leaning Americans approve of the deprivations of First Amendment rights set forth in the Complaint because Defendants' actions result in silencing those who seek to express more conservative political views. So also, these Americans will not experience similar mental anguish and suffering in addition to reputational harm and humiliation that free speech censorship has inflicted on Plaintiffs.

### ii. Plaintiffs injuries are fairly traceable to the acts of the Ohio Defendants.

40.     The Ohio Defendants' acts in furtherance of the pattern of racketeering made Defendants' racketeering scheme possible.  If only the Defendants who reside in Texas had participated in the racketeering scheme, the scheme would not have been successful in establishing the corrupt political monopoly that caused the harm to Plaintiffs' property and business.  It took a collective effort from all Defendants to achieve the level of deception possible to achieve this harm.  Therefore, Plaintiffs'

injuries would not have been sustained "but for" the participation of state level officials, including the Ohio Defendants.

41.    It is certainly foreseeable that the Ohio Defendants' acts in furtherance of the pattern of racketeering would result in loss of property to Plaintiffs and harm to their businesses by defrauding them into making donations through dissemination of false information and narratives.  It is certainly foreseeable that promoting prolonged economic lockdowns for COVID-19 would result in harm to the small business community and would harm Plaintiffs' businesses.  Again, it took a collective effort from Defendants to convince the public to support lockdowns through promotion of the Covid-19 Narrative, so the effort would not have been successful if not for participation of the state level officials such as the Ohio Defendants.

42.    It is also foreseeable that the severe and pervasive violations of federal civil rights elections laws would open the door to fraudulent ballots being cast and the inability to perform a proper audit, thus resulting in deprivations of civil rights described in the Complaint.  Again, it took a collective effort from Defendants to circumvent the federal election integrity laws in each state to the extent that Plaintiffs suffered the mental anguish they have suffered in knowing they can no longer trust the outcome of federal elections in the United States.

43.    Thus, the actions of the Ohio Defendants in furtherance of the pattern of racketeering and the conspiracy to deprive of civil rights were both the "but for" and proximate cause of Plaintiffs' injuries.  Accordingly, Plaintiffs' injuries are fairly traceable to Defendants for purposes of RICO and the civil rights statutes.  *See, e.g.*,

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265 (1992) (common law tort standards of but for and proximate cause applicable to RICO claims); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (in section 1983 action, "plaintiff must establish both causation-in-fact and proximate cause").

### G. The Second Amended Complaint Moots the Ohio Defendants Arguments under Rule 12(b)(6) for failure to state a claim.

44.    The Ohio Defendants argued in their motion that Plaintiffs failed to set forth specific violations of Plaintiffs' constitutional rights.   However, **Exhibit A** hereto and **Exhibits 3 and 4 to the Complaint** and the paragraphs citing those exhibits give the specific acts of the Ohio Defendants with regard to their actions in promoting the Fraudulent Narratives and violating HAVA and the 1960 CRA in concert with the other Defendants.   These acts in furtherance of the conspiracy and pattern of racketeering combined with the acts of the other Defendants to render all federal elections in 2020 as inherently unlawful as in violation of these federal election laws intended to protect Plaintiffs most sacred rights to a representative form of federal government.   No harm could be greater than the knowledge that the Political Class of Defendants have effectively abolished the constitutional republican form of government that was intended to protect all of Plaintiffs' civil rights.   This knowledge is the direct cause of Plaintiffs' mental anguish damages.

45.    With regard to the "invidious class-based discriminatory animus" element for 42 U.S.C. §§ 1985 and 1986, paragraphs 223–25 of the Complaint set forth the legal and factual basis for this element.

46.    Finally, Plaintiffs did not intended to bring *Bivens* claims against the Ohio Defendants and have cleared up that issue in the Complaint as well

**WHEREFORE**, Plaintiffs pray the Court deny Defendants' Mike DeWine and Frank LaRose's Motion to Dismiss as moot and grant all other relief to Plaintiffs to which they may be justly entitled.

Respectfully submitted this June 11, 2021.

/s/ *Paul M. Davis*
Paul M. Davis
Texas Bar Number 24078401
paul@fireduptxlawyer.com
PAUL M. DAVIS & ASSOCIATES, P.C.
5720 Frisco Square Blvd., # 2066
Frisco, TX 75034
Phone: 469-850-2930

ATTORNEY FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that I have served the foregoing motion on all counsel of record who have made appearances in this action to date via the court's ECF notification system on June 11, 2021.

/s/ *Paul M. Davis*
Paul M. Davis