UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| Jeremy Bravo, et al. | § | |
|       *Plaintiffs*, | § | |
| | § | |
| v. | § | No. 6:21-cv-00162-ADA-JCM |
| | § | |
| Nancy Pelosi, et al. | § | |
|       *Defendants.* | § | |
| | § | |

---

## MOTION TO DISMISS OF NEW HAMPSHIRE GOVERNOR CHRISTOPHER T. SUNUNU AND NEW HAMPSHIRE SECRETARY OF STATE WILLIAM M. GARDNER

---

Christopher T. Sununu, Governor of the State of New Hampshire, and William M. Gardner, Secretary of State of the State of New Hampshire (collectively, the "NH Defendants"), by and through the undersigned counsel, move for dismissal of this action pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  In support of this motion, the NH Defendants state the following:

### **INTRODUCTION**

*How many legs does a dog have if you call the tail a leg?*
    *Four.  You can call a tail a leg if you want to, but it doesn't make it a leg.*
        – Abraham Lincoln (commonly attributed)

    *But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—**but it has not shown**—that the pleader is entitled to relief.*
        – <u>Ashcroft v. Iqbal</u>*, 556 U.S. 662, 679 (2009)

    1.      The American justice system provides a judicial process that is "dedicated to a search for truth."  <u>Nix v. Whiteside</u>, 475 U.S. 157, 174 (1986).  To invoke that process, claimants must set forth more than a speculative claim about possibilities they subjectively believe in.

Objective plausibility, not sheer possibility, must be "shown" to get one's day in court.  Thus, in the words of Lincoln, our justice system will not entertain one who stakes his case on his insistence that a tail is a leg.[1]  Plaintiffs insist such here.

2.       According to Plaintiffs, the 2020 federal election was corrupted by a widespread conspiracy amongst all 535 members of Congress, all 50 state governors and 50 state secretaries of state, the current president and vice president, and numerous private actors.  Those purported conspirators, according to Plaintiffs, designed to—and did—end representative government in the United States by implementing a "national ballot box stuffing scheme."  But calling the 2020 federal election the product of a vast conspiracy does not make it so.  Nor does it plausibly "show" that it was.

3.       While the implausibility of Plaintiffs' suit warrants dismissal under the federal pleading rules, deep jurisdictional flaws warrant paying no heed to its merits.  For these reasons, as fully set forth below, the Court should dismiss this action in its entirety and with prejudice.

## BACKGROUND

4.       To their credit, Plaintiffs at least come to this Court acknowledging: (1) that their lawsuit "is unlike any other in history," (Second Am. Compl. ¶ 42); and (2) that just "[d]escribing" it is a "monumentally difficult task," (id. ¶ 50).  Indeed, according to Plaintiffs, they are here to "reestablish the nation that was originally envisioned and framed by their forefathers," (id. ¶ 42), and they seek to do so via a judicial order for "a new federal election for Congress, President, and Vice President" (among other injunctive relief).  (Id. at ¶¶ 299–319; id.

---

[1] Other courts have recognized that the epigram is widely attributed to Lincoln.  See, e.g., Cueto v. Stepp, No. 3:02-CV-00777-JDT, 2005 WL 3448030, at *13 (S.D. Ill. Dec. 15, 2005); BHG, Inc. v. F.A.F., Inc., 784 A.2d 884, 887 n.1 (R.I. 2001).

at p. 95 (prayers "a" and "b")).  They also demand damages.  (Id. at p. 95 (prayers "d" and "e")).  As grounds for these requests, they insist the following.

5.      Between 2014 and 2019, leaders of the Democratic National Committee and the Republican National Committee "met in a series of meetings" during which they formed a "covert[ ]" enterprise for purposes of "install[ing] a socialist form of government" so they could secure a "monopoly on government" and "access to the unending of wealth afforded by their political corruption."  (Id. ¶¶ 51, 66–70, 72, 74).  To achieve these goals, it is said the leaders "agreed" to "execute . . . many fraud and racketeering schemes" moving forward.  (Id. ¶ 72).

6.      As step one of that grand scheme, "senior leaders" of the so-called covert enterprise "direct[ed]" the DNC to "engage[] in broad acts of ballot box stuffing nationwide" to forestall Donald J. Trump's election in 2016.  (Id. ¶¶ 85–86, 91).  In their efforts to get their way, those leaders "extorted" and "bribed" officials at the Department of Justice to keep them all quiet.  (Id. ¶¶ 92–93).

7.      Ahead of the 2020 election, the covert enterprise purportedly undertook to "obtain information from experts and witnesses on how to conduct a fraudulent ballot process" by introducing the Securing Federal Elections Act in Congress.   (Id. ¶ 101).  According to Plaintiffs, although the proposed legislation "g[a]ve the appear[ance] that election integrity [was] a priority," its real purpose was "to obtain expert testimony on vulnerabilities in election integrity" so the covert enterprise could "pass it on" to state operatives.  (Id. ¶ 106).  Thus, the covert enterprise ultimately "kill[ed]" the legislation in order "to suppress the known lack of integrity and vulnerabilities in the process and administration of Federal Elections."  (Id. ¶ 109).

8.      Based on what it had learned during the legislative process—namely that "mail-in ballots were highly predisposed to fraudulent submission"—the covert enterprise next "decided

to utilize the Covid 19 virus" as justification for implementing a "national ballot box stuffing scheme." (Id. ¶¶ 113, 172).  To do so, it began disseminating "a false narrative that 'COVID-19' presented a[n] 'unprecedented need' to make changes to the 2020 Federal Elections and that mail-in voting would be safe and secure . . . ." (Id. ¶ 117).

9.      In furtherance of its purported mission to make the 2020 election "inherently unsecure and susceptible to [its] ballot-box stuffing scheme," the covert enterprise proceeded to "direct[]" the governors of all fifty states to "cause their respective state's election procedures to fail to conform" with certain provisions of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. §§ 20901–21145, and the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. §§ 20701–20702, by issuing "executive orders or by agreeing to 'look the other way.'" (Id. ¶¶ 155, 157, 159–160, 164, 167).  As a result of "bribes" or "extortion" from the covert enterprise, Plaintiffs purport that all of the governors made "false statements" about their respective state's authority to regulate its own elections.  (Id. ¶¶ 161–163).  Also at the behest of the covert enterprise, all state governors and secretaries of state purportedly "eliminat[ed] the ability to conduct any meaningful audit" of the election by "implement[ing] records retention policies" that did not comply with the CRA.  (Id. ¶¶ 174–178).  The covert enterprise apparently achieved compliance with its directives "in exchange for benefits in support [of] future campaigns for public office and/or in the face of threat to expose damaging information about them publicly." (Id. ¶ 155).

10.      Relying on the foregoing, Plaintiffs insist that every state governor and secretary of state conspired with the covert enterprise and its associates to "deprive the People of the United States of the republican form of government guaranteed in the Constitution . . . ." (Id. ¶ 179).  Based on such insistence, Plaintiffs attempt to set forth conspiracy-based civil rights

claims against Defendants pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as well as a racketeering claim pursuant to 18 U.S.C. § 1964(c).

## ARGUMENT

11.    Dismissal of this action is warranted on numerous grounds.  First, Plaintiffs' suit is not within the Court's subject matter jurisdiction.  Alternatively, Plaintiffs' suit does not supply any basis for this Court to exercise personal jurisdiction over the NH Defendants.  Alternatively still, Plaintiffs have failed to state a claim against the NH Defendants.

### I.    Rule 12(b)(1) – No Subject-Matter Jurisdiction

12.    "[T]he judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies,'" Flast v. Cohen, 392 U.S. 83, 94 (1968), and "determining the power of the court to entertain the suit" is therefore "the threshold question in every federal case," Warth v. Seldin, 422 U.S. 490, 498 (1975).  The Court's power to entertain a lawsuit is limited by the United States Constitution and by doctrines of justiciability that the federal judiciary has developed to safeguard its constitutional authority.  Under both limitations, Plaintiffs' suit is barred.

### a.    *Plaintiffs lack constitutional standing.*

13.    "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  Clapper v. Amnesty Intern. USA, 568 U.S. 398, 408 (2013).  To guard against such usurpation, the Constitution requires a party seeking to invoke the federal judiciary's jurisdiction to establish that the party: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

14.     The constitutional baseline of an "injury in fact" is "an invasion of a legally protected interest." Id. at 1548.  The invasion of that interest must be "concrete," "particularized," and "actual or imminent." Clapper, 568 U.S. at 409.  Plaintiffs' suit does not implicate a judicially redressable invasion of their legal interests because it is not based on any invasion of privately enforceable legal rights.

15.     Relying on Article IV, Section 4 of the Constitution (the "Guarantee Clause"), the gravamen of Plaintiffs' complaint is that Defendants have conspired to invade their interest in a republican form of federal government.  (See Second Am. Compl. ¶¶ 42–46, 50, 177–179, 302).  But the Guarantee Clause concerns the form of state governments, not the federal government (the form of which is expressly preserved in Articles I, II, and III of the Constitution).

16.     The Guarantee Clause provides: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against invasion, and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence." U.S. CONST. art. IV, § 4 (underline added).  By its plain language, it thus operates as a guarantee to the people of each state that, to the extent their own state's government ceases to operate in a "republican form," the federal government will intervene to restore such form.  Consistent with what the Guarantee Clause says, Alexander Hamilton explained its meaning to the people of New York in The Federalist:

> Without a guaranty the assistance to be derived from the Union in repelling those domestic dangers which may sometimes threaten the existence of the State constitutions, must be renounced.  Usurpation may rear its crest in each State, and trample upon the liberties of the people, while the national government could legally do nothing more than behold its encroachments with indignation and regret. A successful faction may erect a tyranny on the ruins of order and law, while no succor could constitutionally be afforded by the Union to the friends and supporters of the government.  The tempestuous situation from which Massachusetts has emerged, evinces that dangers of this kind are not merely speculative.  Who can determine what might have been the issue of her late convulsions, if the malcontents

had been headed by a Caesar or by a Cromwell?  Who can predict what effect a despotism, established in Massachusetts, would have upon the liberties of New Hampshire or Rhode Island, of Connecticut or New York?

The Federalist, No. 21 [Other Defects of the Present Confederation].

17.     The Supreme Court has thus rejected application of the Guarantee Clause to "a controversy affecting the structure of the national government as established by the provisions of the national Constitution." Highland Farms Dairy v. Agnew, 300 U.S. 608, 612 (1937).

18.     Aside from Plaintiffs' apparent misunderstanding of what the Guarantee Clause guarantees, it is also beyond dispute that the Guarantee Clause does not give rise to legally protected interests redressable by the judiciary.  See Baker v. Carr, 369 U.S. 186, 297 (1962) (describing the "Guarantee Clause cases" as "non-justiciable"); Highland Farms Dairy, 300 U.S. at 612 (explaining that "the enforcement of that guarantee, according to settled doctrine, is for Congress, not the courts"); State of Ohio ex rel. Bryant v. Akron Metropolitan Park Dist. for Summit County, 281 U.S. 74, 79–80 (1930) ("As to the guaranty to every state of a republican form of government . . . it is well settled that the questions arising under it are political, not judicial, in character, and thus are for the consideration of the Congress and not the courts."); Pacific States Telephone & Telegraph Co. v. State of Oregon, 223 U.S. 118, 149 (1912) ("It was long ago settled that the enforcement of this guaranty belonged to the political department.").

19.     For these reasons, Plaintiffs hold no legally redressable interests subject to invasion and injury under the Guarantee Clause.  They fare no better under the federal statutes they rely on.

20.     As the basis for their claim that all Defendants have deprived them of a republican form of government, Plaintiffs insist that Defendants violated various provisions of HAVA and

the CRA.  (See Second Am. Compl. ¶ 62).  But Plaintiffs lack privately enforceable legal

interests under the statutory provisions they rely on as well.

21.     HAVA, for one, does not confer private legal interests subject to judicial

redressability.  As the United States District Court for the Eastern District of Texas recently

explained: "Simply by its terms, HAVA does not create a private right of action."  Texas Voters

Alliance v. Dallas County, 495 F. Supp. 3d 441, 459 (E.D. Tex. 2020).  It continued:

> The Court is not the first to arrive at this conclusion.  Several courts of appeals have
> also held that HAVA does not create a private cause of action.  See Bellitto v.
> Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Congress established only two
> HAVA enforcement mechanisms.");  Am. Civ. Rts. Union v. Phila. City Comm'rs,
> 872 F.3d 175, 184–85 (3d Cir. 2017) ("The HAVA does not include a private right
> of enforcement.  By its text, HAVA only allows enforcement via attorney general
> suits or administrative complaint.");  Sandusky Cnty. Democratic Party v.
> Blackwell, 387 F.3d 565, 572 (6th Cir. 2004) ("HAVA does not itself create a
> private right of action.").  The Fifth Circuit found the same in an unpublished
> opinion.  See Morales-Garza v. Lorenzo-Giguere, 277 F. App'x 444, 446 (5th Cir.
> 2008).  Moreover, the Supreme Court has even held that private litigants are 'not
> sufficiently likely to prevail on the question as to whether Congress has authorized'
> district courts to enforce HAVA when the plaintiffs are private litigants.  Brunner
> v. Ohio Republican Party, 555 U.S. 5, 6 [ ] (2008) (per curiam).  Taking these
> authorities together, it is clear that HAVA does not expressly confer a private cause
> of action for enforcement purposes.

Id. (internal ellipsis and brackets omitted); accord Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th

Cir. 2019) ("The [American Civil Rights Union] does not – and indeed could not reasonably –

argue that Congress intended to create a private right of action in HAVA.").

22.     Like HAVA, the CRA provisions Plaintiffs rely on are not privately enforceable

legal interests redressable by the federal judiciary.  While CRA Section 20701 creates an

obligation of election officers to "retain and preserve" certain election-related records and

papers, 52 U.S.C. § 20701, Congress provided a very limited and particularized enforcement

mechanism for this statutory obligation.  Specifically, Congress authorized the Attorney General

to demand such records and papers be made available to the Attorney General, 52 U.S.C. §

20703, and it granted "[t]he United States district court for the district in which a demand is made" limited jurisdiction "by appropriate process to compel the production of such record or paper," 52 U.S.C. § 20705.  It further provided that violations of Sections 20701 and 20702 are subject to punishment by fine or imprisonment (and it expressed nothing with respect to enforceability via a civil action).  52 U.S.C. §§ 20701–20702.

23.     This highly specialized enforcement mechanism, coupled with the absence of an express authorization of a private right of action by Congress, leaves Plaintiffs without a judicially redressable private legal interest under the CRA provisions they insist Defendants violated.  See Gonzaga University v. Doe, 536 U.S. 273, 284 (2002) (explaining that "a plaintiff suing under an implied right of action still must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*") (internal quotation omitted; italics in original); Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.") (internal quotation omitted).  Indeed, as the Fifth Circuit has previously explained, the duties and procedures set forth in CRA Sections 20701–20706 are related to "a special statutory proceeding in which the courts play a limited, albeit vital, role," with only "narrowly confined issues open for judicial review or ascertainment."  Kennedy v. Lynd, 306 F.2d 222, 225, 227 (5th Cir. 1962).  The Kennedy Court thus made clear: "[T]his is not, we repeat, the ordinary civil action."  Id. at 225.

24.     For all these reasons, Plaintiffs have not suffered any judicially redressable invasion of private legal interests and therefore do not present this Court with a "case" or

"controversy" within the meaning of Article III.[2]  Accordingly, the Court should dismiss this action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

> **b.** ***Plaintiffs' suit is otherwise non-justiciable under prudential standing rules.***

25.     "Apart from [the] minimum constitutional mandate, [the Supreme Court] has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers."  Warth, 422 U.S at 499.  Although these "prudential rules of standing" are "closely related to Art. III concerns," they are "essentially matters of judicial self-governance" that "serve to limit the role of the courts in resolving public disputes."  Id. at 500.

26.     One such prudential rule applies to suits that are based on a "generalized grievance": "[W]hen the asserted harm is a 'generalized grievance,' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."  Id. at 499.  A closely related rule applies to suits involving "political questions"— i.e., "where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."  Nixon v. United States, 506 U.S. 224, 228 (1993).  Both rules apply here.

27.     ***Generalized Grievance.***  Plaintiffs assert that they have filed this suit to "win back their right to a constitutional republican form of government" and to "reestablish the nation that was originally envisioned and framed by their forefathers . . . ."  (Second Am. Compl. ¶ 42).  They likewise state that they are seeking to "preserve our 'Republican Form of Government' and the 'democratic society' on which it stands."  (Id. ¶ 46).  Accordingly, in Plaintiffs' words, they

---

[2] Additionally, for the reasons explained below in Section III with respect to Plaintiffs' failure to plead facially plausible claims against the NH Defendants, Plaintiffs have likewise failed to show for purposes of standing that the injuries they insist on are "fairly traceable" to the NH Defendants.  See Spokeo, 136 S. Ct. at 1547.

are pursuing this action on behalf of the "American People," generally.  (<u>Id</u>. ¶ 43; <u>accord</u> <u>id</u>. ¶ 50 (describing their cause of action as one involving "Americans"; <u>id</u>. ¶ 60 (referring to their suit as one for "common, everyday Americans"); <u>id</u>. ¶ 61 (stating that "[i]t is time . . . for the People to rule themselves once again"); <u>id</u>. ¶ 157 (asserting that "the entire process as to all federal ballots was unlawful"); <u>id</u>. ¶ 179 (stating that Defendants, generally, acted with the purpose "to deprive the people of the United States of the republican form of government guaranteed in the Constitution," and acknowledging that Plaintiffs are merely "among those people").

      28.     As all citizens share an interest in preserving a constitutional form of government, Plaintiffs' complaint that such form has been abdicated (and that the Court should order a remedy) amounts to a textbook generalized grievance.  Cf. <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 706 (2013) ("A litigant raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); <u>Schlesinger v. Reservists Committee to Stop the War</u>, 418 U.S. 208, 217 (1974) ("Respondents seek to have the Judicial Branch compel the Executive Branch to act in conformity with the Incompatibility Clause, an interest shared by all citizens. . . .  [T]hat claimed nonobservance . . . would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury."); <u>cf</u>. <u>also</u> <u>American Civil Rights Union v. Martinez-Rivera</u>, 166 F. Supp. 3d 779, 803 (W.D. Tex. 2015) (recognizing that "all citizens in general want to participate in an electoral system where only lawfully cast ballots count" but that "complaints of undermined confidence and potential vote dilution are nothing but a generalized grievance about government, complaining that an official should be required to follow the law").

29.     *Political Question.*  As already discussed, lawsuits like this one that challenge the form of government raise political questions, not judicially resolvable ones.  See Baker, 369 U.S. at 297; Highland Farms Dairy, 300 U.S. at 612; Akron Metropolitan Park, 281 U.S. at 79–80; Pacific States Telephone, 223 U.S. at 149.

30.     For these reasons, independent of their failure to invoke this Court's jurisdiction with a constitutional "case" or "controversy," Plaintiffs also implore the Court to set aside deeply rooted principles of judicial prudence because President Biden has issued a "slew of executive orders . . . Russia and ISIS are licking their chops . . . [a]n amnesty bill is now imminent which will all but erase our borders, and legislation and executive orders are already in the works to deprive Americans of their Second Amendment right to defend themselves as times get more desperate." (Second Am. Compl. ¶ 310).  But "[t]he powers of the federal judiciary will be adequate for the great burdens placed upon them only if they are employed prudently, with recognition of the strengths as well as the hazards that go with our kind of representative government." Schlesinger, 418 U.S. at 222 (quotation omitted).

31.     Accordingly, the NH Defendants respectfully suggest that the Court should dismiss this action, in its entirety, as to all Defendants and not only themselves.[3]

## II.    Rule 12(b)(2) – No Personal Jurisdiction

32.     "A federal court may exercise personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009).  Although "the Texas

---

[3] To the extent any defendant wishes to join Section I of this motion or to otherwise adopt it by reference, the NH Defendants have no objection.

long-arm statute extends as far as constitutional due process allows," id., due process does not

allow Plaintiffs to hale the NH Defendants into Texas to answer their complaint.

33.    "The relevant standard for due process is rote: The plaintiff must show that (1) the

defendant purposefully availed himself of the benefits and protections of the forum state by

establishing 'minimum contacts' with the forum state, and (2) the exercise of personal

jurisdiction over that defendant does not offend traditional notions of 'fair play and substantial

justice.'" Id. (internal quotation omitted).

34.    Plaintiffs have not alleged facts showing that the NH Defendants have had any

contacts with Texas, let alone sufficiently minimal ones.  Instead, they assert that all Defendants

have "sufficient minimum contacts with the United States" for haling them here to answer

Plaintiffs' Racketeering Influenced and Corrupt Organizations Act ("RICO") claim.  (Second

Am. Compl. ¶ 38).  In relying solely on contacts with the "United States" as the basis for

personal jurisdiction in this case, Plaintiffs actually appear to affirmatively concede that the NH

Defendants do not have any relevant contacts with this forum.

35.    Nevertheless, Plaintiffs maintain that personal jurisdiction exists as to all

Defendants pursuant to RICO Section 1965, (id.), which authorizes the Court to summon a party

in a RICO action from "any judicial district of the United States . . . ."  18 U.S.C. § 1965(b); see

Busch v. Buchman, Buchman & O'Brien, Law Firm, 11 F.3d 1255, 1258 (5th Cir. 1994)

("[W]hen a federal court is attempting to exercise personal jurisdiction over a defendant in a suit

based upon a federal statute providing for nationwide service of process, the relevant inquiry is

whether the defendant has had minimum contacts with the United States.").  They are wrong.

36.    RICO Section 1965 authorizes extra-jurisdictional service only when "it is shown

that the ends of justice require" it.  18 U.S.C. § 1965(b).  As fully explained in Section III(e)

below, Plaintiffs have fallen woefully short of stating a facially plausible RICO claim against the NH Defendants.  As such, Plaintiffs have likewise failed to show that the ends of justice require bringing them before this Court.  Accordingly, Plaintiffs' attempt to conscript RICO as a vehicle for conjuring up personal jurisdiction that would not otherwise exist is futile, at best.

37.     For these reasons, Plaintiffs have asserted no lawful or factual basis for haling the NH Defendants before this Court and the claims against them should thus be dismissed.

## III.     <u>Rule 12(b)(6) – Failure to State a Claim Upon Which Relief May be Granted</u>

38.     Plaintiffs' suit against the NH Defendants would be futile even if it did not suffer from the foregoing jurisdictional flaws because it also fails to state a claim against them.

39.     "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  To state a plausible claim, a complaint must "show[]"—not merely "allege"—that the plaintiff is entitled to relief.  <u>Id</u>. at 678–679 (quoting Rule 8(a)(2)).  Such a showing requires more than merely "labels," "conclusions," or "naked assertions" that are "devoid of further factual enhancement."  <u>Id</u>. at 678.  Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id</u>.  Moreover, the well-pleaded factual allegations themselves "must be enough to raise a right to relief above a speculative level."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007).  Whether a complaint's well-pleaded facts state a plausible claim is ultimately a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense."  <u>Iqbal</u>, 556 U.S. at 679.

40.     Plaintiffs rely on 42 U.S.C. §§ 1983, 1985, and 1986 as vehicles for their

constitutional claims, and they bring their racketeering claim pursuant to 18 U.S.C. § 1964(c).

For the following reasons, each count asserted fails to state a claim against the NH Defendants.[4]

      **a.** ***Count I – Section 1983 (Republican Government & Voting Rights)***

41.     In Count I, Plaintiffs insist that defendant "state officials" were "willful

participants in a conspiracy . . . to deprive Plaintiffs" of their constitutional rights to a republican

form of government, due process, and equal protection.  (Id. ¶¶ 203–204).  But Plaintiffs have

failed to show with well-pleaded facts that their insistence on the NH Defendants' involvement

in the purported "conspiracy" is plausible rather than speculative.

42.     For one, Plaintiffs have not pleaded any factual content specific to the NH

Defendants.  Instead, their claim rests entirely on general and conclusory accusations concerning

how all state governors and secretaries of state, as a group, facilitated "unsecure" election

procedures at the "covert enterprise's" direction.  In the absence of specific facts showing that

either of the NH Defendants themselves had an agreement with Defendants to violate the

Constitution, Plaintiffs' claim against them fails.  See Lynch v. Cannatella, 810 F.2d 1363,

1369–1370 (5th Cir. 1987) ("Plaintiffs who assert conspiracy claims under civil rights statutes

must plead the operative facts upon which their claim is based.  Bald allegations that a

conspiracy existed are insufficient.").

43.     The closest Plaintiffs come to asserting anything specific as to the NH Defendants

is in Exhibit 3 to their Second Amended Complaint, where they vaguely indicate that the NH

Defendants (again, just like every other state-level defendant) made "fraudulent" statements

---

[4] Only Counts I–IV and VII are discussed in this section, as Plaintiffs have designated Counts V and VI as "Bivens" claims that are, accordingly, "against federal officials only."  (Second Am. Compl. at pp. 74, 76).

about how COVID-19 was an "unprecedented event that required modification of election laws." (Id., Ex. 3 at 6 (referring to ¶¶ 125(a) and (b) of the Second Amended Complaint)).  To the extent this amounts to a specific factual allegation against the NH Defendants, it does not approach the plausibility threshold on a conspiracy-based claim.  Plaintiffs' assertion that such statements were "fraudulent" is a naked legal conclusion, not a well-pleaded fact.  And the purported "statements" about modifying election procedures in response to COVID-19 are "just as much in line with a wide swath of rational" policy-based decisions related to public health and voting access as they are with any conspiracy to put an end to republican government in the United States.  Twombly, 550 U.S. at 554.

44.     As the Supreme Court explained in Twombly:

[L]awful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a [conspiracy] claim [under the Sherman Antitrust Act], they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

Id. at 556 (underline added).

45.     Consistent with this Court's own judicial experience, see **Exhibit A** (the Court's "Ninth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic," in effect at the time of the 2020 election), common sense dictates that the NH Defendants' purported statements could just as well have been independent action as opposed to the product of an agreement to upend the Constitution for personal gain. For these reasons, Count I is not based on a facially plausible claim and should be dismissed.

**b.** *Count II – Section 1983 (First Amendment)*

46.     In Count II, Plaintiffs assert that "Defendants," generally, interfered with Plaintiffs' freedom of expression in violation of their rights under the First Amendment. (Second Am. Compl. ¶¶ 212–213).  But they state no well-pleaded facts specific to the NH Defendants in support of this claim.  A claim is only facially plausible against a particular defendant "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that <u>the defendant</u> is liable for the misconduct alleged."  <u>Iqbal</u>, 556 U.S. at 678.  Count II does not contain such factual content as to the NH Defendants, so it should be dismissed.

**c.** *Count III – Section 1985*

47.     In Count III, Plaintiffs claim that "Defendants," generally, "conspired together" to interfere with their constitutional rights to a republican form government, due process, equal protection, and free expression.  (Second Am. Compl. ¶¶ 220–222).  For the same reasons that Counts I and II fail, Count III's conspiracy claim also fails the facial plausibility standard as to the NH Defendants and should be dismissed.

**d.** *Count IV – Section 1986*

48.     In Count IV, Plaintiffs seek relief against "Defendants," generally, on the basis that they violated Section 1986 by neglecting or refusing to prevent the purported conspiracy. (<u>Id</u>. ¶ 229).  Once again though, they have not pleaded factual content specific to the NH Defendants in support of this claim and it should therefore be dismissed.

**e.** *Count VII – Section 1964(c) (RICO)*

49.     In Count VII, Plaintiffs request relief pursuant to 18 U.S.C. § 1964(c) on the grounds that "Defendants," generally again, violated 18 U.S.C. § 1962(c) because they "agreed to and did conduct and participate in the conduct of the [covert] enterprise's affairs through a

pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs

and depriving them of their constitutional rights."  (Id. ¶ 253).   This claim also fails due to its

complete lack of specificity with respect to the NH Defendants.

50.     Under RICO, it is "unlawful for any person employed by or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  A private

cause of action is available to "[a]ny person injured in his business or property by reason of

violation of section 1962 of this chapter."  18 U.S.C. § 1964(c).

51.     RICO claims are subject to the heightened pleading standard prescribed by Rule

9(b).  See Old Time Enterprises, Inc. v. International Coffee Corp., 862 F.2d 1213, 1217–1220

(5th Cir. 1989) (affirming district court's application of Rule 9(b) to plaintiff's RICO claim);

accord Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007)

("Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an

increased level of specificity.") (citing, inter alia, Rule 9(b)); Midwest Grinding Co., Inc. v.

Spitz, 976 F.2d 1016, 1020 (7th Cir. 1992) (explaining that "Rule 9(b) requires that a RICO

plaintiff . . . must, at a minimum, describe the predicate acts with some specificity and state the

time, place, and content of the alleged communications perpetrating the fraud") (internal

quotation omitted); Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir. 1991) (same)

52.     Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  "At a

minimum, Rule 9(b) requires allegations of the particulars of 'time, place, and contents of the

false representations, as well as the identity of the person making the misrepresentation and what

he obtained thereby." Tel-Phonic Services, Inc. v. TBS Intern., Inc., 975 F.2d 1134, 1139 (5th Cir. 1992). As already explained, the Second Amended Complaint is devoid of any such particulars with respect to the NH Defendants. Instead, Plaintiffs rest their claim on vague allegations concerning state governors and secretaries of state, as a group.

53.     Under Twombly and Iqbal, the vagueness of those generalized allegations alone is a sufficient basis for dismissal. Cf., e.g., Foval v. First Nat. Bank of Commerce of New Orleans, Civ. A. No. 86-1361, 1986 WL 12984, at *1 (E.D. La. Nov. 6, 1986) (unreported minute entry) ("Global allegations that defendants constitute an amorphous enterprise, based only upon vague allegations of general fraud, cannot establish a RICO claim.").

54.     But Plaintiffs' failure to state particularized allegations specific to the NH Defendants is fatal to their claim in-and-of-itself. Cf., e.g., Leon v. Continental AG, 301 F. Supp. 3d 1203, 1232 (S.D. Fl. 2017) (explaining that "[e]xamples of dispositive deficiencies with the plaintiff's [RICO] allegations included failure to discuss the nature of each defendant's participation in the scheme" and "failure to discuss each alleged statement, document or misrepresentation made with the proper level of precision"); McMullan v. Cook, No. 96-30188, 1997 WL 114880, at * 1 (5th Cir. Feb. 17, 1997) (unreported per curiam opinion) (ruling that plaintiffs failed to state a RICO claim where "[e]ven assuming they have stated the requisite predicate acts, their vague and conclusory allegations make it impossible to determine which RICO defendants engaged in which pattern of racketeering connected to the acquisition, establishment, conduct, or control of which enterprise"); Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1381 (11th Cir. 1997) (ruling that RICO claim was subject to dismissal where the complaint "simply lumped together all of the [d]efendants in their

allegations of fraud" and was "devoid of specific allegations with respect to the separate [d]efendants").

55.     For these reasons, Plaintiffs' RICO claim against the NH Defendants is not facially plausible and should therefore be dismissed.

## CONCLUSION

56.     The Supreme Court has warned about the great dangers of "open[ing] the Judiciary to an arguable charge of providing government by injunction." Schlesinger, 418 U.S. at 222.  Plaintiffs, though, seek exactly such government here.  Disturbingly, they do so on no more than the barest of conclusory assertions against each and every member of Congress and each and every state governor and secretary of state, among many others.  In these respects, their suit is nothing short of an abuse of the judicial process.  That abuse is further evidenced by Plaintiffs' failure to invoke both the subject matter jurisdiction of this Court and the Court's personal jurisdiction over the NH Defendants.  For all of these reasons, the Court should dismiss this action in its entirety, with prejudice.

Respectfully Submitted,

JOHN M. FORMELLA,
NEW HAMPSHIRE ATTORNEY GENERAL

By:     /s/ Jennifer Ramsey
         Jennifer S. Ramsey
         Texas Bar #16519300
         New Hampshire Bar #268964
         Assistant Attorney General (Civil Bureau)
         Department of Justice
         33 Capitol Street
         Concord, NH 03301
         (603) 271-3650
         jennifer.ramsey@doj.nh.gov

[*Certificate of service to follow*]

20

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing motion is being served upon all parties of record or their counsel, via the Court's electronic filing system, on this the 24th day of June, 2021.

/s/ Jennifer Ramsey
Jennifer S. Ramsey